2013-1177

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

SINCLAIR-ALLISON, INC.,

*Plaintiff-Appellant,*

v.

FIFTH AVENUE PHYSICIAN SERVICES, LLC,

FIFTH AVENUE AGENCY, INC.,

PRIMORIS CREDENTIALING NETWORK,

AND PROFILE VERIFICATION SERVICES,

*Defendants-Appellees.*

Appeal from the United States District Court for the Western District of Oklahoma in Case No. 12-CV-0360, Judge Vicki Miles-LaGrange

## JOINT APPENDIX

Nathan B. Webb
Daniel A. Thomson
Emerson Thomson Bennett
1914 Akron-Peninsula Road
Akron, OH 44313
(330) 434-9999
*Attorneys for Plaintiff-Appellant*

John A. Kenney
McAfee & Taft
Two Leadership Square, 10th Floor
211 North Robinson
Oklahoma City, OK 73102
(405) 235-9621
john.kenney@mcafeetaft.com
*Attorney for Defendants-Appellees*

# TABLE OF CONTENTS

Page(s)

1. District Court Judgment ..................................................................... 1

2. District Court Order granting Motion to Dismiss ............................. 2-9

3. Docket Entries ............................................................................ 10-14

4. Patent 6,862,571 ........................................................................ 15-21

5. Patent 7,469,214 ........................................................................ 22-26

6. Complaint ................................................................................... 27-82

7. Defendants' Motion to Dismiss ................................................... 83-97

8. Plaintiff's Response to Defendants' Motion to Dismiss .............. 106-07, 109-19

9. Defendants' Motion for Protective Order and accompanying
   Declarations ............................................................. 502-03, 513, 517

# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SINCLAIR-ALLISON, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )      Case No. CIV-12-360-M |
| | ) |
| FIFTH AVENUE PHYSICIAN | ) |
| SERVICES, LLC; | ) |
| FIFTH AVENUE AGENCY, INC.; | ) |
| PRIMORIS CREDENTIALING | ) |
| NETWORK; and | ) |
| PROFILE VERIFICATION SERVICES, | ) |
| | ) |
| Defendants. | ) |

## **JUDGMENT**

Pursuant to a separate order issued this same date, this action is hereby dismissed.

**ENTERED at Oklahoma City, Oklahoma this 19th day of December, 2012.**

VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

SINCLAIR-ALLISON, INC.,              )
                                     )
                    Plaintiff,       )
                                     )
vs.                                  )        Case No. CIV-12-360-M
                                     )
FIFTH AVENUE PHYSICIAN               )
SERVICES, LLC;                       )
FIFTH AVENUE AGENCY, INC.;           )
PRIMORIS CREDENTIALING               )
NETWORK; and                         )
PROFILE VERIFICATION SERVICES,       )
                                     )
                    Defendants.      )

## ORDER

Before the Court is defendants' Motion to Dismiss, filed June 4, 2012.  On June 25, 2012, plaintiff filed its response, and on July 2, 2012, defendants filed their reply.  On August 2, 2012, plaintiff filed a Supplemental Brief in Response to Defendants' Motion to Dismiss, and on August 9, 2012, defendants filed their response to plaintiff's supplemental brief.[1]

I.      Introduction

Plaintiff brings this action for patent infringement against defendants.  Specifically, plaintiff alleges that defendants have infringed U.S. Patent Number 6,862,571 ("Patent '571") and U.S. Patent Number 7,469,214 ("Patent '214").  Broadly speaking, Patent '571 includes patented processes, and apparatuses, for compiling healthcare professional credentialing information and transferring said information to an application for medical malpractice insurance.  Broadly speaking,

---

[1]Plaintiff submitted its supplemental brief to address the applicability of the Federal Circuit's decision in *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, _____ F.3d _____, No. 2011-1301, 2012 WL 2708400 (Fed. Cir. July 9, 2012).  On October 9, 2012, the Federal Circuit issued an order granting a petition for rehearing en banc in the *CLS Bank* case and vacating its July 9, 2012 opinion.  *See CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, No. 2011-1301, 2012 WL 4784336 (Fed. Cir. Oct. 9, 2012).

Patent '214 includes a patented method for ensuring current information for liability insurance underwriting, wherein associated credentialing information may be updated and analyzed to determine if a policy should be underwritten or renewed.

Defendants have moved this Court to dismiss this action, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted. Specifically, defendants contend that the business method sought to be patented in Patent '571 and Patent '214 is an unpatentable abstract idea and, therefore, the patents are unenforceable and invalid as a matter of law.

II.    Discussion

Section 101 of the Patent Act provides:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101. The United States Supreme Court has set forth three specific exceptions to § 101's broad patent-eligibility principles: "laws of nature, physical phenomena, and abstract ideas." *Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010) ("*Bilski II*"). Therefore, generally, "any invention within the broad statutory categories of § 101 that is made by man, not directed to a law of nature or physical phenomenon, and not so manifestly abstract as to preempt a fundamental concept or idea is patent eligible." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1331 (Fed. Cir. 2012). Additionally, "for abstractness to invalidate a claim it must exhibit itself so manifestly as to override the broad statutory categories of eligible subject matter and the statutory context that directs primary attention on the patentability criteria of the rest of the Patent Act." *Id.* at 1333 (internal quotation and citation omitted).

Whether asserted patent claims are invalid for failure to claim statutory subject matter under § 101 is a question of law. *See In re Comiskey*, 554 F.3d 967, 975 (Fed. Cir. 2009). However, "determination of this question may require findings of underlying facts specific to the particular subject matter and its mode of claiming." *Arrhythmia Research Tech. Inc. v. Corazonix Corp.*, 958 F.2d 1053, 1056 (Fed. Cir. 1992). Therefore, because a patent is presumed to be valid pursuant to 35 U.S.C. § 282, a party must prove the factual elements of ineligibility by clear and convincing evidence. *See Island Intellectual Prop. LLC v. Deutsche Bank AG*, No. 09 Civ. 2675 (KBF), 2012 WL 386282, at *2 (S.D.N.Y. Feb. 6, 2012); *Voter Verified, Inc. v. Election Sys. & Software, Inc.*, 745 F. Supp. 2d 1237, 1251 (M.D. Fla. 2010) ("A patent is presumed valid, and [defendant] bears the burden to prove the factual elements of invalidity under 35 U.S.C. § 101 . . . by clear and convincing evidence.").

Further, there is no requirement that claims construction be completed before examining patentability. *See Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada*, 771 F. Supp. 2d 1054, 1059 (E.D. Mo. 2011) (addressing defendant's § 101 arguments before proceeding with claims construction); *Fuzzysharp Techs., Inc. v. 3D Labs Inc., Ltd.*, No. C07-5948-SBA, 2009 WL 4899215, at *2, n.1 (N.D. Cal. Dec. 11, 2009) (declining to complete claims construction before ruling on validity, but indicating that patent holder's construction would be utilized if necessary). Having carefully reviewed the parties' submissions, the Court finds no need to formally construe any of the claims prior to ruling on the issue of validity. Plaintiff's claims construction will be utilized if necessary.

Finally, in *Bilski II*, the Supreme Court held that the "machine-or-transformation test" is not the sole test for deciding whether an invention is a patent-eligible process but "is a useful and

important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101." *Bilski II*, 130 S. Ct. at 3227. The Supreme Court further held that its precedents on the unpatentability of abstract ideas provide useful tools in determining the validity of business process patents. *Id*. at 3229.[2]

The question before the Court in the instant action is whether the patents at issue claim protection for a patentable process or for an abstract idea. In making this determination, the Court will first consider whether the claims satisfy the machine-or-transformation test and then will apply *Bilski II* and examine whether what is claimed is an abstract idea under *Benson*, *Flook*, and *Diehr*.

A.    Machine-Or-Transformation Test

Under the machine-or-transformation test, a claimed process is patent-eligible under § 101 if: (1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing. *See Bilski II*, 130 S. Ct. at 3224. Further, "the recited machine or transformation must not constitute mere 'insignificant postsolution activity.'" *In re Bilski*, 545 F.3d 943, 957 (Fed. Cir. 2008) (citing *Flook*, 437 U.S. at 590). Defendants assert that Patent '571 and Patent '241 fail to satisfy the machine-or-transformation test. Plaintiff, on the other hand, contends that Patent '571 and Patent '241 pass the machine-or-transformation test.

1.    Machine

The Federal Circuit has found:

> to impart patent-eligibility to an otherwise unpatentable process
> under the theory that the process is linked to a machine, the use of the
> machine must impose meaningful limits on the claim's scope. In

---

[2]The Supreme Court specifically references the following prior decisions: *Gottschalk v. Benson*, 409 U.S. 63 (1972); *Parker v. Flook*, 437 U.S. 584 (1978); and *Diamond v. Diehr*, 450 U.S. 175 (1981).

> other words, the machine must play a significant part in permitting the claimed method to be performed. . . . the basic character of a process claim drawn to an abstract idea is not changed by claiming only its performance by computers, or by claiming the process embodied in program instructions on a computer readable medium. Thus, merely claiming a software implementation of a purely mental process that could otherwise be performed without the use of a computer does not satisfy the machine prong of the machine-or-transformation test.

*Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011). The Federal Circuit has further found:

> In order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations.

*Dealertrack*, 674 F.3d at 1333 (internal quotations and citation omitted). Further, the salient question is not whether the claims are tied to *a* machine but whether the claims are tied to *a particular* machine. *See Fuzzysharp*, 2009 WL 4899215, at *4.

Plaintiff asserts that the claimed processes include limitations that meaningfully limit the claim scope to only those credentialing and medical malpractice collaborations that utilize electronic forwarding and transferring (Patent '571) and a computer network (Patent '214). Having carefully reviewed the patent claims, the Court finds that Patent '571 and Patent '214 are not tied to a particular machine. Specifically, construing the terms "electronic forwarding and transferring" and "computer network" in the light most favorable to plaintiff, the Court finds that the patent claims are not tied to a particular machine. Electronic forwarding and transferring can be accomplished by a number of machines, including a computer or a fax machine; however, the patent claims do not provide any specifics as to which machine is to be used and/or how that machine is to be

programmed to perform the steps claimed in the patents. Additionally, the term "computer network" is not tied to any *particular* computer network; the claim in Patent '214 simply references "a computer network." The computer network referenced is nothing more than a general computer network that has been programmed in some unspecified manner. The patent claims contain no indication that the computers, or other devices required to implement the methods, are specifically programmed, and the claims make no mention of any specific hardware, let alone software or specifically programmed hardware.

Further, the Court finds the terms "electronic forwarding and transferring" and "computer network" do not impose any meaningful limit on the scope of the claims nor do they play a significant part in permitting the claimed method to be performed but rather simply function as an obvious mechanism for permitting the process to be achieved more quickly and efficiently. The patent claims in the case at bar are entirely unlike patent claims in other cases where, as a practical matter, the use of a computer is required to perform the claimed method. The patents clearly recognize this as it is stated in the preferred embodiment section of Patent '571 and Patent '214 that "this invention is not limited to the preferred embodiment, and can be accomplished without the use of computers or electronic means. The methods of transferring information manually, or by way of a hybrid combination of manual and electronic transference, are both encompassed by this invention." Patent '571, Col. 5, ln. 18-23; Patent '214, Col. 5, ln. 43-48.

2.    Transformation

"A claimed process is patent-eligible if it transforms an article into a different state or thing. This transformation must be central to the purpose of the claimed process." *Bilski*, 545 F.3d at 962. Further,

> So long as the claimed process is limited to a practical application of a fundamental principle to transform specific data, and the claim is limited to a visual depiction that represents specific physical objects or substances, there is no danger that the scope of the claim would wholly pre-empt all uses of the principle.

*Id.* at 963. "The mere manipulation or reorganization of data, however, does not satisfy the transformation prong." *Cybersource*, 654 F.3d at 1375. "Purported transformations or manipulations simply of public or private legal obligations or relationships, business risks, or other such abstractions cannot meet the test because they are not physical objects or substances, and they are not representative of physical objects or substances." *Bilski*, 545 F.3d at 963.

Plaintiff contends that because the central purpose of the patents is to transform a medical healthcare professional's credentialing application into an application for medical malpractice insurance, the transformation test is met. Having carefully reviewed the patent claims, the Court finds that the transformation test is not met. Specifically, the Court finds the processes claimed in Patent '571 and Patent '214 do not transform any article to a different state or thing. The Court finds that the patent claims do not transform the raw data in the credentialing application into anything other than more data in the application for medical malpractice insurance and are not representations of any physically existing objects. Data from the credentialing application is simply transferred, not transformed, to an application for medical malpractice insurance.

B.    Abstract Idea

The Court now considers whether the patent claims are otherwise patentable or are unpatentable abstract ideas. In making this determination, the Court has considered the Supreme Court's precedents regarding abstract ideas as set forth in *Bilski II*. Having carefully reviewed Patent '571 and Patent '214, the Court finds that the claims are invalid as being directed to an

abstract idea preemptive of a fundamental concept or idea that would foreclose innovation in this area. The patent claims simply explain the basic concept of compiling data and recycling it for different purposes. The Court further finds that the steps that constitute the processes do not impose meaningful limits on the claims' scope. Although directed to a particular use (transferring healthcare professional credentialing information to a medical malpractice insurance application), the patents nonetheless cover a broad idea. The notion of compiling data and recycling it for different purposes generally and compiling data and recycling it for the purpose of a medical malpractice insurance application, like the relationship between hedging and hedging in the energy market addressed in *Bilski II*, is of no consequence without more.

III.   Conclusion

For the reasons set forth above, the Court finds that the claims in Patent '571 and Patent '214 are patent ineligible abstract ideas under § 101 and that the patents, therefore, are unenforceable and invalid as a matter of law. The Court, accordingly, GRANTS defendants' Motion to Dismiss [docket no. 18].

**IT IS SO ORDERED this 19th day of December, 2012.**

VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE

# U.S. District Court
## Western District of Oklahoma[LIVE] (Oklahoma City)
## CIVIL DOCKET FOR CASE #: 5:12–cv–00360–M

Sinclair–Allison Inc v. Fifth Avenue Physician Services LLC et al

Assigned to: Honorable Vicki Miles–LaGrange

Case in other court:  United States Court of Appeals for the Federal Cir, 13–01177

Cause: 28:1338 Patent Infringement

Date Filed: 04/02/2012
Date Terminated: 12/19/2012
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Sinclair–Allison Inc**                      represented by   **Kenneth T McConkey**
Klingenberg &Associates PC
330 NW 13th St
Oklahoma City, OK 73103
405–236–1985
Fax: 405–236–1541
Email: kmcconkey@kenkling.com
*ATTORNEY TO BE NOTICED*

**Nathan B Webb**
Emerson Thomson Bennett
1914 Akron–Peninsula Rd
Akron, OH 44313
330–434–9999
Fax: 330–434–8888
Email: iplaw@etblaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Fifth Avenue Physician Services LLC**       represented by   **Amy D White**
McAfee &Taft
211 N Robinson Ave
10th Fl
Oklahoma City, OK 73102
405–235–9621
Fax: 405–235–0439
Email: amy.white@mcafeetaft.com
*ATTORNEY TO BE NOTICED*

**Jeremiah L Buettner**
McAfee &Taft–OKC
211 N Robinson Ave
10th Fl
Oklahoma City, OK 73102
405–552–2241
Fax: 405–228–7441
Email: jeremiah.buettner@mcafeetaft.com
*ATTORNEY TO BE NOTICED*

**John A Kenney**
McAfee &Taft
211 N Robinson Ave
10th Fl
Oklahoma City, OK 73102
405–235–9621
Fax: 405–235–0439
Email: john.kenney@mcafeetaft.com

*ATTORNEY TO BE NOTICED*

**Defendant**

**Fifth Avenue Agency Inc**                                        represented by   **Amy D White**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

                                                                                    **Jeremiah L Buettner**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

                                                                                    **John A Kenney**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Primoris Credentialing Network**                                 represented by   **Amy D White**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

                                                                                    **Jeremiah L Buettner**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

                                                                                    **John A Kenney**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**ProFile Verification Services**                                  represented by   **Amy D White**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

                                                                                    **Jeremiah L Buettner**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

                                                                                    **John A Kenney**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 04/02/2012 | 1 | COMPLAINT against Fifth Avenue Agency Inc, Fifth Avenue Physician Services LLC, Primoris Credentialing Network, ProFile Verification Services filed by Sinclair−Allison Inc. (Attachments: # 1 Exhibit 1 − Patent No. US 6862571 B2, # 2 Exhibit 2 − Patent No. 7469214 B2, # 3 Exhibit 3 − Fifth Ave Physician Svcs Web Pages, # 4 Civil Cover Sheet) (njr) (Entered: 04/02/2012) |
| 04/02/2012 | 2 | Summons Issued Electronically as to Fifth Avenue Agency Inc, Fifth Avenue Physician Services LLC, Primoris Credentialing Network, ProFile Verification Services. (njr) (Entered: 04/02/2012) |
| 04/02/2012 | 3 | ENTRY of Appearance by Kenneth T McConkey on behalf of Sinclair−Allison Inc (McConkey, Kenneth) (Entered: 04/02/2012) |
| 04/02/2012 | 4 | DISCLOSURE STATEMENT − CORPORATE by Sinclair−Allison Inc. (McConkey, Kenneth) (Entered: 04/02/2012) |
| 04/02/2012 | 5 | Receipt for Money Received from Sinclair−Allison Inc in the amount of $350.00, receipt number OKW500023670 regarding 1 Complaint. (njr) (Entered: 04/03/2012) |

| 04/05/2012 | 6 | MOTION for Leave to Appear Pro Hac Vice by Sinclair–Allison Inc. (Attachments: # 1 Affidavit Request for Admission Pro Hac Vice Form)(McConkey, Kenneth) (Entered: 04/05/2012) |
|---|---|---|
| 04/09/2012 | 7 | Receipt for Money Received from Sinclair–Allison Inc in the amount of $50.00, receipt number OKW500023917 regarding 6 MOTION for Leave to Appear Pro Hac Vice. (njr) (Entered: 04/09/2012) |
| 04/10/2012 | 8 | ORDER granting 6 Motion to Appear Pro Hac Vice requesting admission of Nathan B. Webb pro hac vice; Nathan B. Webb is admitted to practice before this Court for the limited purpose of participating in this case on behalf of plaintiff, provided he submits an ECF registration form and files an entry of appearance, consistent with LCvR 83.4. Signed by Honorable Vicki Miles–LaGrange on 4/10/2012. (ks) (Entered: 04/10/2012) |
| 04/20/2012 | 9 | WAIVER OF SERVICE Returned Executed by Defendant Fifth Avenue Agency Inc. Fifth Avenue Agency Inc waiver sent on 4/5/2012, answer due 6/4/2012. (Attachments: # 1 Attachment Fifth Avenue Agency Waiver)(McConkey, Kenneth) (Entered: 04/20/2012) |
| 04/20/2012 | 10 | WAIVER OF SERVICE Returned Executed by Defendant Fifth Avenue Physician Services LLC. Fifth Avenue Physician Services LLC waiver sent on 4/5/2012, answer due 6/4/2012. (Attachments: # 1 Attachment Fifth Avenue Services Waiver)(McConkey, Kenneth) (Entered: 04/20/2012) |
| 04/20/2012 | 11 | WAIVER OF SERVICE Returned Executed by Defendant Primoris Credentialing Network. Primoris Credentialing Network waiver sent on 4/5/2012, answer due 6/4/2012. (Attachments: # 1 Attachment Prmoris Waiver)(McConkey, Kenneth) (Entered: 04/20/2012) |
| 04/20/2012 | 12 | WAIVER OF SERVICE Returned Executed by Defendant ProFile Verification Services. ProFile Verification Services waiver sent on 4/5/2012, answer due 6/4/2012. (Attachments: # 1 Attachment ProFile Waiver)(McConkey, Kenneth) (Entered: 04/20/2012) |
| 05/04/2012 | 13 | ENTRY of Appearance by Nathan B Webb on behalf of Sinclair–Allison Inc (Webb, Nathan) (Entered: 05/04/2012) |
| 06/04/2012 | 14 | ENTRY of Appearance by John A Kenney on behalf of Fifth Avenue Agency Inc, Fifth Avenue Physician Services LLC, Primoris Credentialing Network, ProFile Verification Services (Kenney, John) (Entered: 06/04/2012) |
| 06/04/2012 | 15 | DISCLOSURE STATEMENT – CORPORATE by Fifth Avenue Agency Inc . (Kenney, John) (Entered: 06/04/2012) |
| 06/04/2012 | 16 | DISCLOSURE STATEMENT – CORPORATE by Primoris Credentialing Network . (Kenney, John) (Entered: 06/04/2012) |
| 06/04/2012 | 17 | DISCLOSURE STATEMENT – LLC by Fifth Avenue Physician Services LLC . (Kenney, John) (Entered: 06/04/2012) |
| 06/04/2012 | 18 | MOTION to Dismiss *and Brief in Support* by All Defendants. (Kenney, John) (Entered: 06/04/2012) |
| 06/04/2012 | 19 | ENTRY of Appearance by Jeremiah L Buettner on behalf of All Defendants (Buettner, Jeremiah) (Entered: 06/04/2012) |
| 06/04/2012 | 20 | ENTRY of Appearance by Amy D White on behalf of All Defendants (White, Amy) (Entered: 06/04/2012) |
| 06/25/2012 | 21 | RESPONSE to Motion re 18 MOTION to Dismiss *and Brief in Support* filed by Sinclair–Allison Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Webb, Nathan) (Entered: 06/25/2012) |
| 07/02/2012 | 22 | REPLY to Response to Motion re 18 MOTION to Dismiss *and Brief in Support* filed by All Defendants. (Kenney, John) (Entered: 07/02/2012) |
| 08/01/2012 | 23 | MOTION for Leave to File Reply *Supplemental Brief* by All Plaintiffs. (Attachments: # 1 Attachment Supplemental Brief, # 2 Attachment Order Granting Leave to File Supplemental Brief)(Webb, Nathan) (Entered: 08/01/2012) |

| 08/01/2012 | 24 | ORDER granting 23 plaintiff's Request for Leave to File Supplemental Brief. Plaintiff shall file its supplemental brief within three (3) days of the date of this Order. Further, the Court GRANTS defendants leave to file a reply to plaintiff's supplemental brief; said reply shall be filed within seven (7) days of the date plaintiff files its supplemental brief. Signed by Honorable Vicki Miles–LaGrange on 8/1/2012. (njr) (Entered: 08/01/2012) |
|---|---|---|
| 08/02/2012 | 25 | SUPPLEMENT re 21 Response to Motion *Supplemental Brief* by All Plaintiffs. (Webb, Nathan) (Entered: 08/02/2012) |
| 08/09/2012 | 26 | REPLY to Response to Motion re 25 Supplement *Response to Plaintiff's Supplemental Brief in Response to Defendants' Motion to Dismiss* by All Defendants. (Kenney, John) Modified on 8/9/2012 to reflect the filing is a Reply, not a Supplement. (njr). (Entered: 08/09/2012) |
| 11/29/2012 | 27 | MOTION for Protective Order *and to Stay Discovery Pending Resolution of Motion to Dismiss or, in the alternative, Motion to Quash Subpoenas and Request for Expedited Hearing or a Stay of Service until the Substance of this Motion is ruled upon* by All Defendants. (Attachments: # 1 Exhibit 1 – Declaration of Amber Feist, # 2 Exhibit 2 – Declaration of James Mays, # 3 Exhibit 3 – Notice of Subpoena, # 4 Exhibit 4 – November 28 Email)(Buettner, Jeremiah) (Entered: 11/29/2012) |
| 12/03/2012 | 28 | ORDER shortening plaintiff's time to file response to 27 defendants' Motion For Protective Order And To Stay Discovery Pending Resolution Of Motion To Dismiss Or, In The Alternative, Motion To Quash Subpoenas And Request For Expedited Hearing Or A Stay Of Service Until The Substance Of This Motion Is Ruled Upon and ordering plaintiff to file its response by December 12, 2012. Additionally, any reply shall be filed by December 17, 2012. Signed by Honorable Vicki Miles–LaGrange on 12/3/2012. (ks) (Entered: 12/03/2012) |
| 12/12/2012 | 29 | RESPONSE in Opposition re 27 MOTION for Protective Order *and to Stay Discovery Pending Resolution of Motion to Dismiss or, in the alternative, Motion to Quash Subpoenas and Request for Expedited Hearing or a Stay of Service until the Substance of this Motion is ruled upon* filed by Sinclair–Allison Inc. (Attachments: # 1 Exhibit 1 – September 20 Email, # 2 Exhibit 2 – Declaration of Nathan Webb)(Webb, Nathan) (Entered: 12/12/2012) |
| 12/17/2012 | 30 | REPLY to Response to Motion re 27 MOTION for Protective Order *and to Stay Discovery Pending Resolution of Motion to Dismiss or, in the alternative, Motion to Quash Subpoenas and Request for Expedited Hearing or a Stay of Service until the Substance of this Motion is ruled upon* filed by All Defendants. (Attachments: # 1 Exhibit 1 – 09122012 Email, # 2 Exhibit 2 – McBride Letter 12122012)(Buettner, Jeremiah) (Entered: 12/17/2012) |
| 12/19/2012 | 31 | ORDER granting 18 defendant's Motion to Dismiss (as more fully set out in order). Signed by Honorable Vicki Miles–LaGrange on 12/19/2012. (ks) (Entered: 12/19/2012) |
| 12/19/2012 | 32 | JUDGMENT – Pursuant to a separate order issued this same date, this action is hereby dismissed. Signed by Honorable Vicki Miles–LaGrange on 12/19/2012. (ks) (Entered: 12/19/2012) |
| 01/17/2013 | 33 | NOTICE OF APPEAL as to 32 Judgment, 31 Order on Motion to Dismiss by Sinclair–Allison Inc. Filing fee $ 455. (Webb, Nathan) (Entered: 01/17/2013) |
| 01/17/2013 | 34 | USCA Appeal Fee received in the amount of $455, receipt number OKW500030040, re 33 Notice of Appeal filed by Sinclair–Allison Inc. (njr) (Entered: 01/17/2013) |
| 01/17/2013 | 35 | PRELIMINARY RECORD LETTER – Electronic Transmission of Notice of Appeal with Preliminary Record sent to Tenth Circuit Court of Appeals re 33 Notice of Appeal. DISREGARD per Docket Annotation filed 1/17/2013. (njr). (Entered: 01/17/2013) |
| 01/17/2013 | | Docket Annotation: Disregard 35 Preliminary Record Letter to Tenth Circuit. Appeal will be sent to the Federal Circuit. (njr) (Entered: 01/17/2013) |

| 01/17/2013 | | Docket Annotation: Electronicaly transmitted appeal documents to United States Court of Appeals for the Federal Circuit. (njr) (Entered: 01/17/2013) |
|---|---|---|
| 01/29/2013 | <u>36</u> | NOTICE OF DOCKETING: Federal Circuit Appeal No. 13–1177 re <u>33</u> Notice of Appeal. (njr) (Entered: 01/29/2013) |
| 02/01/2013 | <u>37</u> | TRANSCRIPT Order Form by Sinclair–Allison Inc re <u>33</u> Notice of Appeal that transcripts are not necessary. See order form for dates and proceedings. (Webb, Nathan) (Entered: 02/01/2013) |
| 02/11/2013 | <u>38</u> | Report Regarding Patent and Trademark. (njr) (Entered: 02/11/2013) |

(12) **United States Patent**　　(10) **Patent No.:**　　**US 6,862,571 B2**
Martin et al.　　(45) **Date of Patent:**　　**Mar. 1, 2005**

(54) **CREDENTIALER/MEDICAL MALPRACTICE INSURANCE COLLABORATION**

(75) Inventors: **David A. Martin**, Bentleyville, OH (US); **David R. Montgomery**, Hudson, OH (US)

(73) Assignee: **The Premium Group, Inc.,** Cleveland, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 12 days.

(21) Appl. No.: **09/339,479**

(22) Filed: **Jun. 24, 1999**

(65) **Prior Publication Data**

US 2002/0087354 A1 Jul. 4, 2002

(51) **Int. Cl.**[7] ............................................... **G06F 17/60**
(52) **U.S. Cl.** ......................................................... **705/4**
(58) **Field of Search** ................................ 705/1, 2, 3, 4; 283/54

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,831,526 | A | * | 5/1989 | Luchs et al. | 705/4 |
| 4,858,121 | A | * | 8/1989 | Barber et al. | 705/2 |
| 5,070,452 | A | * | 12/1991 | Doyle, Jr. et al. | 705/2 |
| 5,272,623 | A | * | 12/1993 | Grubb et al. | 717/1 |
| 5,640,501 | A | * | 6/1997 | Turpin | 707/507 |
| 5,664,109 | A | * | 9/1997 | Johnson et al. | 705/2 |
| 6,035,276 | A | * | 3/2000 | Newman et al. | 705/2 |
| 6,189,029 | B1 | * | 2/2001 | Fuerst | 709/217 |

FOREIGN PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| GB | | 2231420 | A | * 11/1990 | G06F/15/21 |

OTHER PUBLICATIONS

The Premium Group, Inc. web page. http://www.premium-groupinc.com/services.html. Downloaded on Mar. 5, 2001.*
"Sweetwater Health Enterprises Receives NCQA Certification, Releases Network Management Software Application," PR Newswire. Sep. 26, 1996. p. 1–2.*

"CompHealth Credentialing Services Certified by the National Committee for Quality Assurance," PR Newswire. Feb. 22, 2001. p. 1–2.*

"Docsbackoffice.com, Inc. Announces CTO Relationship as Part of A Strategic Agreement with Conversion Services International to Outsource its Support, Web Site and Software Projects," Business Wire. Mar. 14, 2000. p. 1–2.*

Turner, Missy. "Bexar Medical Society Taking Credentialing Unit National," San Antonio Business Journal. Feb. 26, 1999. p. 1–2.*

Jaklevic, Starting your own PPM, Apr. 1997, Modern Healthcare, p. 42.*

The Managed care Group—Medical Management—Credentialing.

Federal Credentialing Program.

Industry's First Online Credentialing Service Saves Weeks of Processing Time.

* cited by examiner

*Primary Examiner*—Joseph Thomas
*Assistant Examiner*—Christopher L. Gilligan
(74) *Attorney, Agent, or Firm*—Brouse McDowell; Roger D. Emerson; Daniel A. Thomson

(57) **ABSTRACT**

An inventive process is disclosed for linking credentialing information with a medical malpractice insurance application. The credentialing information is automatically transferred from the credentialing questionnaire to an insurance application, and this credentialing information is then used to generate a medical malpractice insurance policy. The medical malpractice insurance policy is a two year policy, in order to coincide with the required re-credentialing of the healthcare provider. The inventive process also includes linking an information database, not created for insurance purposes, with an insurance application.

**17 Claims, No Drawings**

US 6,862,571 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# CREDENTIALER/MEDICAL MALPRACTICE INSURANCE COLLABORATION

## BACKGROUND OF THE INVENTION

### 1. Field of Invention

This invention pertains to the art of processes for linking an information database with an insurance application, and more particularly to the process of linking credentialing information with a medical malpractice insurance application.

### 2. Description of the Related Art

It is well known that regulatory agencies in the United States require health professionals to have their credentials verified every two years. Verification is a time consuming process that typically includes the assembly of various documents, including proof of the physician's license, a valid Drug Enforcement Agency certificate, proof of completion of medical school, proof of board certification, proof of appropriate work history, etc. Thus, the verification process often takes many days and sometimes weeks to complete. Unfortunately, this time consuming process is the only known way that the regulatory agencies can ensure the public that it is receiving care from a qualified medical professional.

It is also well known that the National Committee for Quality Assurance (NCQA) sets the standard for credentialing in managed care organizations. Defined as "the process by which a managed care organization authorizes, contracts, or employs, practitioners, who are licensed to practice independently, to provide services to its members," credentialing simply means making sure that a practitioner is qualified to render care to patients.

Although there is likely to be some variation on the specific criteria used, the basic elements required in establishing proper credentialing information for a physician are likely to include the following: a valid and current license, clinical privileges in a hospital, valid Drug Enforcement Agency (DEA) or Controlled Dangerous Substance certificate (CDS), appropriate education and training (i.e. graduation from an approved medical school and completion of an appropriate residency or specialty program), board certification, appropriate work history, malpractice insurance, and a history of any liability claims. Managed care organizations also credential nonphysician practitioners, such as dentists, chiropractors, and podiatrists. The primary differences between physician and nonphysician practitioners for purposes of credentialing, lie in the requirements, and therefore, in the verification of select data. For example, chiropractors are not board certified and do not require DEA or CDS certificates.

Credentialing is a necessary and critical step in securing qualified practitioners to render and manage the care of managed care organization subscribers or members. The managed care organizations oftentimes delegate certain activities in the credentialing process. A Credentials Verification Organization (CVO), which may be certified by NCQA, will verify a practitioner's credentials for a set price. Contracting with a NCQA-certified CVO exempts the hospital, healthcare entity, or managed care organization from the due diligence oversight requirements, specified by NCQA and the Joint Commission for Accreditation of Healthcare Organizations (JCAHO), for all the verification services. By contracting out the necessary credentialing to a NCQA-cerrtified CVO, the managed care organizations have met their due diligence requirements.

CompHealth, a licensed CVO in the United States, has developed a new web-based credentialing service, moving as much of the process online as possible. One of the keys to the credentialing service is an Internet application called Apply.net. Medical professionals can use the Apply.net application to submit their information to CompHealth via the Internet. However, there is currently in the art no known connection between the credentialing services, the credentialing information, and the insurance industry.

The Federal government has attempted to alleviate some of the problems of credential sharing among separate government entities. The Federal Credentialing Program was created to attempt to electronically link credentialing databases among the federal agencies and departments. However, this credentialing information sharing is limited to the federal government and does not involve the insurance industry.

The present invention provides a process for quickly and efficiently linking credentialing information with a medical malpractice insurance policy. Difficulties inherent in the related art are therefore overcome in a way that is simple and efficient while providing better and more advantageous results.

## SUMMARY OF THE INVENTION

In accordance with one aspect of the current invention, the credentialing information is automatically transferred to an insurance application.

In accordance with another aspect of the present invention, at least one medical malpractice insurance premium quote can be generated without the physician having to fill out an application.

Yet another aspect of the current invention includes generating a two year medical malpractice insurance policy in order to coincide with the required re-credentialing of the physician.

In accordance with still another aspect of the current invention, the process includes means for generating the information database for any non-insurance purpose, means for forwarding at least a portion of the information from the information database to an insurance participant, means for generating an insurance premium quote, and means for transferring the at least a portion of the information from the information database to an insurance application.

In accordance with another aspect of the current invention, the process includes a means for providing a questionnaire for gathering information for the database, means for inserting a means for obtaining a customer's permission for release of the information to the insurance participant into the questionnaire, means for inserting at least one more question into the questionnaire, the at least one more question for gathering further information related to a particular insurance product, and means for forwarding all of the questionnaires with an affirmative response to the first question to the insurance participant.

One advantage of the present invention is that the physician will not have to fill out a separate application form for medical malpractice insurance.

Another advantage of the present invention is that the medical malpractice insurance policy is of a duration that corresponds to the recredentialing process, thus eliminating the long term need for physicians to recomplete insurance applications or insurance renewal applications.

Yet another advantage of the current invention is that the entire process can be automated, thereby, creating a quick and efficient process.

US 6,862,571 B2

3

Still another advantage of the current invention is that the process increases competition among malpractice insurers by giving them easier access to potential insureds.

One more advantage of the current invention is that the process will drive down the healthcare provider's processing costs, thereby lowering costs of one of physicians' largest line item expenses, thereby lowering the costs of healthcare to consumers.

Still other benefits and advantages of the invention will become apparent to those skilled in the art to which it pertains upon a reading and understanding of the following detailed specification.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

The inventive process is designed to link credentialing information with a medical malpractice insurance application. The credentialing information, which the regulatory agencies require of health professionals, can be compiled for each physician by a credentials verification organization (CVO). The credentialing information, however, can be gathered by any entity licensed to do so. The CVO typically obtains and/or verifies required information about each physician, including, a valid and current license, clinical privileges at a hospital, valid DEA or CDS certificates, appropriate education and training (i.e., graduation from an approved medical school and completion of an appropriate residency or specialty program), board certification, appropriate work history, malpractice insurance, and a history of liability claims. This information is used by healthcare entities to ensure the public that it is receiving adequate care from a qualified medical professional. What is to be especially noted is that the information gathered by the CVO is virtually identical to the information required to underwrite a medical malpractice insurance policy.

The inventive process begins by having the CVO include means for obtaining the physician's permission for release of the credentialing information to the medical malpractice insurance participant. This means for obtaining the physician's permission could be in the form of a question added to the questionnaire, requesting the physician's permission. An example of what the question might be is, "May we release this information for the purpose of obtaining competitive malpractice insurance quotes for you?" The means for obtaining permission could also include a statement above the signature line stating that by signing the questionnaire the doctor is giving the CVO permission to release the information to the medical malpractice insurance participant. All of the credentialing questionnaires in which such permission is granted are then automatically forwarded by the CVO to the medical malpractice insurance participant. What is meant by the term "medical malpractice insurance participant" is any one, or more, of the following: insurance companies, brokers, agents, third party administrators, risk bearers, claims managers, risk managers, insurance marketers, and the like.

Using the credentialing information, at least one insurance premium quote is generated for the medical malpractice insurance policy. The medical malpractice insurance participant can provide multiple quotes from various insurance companies to the physician. The insurance participant then contacts the physician with the premium quotes and policy terms and conditions. By "quote" it is meant either a non-binding or binding quote of the cost of the insurance policy premium.

If the physician orders the medical malpractice insurance, the credentialing information is transferred from the creden-

4

tialing questionnaire to a medical malpractice insurance application. An application for medical malpractice insurance is then generated by a computer for the physician.

The insurance participant then delivers the completed application to the physician for the physician's review and approval.

Once the medical malpractice insurance policy has been approved by the physician, a two year policy is generated by the insurance participant. This two year policy coincides with the required re-credentialing procedure for the physician. The physician will no longer be required to fill out a new application for medical malpractice insurance each time the medical malpractice policy comes up for renewal. Each time the re-credentialing is done, which, in the preferred embodiment, occurs every two years, the updated credentialing information can then be sent again to the insurance participant, and the medical malpractice insurance policy can be renewed with expediency and efficiency.

The two year medical malpractice insurance policy is a preferred embodiment of the invention, and is not intended to limit the invention in any way. The current inventive process also encompasses any length of policy term that coincides with the re-credentialing process. For example, if the re-credentialing occurs every three years, instead of every two years, a three year medical malpractice insurance policy can be issued.

Also, the information on the medical malpractice insurance application, since it is almost identical to the credentialing information, can be transferred back to a credentialing questionnaire for any subsequent health organizations that require credentialing of the subject physician. The medical malpractice insurance participant can transfer this information, and send copies of the credentialing questionnaires to the various health organizations, thereby saving the physician a great deal of time and effort. The physician will no longer be required to fill out multiple credentialing questionnaires for multiple health organizations. In the past, a physician had to fill out a credentialing questionnaire for each and every health organization from which they desired approval. With the inventive process, the physician need only fill out one credentialing questionnaire, and from that, the process transfers the information to a medical malpractice insurance application. From the insurance application, the credentialing information can be transferred to multiple questionnaires to send out to multiple health organizations. All that the physician needs to do is to contact the medical malpractice insurance participant and request that the insurance participant complete a credentialing application for whichever health organization the physician wishes. The medical malpractice insurance participant can then transfer the information from the insurance application to the credentialing questionnaire and provide the completed questionnaire to the physician. The physician then reviews the credentialing questionnaire, signs it, and submits it to the credentialing entity, or health organization. The inventive process encompasses all of the subsequent applications and questionnaires that the physician would need for any subsequent health organizations that require the credentialing information.

If a physician has already obtained medical malpractice insurance coverage, the medical malpractice insurance participant will have all, or most, of the information necessary for the credentialing process. This invention also encompasses the initial step of the process being the medical malpractice insurance participant transferring the information from the medical malpractice insurance application to the credential-

5

ing questionnaire. In this manner, the credentialing process can be efficiently and quickly completed even after the physician has a medical malpractice insurance policy.

In either of the situations where the information is going from the insurance application to the credentialing questionnaire, or vice versa, it is possible that some of the questions will not match up. If one of the questions on either the credentialing questionnaire or the insurance application is left blank due to the questions not matching up, these questions will be highlighted, and when the physician receives the application or questionnaire, the physician will fill in the highlighted blank spaces.

In the preferred embodiment, the inventive process occurs automatically via electronic transmission and computer data manipulation. The required computer hardware, and the necessary computer code, would be obvious to one skilled in the computer art.

However, this invention is not limited to the preferred embodiment, and can be accomplished without the use of computers or electronic means. The methods of transferring information manually, or by way of a hybrid combination of manual and electronic transference, are both encompassed by this invention. In the manual, or hybrid of manual and electronic, transference embodiments, the steps taken to link the insurance application with the credentialing information are identical to the steps taken in the preferred embodiment, and those steps are incorporated herein by reference.

The present invention is also not limited to the medical malpractice field, but includes the entire range of insurance participants. The present invention can be used to link any information database, not created for insurance purposes, to any type of insurance application. The only information databases not encompassed within this invention would be databases created for the purpose of filling out an insurance application, or for the purpose of obtaining any type of insurance. An example of the type of information database not encompassed within this invention would be an Internet insurance application form. However, any other information database, not created for insurance purposes, can be linked by this inventive process to an insurance application. The means by which this information is linked with the insurance application is identical to the process described in the medical malpractice insurance process, and the steps of the process are incorporated herein by reference. However, when linking the information to other forms of insurance, further questions may need to be added in order to gather further, necessary information. An example of some further questions, necessary for life insurance, would be whether someone is a smoker or a nonsmoker.

The types of insurance applications that can be linked can include, but are not limited to, the following: life insurance, automobile insurance, medical malpractice insurance, legal malpractice insurance, professional liability insurance, health insurance, disability insurance, renter's insurance, homeowner's insurance, flood insurance, fire insurance, hurricane insurance, and earthquake insurance, or any other line of insurance.

It is to be noted that the invention encompasses the idea that the credentialing organization, the healthcare entity, the insurance participant, etc. can be one entity or separate entities. For example, a hospital that does its own credentialing and provides insurance for its physicians is encompassed within this invention.

In another embodiment of this invention, there is no need for a credentialing questionnaire to be provided. The CVO should have all the data necessary for filling out an insurance

6

application, and all that would be needed would be the physician's permission for use of the information. In this embodiment, the initial step of the process would be transferring the credentialing information from the CVO directly into either an insurance application or an insurance policy.

The invention also encompasses the use of electronic transmission of the information to the physician for the physician's approval. The physician could then send approval for the insurance policy back to the insurance participant. Under this method of the invention, no signature is required by the physician, only the physician's approval of the insurance policy.

The invention has been described with reference to preferred embodiments. Obviously, modifications and alterations will occur to others upon a reading and understanding of this specification. It is intended to include all such modifications and alternations in so far as they come within the scope of the appended claims or the equivalents thereof.

Having thus described the invention, it is now claimed:

1. A process of linking credentialing information with a medical malpractice insurance application, the process comprising the steps of:

provide a questionnaire for use in compiling credentialing information concerning an associated physician to create a first credentialing application, the questionnaire including means for obtaining the physician's permission for release of the credentialing information to an associated medical malpractice insurance participant;

electronically forwarding the information to an associated credentialing entity;

verifying the credentialing information;

electronically forwarding the questionnaire from the credentialing entity the medical malpractice insurance participant if the physician gave permission for release of the credentialing information;

providing the physician with at least one insurance premium quote generated by the medical malpractice insurance participant for use in generating a medical malpractice insurance policy for the physician based at least in part on the credentialing information;

preparing a medical malpractice insurance application for the physician;

electronically transferring at least a portion of the verified credentialing information from the questionnaire to the medical malpractice insurance application;

completing the formation of the medical malpractice insurance application;

delivering the medical malpractice insurance application to the physician for the physician's review and approval;

generating the medical malpractice insurance policy to coincide with subsequent credentialing applications for the physician;

electronically transferring the credentialing information from the medical malpractice insurance policy to the subsequent credentialing application;

generating a subsequent credentialing application; and,

sending the subsequent credentialing application to an associated healthcare organization to which the physician must provide the credentialing information.

2. A process of linking credentialing information with a medical malpractice insurance application, the process comprising the steps of:

7

compiling credentialing information from a credentialing questionnaire regarding an associated healthcare provider;

obtaining the healthcare providers permission for release of the credentialing information to a medical malpractice insurance provider;

electronically forwarding at least a portion of the credentialing information to an associated medical malpractice insurance participant;

electronically transferring the at least a portion of the credentialing information to a medical malpractice insurance application; and,

processing the medical malpractice insurance application based on the at least a portion of the credentialing information.

3. The process of claim 2, wherein after forwarding at least a portion of the credentialing information from the credentialing entity to the medical malpractice insurance participant, the process comprises the step of:

providing the healthcare provider with at least one insurance premium quote for a medical malpractice insurance policy generated by the medical malpractice insurance participant.

4. The process of claim 2, wherein the process further comprises the step of:

delivering the medical malpractice insurance application to the healthcare provider for the healthcare provider's review and approval.

5. The process of claim 4, wherein the step of generating an insurance premium quote for a medical malpractice insurance policy comprises the steps of:

quoting the insurance premium to the healthcare provider; and,

selling the medical malpractice insurance policy to the healthcare provider.

6. The process of claim 5, wherein the process further comprises the step of:

generating the medical malpractice insurance policy, the policy being a two-year policy, in order to coincide with a required re-credentialing procedure for the healthcare provider.

7. The process of claim 6, wherein the of forwarding the credentialing information to a medical malpractice insurance participant comprises the steps of:

inserting means for obtaining the healthcare providers permission for release of the credentialing information to a medical malpractice insurance provider into the questionnaire, and,

electronically forwarding all of the credentialing questionnaires with an affirmative response to the medical malpractice insurance participant.

8. The process of claim 7, wherein the process further comprises the steps of:

generating a second credentialing application;

electronically transferring the credentialing information from the medical malpractice insurance application to the second credentialing application; and,

sending the second credentialing application to another health organization to which the physician must provide the credentialing information.

9. The process of claim 8, wherein the process further comprises the step of:

repeating the preceding three steps of claim 8.

10. The process of claim 2, wherein electronically forwarding at least a portion of the credentialing information

8

from the credentialing entity to the medical malpractice insurance participant further comprises the step of:

electronically forwarding at least a portion of verified credentialing information from the credentialing entity to the medical malpractice participant.

11. An apparatus for linking credentialing information with a medical malpractice insurance application, the apparatus comprising:

means for compiling credentialing information regarding an associated healthcare provider from a credentialing questionnaire;

means for electronically forwarding the credentialing information to an associated medical malpractice insurance participant;

means for generating at least one insurance premium quote for a medical malpractice insurance policy; and,

means for electronically transferring to credentialing information from the credentialing questionnaire to the medical malpractice insurance application.

12. The apparatus of claim 11, wherein the apparatus further comprises means for generating to medical malpractice insurance policy, the policy being of a duration, in order to coincide with a required re-credentialing procedure for the healthcare provider.

13. The apparatus of claim 11, wherein the means for electronically forwarding the credentialing information to a medical malpractice participant further comprises:

means for electronically forwarding verified credentialing information to a medical malpractice insurance participant.

14. A process for linking credentialing information with a medical malpractice insurance policy, the process comprising the steps of:

providing means for obtaining an associated healthcare provider's permission to release the credentialing information to an associated medical malpractice insurance participant;

receiving permission from the healthcare provider to release the credentialing information;

electronically forwarding at least a portion of the credentialing information from an associated credentialing entity to the medical malpractice insurance participant; and,

providing the healthcare provider with at least one insurance premium quote for a medical malpractice insurance policy generated by the medical malpractice insurance participant.

15. The process of claim 14, wherein the process further comprises the steps of:

receiving the healthcare provider's approval of the at least one insurance premium quote; and,

creating a medical malpractice insurance policy.

16. The process of claim 15, wherein providing the healthcare provider with at least one insurance premium quote for a medical practice insurance policy generated by the medical malpractice insurance participant comprises the steps of:

providing the healthcare provider with at least one insurance premium quote for a medical malpractice insurance policy generated by the medical malpractice insurance participant; and,

US 6,862,571 B2

**9**

electronically transferring the credentialing information to a medical malpractice insurance application.

**17**. The process of claim **14**, wherein electronically forwarding at least a portion of the credentialing information from the credentialing entity to the medical malpractice insurance participant further comprises the step of:

**10**

electronically forwarding at least a portion of verified credentialing information from the credentialing entity to the medical malpractice insurance participant.

*    *    *    *    *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,862,571 B2                                    Page 1 of 1
DATED         : March 1, 2005
INVENTOR(S)   : David A. Martin

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

<u>Column 8,</u>
Line 19, "transferring to credentialing" should be -- transferring the credentialing --.
Line 23, "generating to medical" should be -- generating the medical --.

Signed and Sealed this

Eighteenth Day of October, 2005

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

US007469214B2

(12) **United States Patent**
Martin et al.

(10) **Patent No.:** **US 7,469,214 B2**
(45) **Date of Patent:** **Dec. 23, 2008**

(54) **METHOD OF MEDICAL MALPRACTICE AND INSURANCE COLLABORATION**

(75) Inventors: **David A. Martin**, Bentleyville, OH (US); **David R. Montgomery**, Hudson, OH (US)

(73) Assignee: **Sinclair Allison, Inc.**, Solon, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1394 days.

(21) Appl. No.: **10/067,181**

(22) Filed: **Feb. 4, 2002**

(65) **Prior Publication Data**

US 2002/0082876 A1     Jun. 27, 2002

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/339,479, filed on Jun. 24, 1999, now Pat. No. 6,862,571.

(51) **Int. Cl.**
*G06Q 40/00* (2006.01)

(52) **U.S. Cl.** ........................ **705/4**; 705/1; 705/2; 705/3; 283/54

(58) **Field of Classification Search** ...................... 705/4
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,831,526 | A | 5/1989 | Luchs et al. |
| 4,858,121 | A | 8/1989 | Barber et al. |
| 5,070,452 | A | 12/1991 | Doyle, Jr. et al. |
| 5,272,623 | A | 12/1993 | Grubb et al. |
| 5,325,478 | A | 6/1994 | Shelton et al. |
| 5,483,443 | A | 1/1996 | Milstein et al. |
| 5,640,501 | A | 6/1997 | Turpin |
| 5,644,778 | A | 7/1997 | Burks et al. |
| 5,664,109 | A | 9/1997 | Johnson et al. |
| 5,701,423 | A | 12/1997 | Crozier |
| 5,758,324 | A | 5/1998 | Hartman et al. |
| 5,787,434 | A | 7/1998 | Nakamura et al. |
| 6,035,276 | A | 3/2000 | Newman et al. |
| 6,104,793 | A * | 8/2000 | Dyer ..................... 379/114.25 |
| 6,189,029 | B1 | 2/2001 | Fuerst |

| | | | |
|---|---|---|---|
| 6,272,471 | B1 * | 8/2001 | Segal ............................ 705/4 |
| 6,571,214 | B2 | 5/2003 | Newman et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 392 155 B1 | 7/1997 |

OTHER PUBLICATIONS

PHICO Capital Markets Debuts On-Line Insurance Quotes for Physicians Malpractice Coverage, Feb. 1999, Business Wire, p. 1867.*
*Streamlining Credentialing for the 21st Century*; Federal Credentialing Program, May 12, 1999.
*CompHealth Launches Unique Web-based Service Using VisualAge for Java*; IBM.
*CompHealth Credentialing Services Certified by the National Committee for Quality Assurance*; The Dialog Corporation; Feb. 22, 2001.
*Docsbackoffice.com, Inc. Announces CTO Relationship as Part of a Strategic Agreement with Conversion Services International to Outsource its IT Support, Web site and Software Projects*; The Dialog Corporation; Mar. 14, 2000.
*Sweetwater Health Enterprises Receives NCQA Certification, Releases Network Management Software*; The Gale Group; Sep. 26, 1996.
*Bexar Medical Society Taking Credentialing Unit National*; Bell & Howell; Feb. 26, 1999.
*Medical Management—Credentialing*; The Managed Care Group; May 13, 1999.
*Unique Service Services*, The Premium Group; Mar. 5, 2001.

* cited by examiner

*Primary Examiner*—C Luke Gilligan
*Assistant Examiner*—David Rines
(74) *Attorney, Agent, or Firm*—Roger D. Emerson; Daniel A. Thomson; Emerson, Thomson & Bennett, LLC

(57) **ABSTRACT**

An inventive process is disclosed for linking credentialing information with a medical malpractice insurance application. The credentialing information is automatically transferred from the credentialing questionnaire to an insurance application, and this credentialing information is then used to generate a medical malpractice insurance policy. The medical malpractice insurance policy is a two year policy, in order to coincide with the required re-credentialing of the healthcare provider. The inventive process also includes linking an information database, not created for insurance purposes, with an insurance application.

**1 Claim, No Drawings**

US 7,469,214 B2

1

## METHOD OF MEDICAL MALPRACTICE AND INSURANCE COLLABORATION

This application is a continuation-in-part application of U.S. Ser. No. 09/339,479, filed on Jun. 24, 1999, which is now U.S. Pat. No. 6,862,571.

### I. BACKGROUND OF THE INVENTION

A. Field of Invention

This invention pertains to the art of processes for linking an information database with an insurance application, and more particularly to the process of linking credentialing information with a medical malpractice insurance application.

B. Description of the Related Art

It is well known that regulatory agencies in the United States require health professionals to have their credentials verified every two years. Verification is a time consuming process that typically includes the assembly of various documents, including proof of the physician's license, a valid Drug Enforcement Agency certificate, proof of completion of medical school, proof of board certification, proof of appropriate work history, etc. Thus, the verification process often takes many days and sometimes weeks to complete. Unfortunately, this time consuming process is the only known way that the regulatory agencies can ensure the public that it is receiving care from a qualified medical professional.

It is also well known that the National Committee for Quality Assurance (NCQA) sets the standard for credentialing in managed care organizations. Defined as "the process by which a managed care organization authorizes, contracts, or employs, practitioners, who are licensed to practice independently, to provide services to its members," credentialing simply means making sure that a practitioner is qualified to render care to patients.

Although there is likely to be some variation on the specific criteria used, the basic elements required in establishing proper credentialing information for a physician are likely to include the following: a valid and current license, clinical privileges in a hospital, valid Drug Enforcement Agency (DEA) or Controlled Dangerous Substance certificate (CDS), appropriate education and training (i.e. graduation from an approved medical school and completion of an appropriate residency or specialty program), board certification, appropriate work history, malpractice insurance, and a history of any liability claims. Managed care organizations also credential nonphysician practitioners, such as dentists, chiropractors, and podiatrists. The primary differences between physician and nonphysician practitioners for purposes of credentialing, lie in the requirements, and therefore, in the verification of select data. For example, chiropractors are not board certified and do not require DEA or CDS certificates.

Credentialing is a necessary and critical step in securing qualified practitioners to render and manage the care of managed care organization subscribers or members. The managed care organizations oftentimes delegate certain activities in the credentialing process. A Credentials Verification Organization (CVO), which may be certified by NCQA, will verify a practitioner's credentials for a set price. Contracting with a NCQA-certified CVO exempts the hospital, healthcare entity, or managed care organization from the due diligence oversight requirements, specified by NCQA and the Joint Commission for Accreditation of Healthcare Organizations (JCAHO), for all the verification services. By contracting out the necessary credentialing to a NCQA-certified CVO, the managed care organizations have met their due diligence requirements.

2

CompHealth, a licensed CVO in the United States, has developed a new web-based credentialing service, moving as much of the process online as possible. One of the keys to the credentialing service is an Internet application called Apply-.net. Medical professionals can use the Apply.net application to submit their information to CompHealth via the Internet. However, there is currently in the art no known connection between the credentialing services, the credentialing information, and the property and casualty insurance industry.

The Federal government has attempted to alleviate some of the problems of credential sharing among separate government entities. The Federal Credentialing Program was created to attempt to electronically link credentialing databases among the federal agencies and departments. However, this credentialing information sharing is limited to the federal government and does not involve the insurance industry.

The present invention provides a process for quickly and efficiently linking credentialing information with a medical malpractice insurance policy. Difficulties inherent in the related art are therefore overcome in a way that is simple and efficient while providing better and more advantageous results.

### II. SUMMARY OF THE INVENTION

In accordance with one aspect of the present invention, a method for ensuring current information for insurance underwriting when credentialing information has been obtained from a healthcare provider includes the steps of obtaining a release of the associated credentialing information from the associated healthcare provider, updating the associated credentialing information with new information, the new information being collected by an associated insurance entity, being at least one of the group comprising: no new information, medical incident, the medical incident occurring after compiling of the associated credentialing information, likely to become a claim for damages against the healthcare provider, claim for damages arising after compiling of the associated credentialing information, lawsuit arising after compiling of the associated credentialing information, and change to healthcare provider's practice profile, and evaluating the new information.

In accordance with another aspect of the present invention a method for underwriting insurance in between recredentialing periods includes the steps of obtaining a release of associated credentialing information from an associated healthcare provider, reviewing the associated credentialing information, and updating the associated credentialing information.

In accordance with still another aspect of the present invention, the method includes the step of updating the associated credentialing information updating the associated credentialing information with new information, the new information being collected by an associated insurance entity, being at least one of the group comprising: no new information, medical incident, the medical incident occurring after compiling of the associated credentialing information, likely to become a claim for damages against the healthcare provider, claim for damages arising after compiling of the associated credentialing information, lawsuit arising after compiling of the associated credentialing information, and change to healthcare provider's practice profile.

In accordance with yet another aspect of the present invention, the method includes the steps of evaluating the new information, generating an insurance premium quote, and generating a medical malpractice insurance policy based on the new information.

3

4

In accordance with another aspect of the present invention, the method includes the steps of obtaining a release of associated credentialing information from an associated healthcare provider, the release being obtained via a global computer network and reviewing the associated credentialing information, the information being view via the global computer network.

In accordance with still another aspect of the present invention, an apparatus for insurance underwriting between recredentialing periods includes means for obtaining a release of associated credentialing information from an associated healthcare provider, means for reviewing the associated credentialing information, and means for updating the associated credentialing information.

In accordance with yet another aspect of the present invention, the apparatus includes means for updating the associated credentialing information updating the associated credentialing information with new information, the new information being collected by an associated insurance entity, being at least one of the group comprising: no new information, medical incident, the medical incident occurring after compiling of the associated credentialing information, likely to become a claim for damages against the healthcare provider, claim for damages arising after compiling of the associated credentialing information, lawsuit arising after compiling of the associated credentialing information, and change to healthcare provider's practice profile, means for evaluating the new information, means for generating an insurance premium quote, and means for generating a medical malpractice insurance policy based on the new information.

In accordance with still another aspect of the present invention, the apparatus includes means for obtaining a release of associated credentialing information from an associated healthcare provider, the release being obtained via a global computer network and means for reviewing the associated credentialing information, the information being view via the global computer network.

Still other benefits and advantages of the invention will become apparent to those skilled in the art to which it pertains upon a reading and understanding of the following detailed specification.

### III. DESCRIPTION OF SEVERAL EMBODIMENTS

The inventive process is designed to link credentialing information with a medical malpractice insurance application. The credentialing information, which the regulatory agencies require of health professionals, can be compiled for each physician by a credentials verification organization (CVO). The CVO typically obtains and/or verifies required information about each physician, including, a valid and current license, clinical privileges at a hospital, valid DEA or CDS certificates, appropriate education and training (i.e., graduation from an approved medical school and completion of an appropriate residency or specialty program), board certification, appropriate work history, malpractice insurance, and a history of liability claims. This information is used by healthcare entities to ensure the public that it is receiving adequate care from a qualified medical professional. What is to be especially noted is that the information gathered by the CVO is virtually identical to the information required to underwrite a medical malpractice insurance policy.

The inventive process begins by having the CVO include means for obtaining the physician's permission for release of the credentialing information to the medical malpractice insurance participant. This means for obtaining the physi-

cian's permission could be in the form of a question added to the questionnaire, requesting the physician's permission. An example of what the question might be is, "May we release this information for the purpose of obtaining competitive malpractice insurance quotes for you?" The means for obtaining permission could also include a statement above the signature line stating that by signing the questionnaire the doctor is giving the CVO permission to release the information to the medical malpractice insurance participant. All of the credentialing questionnaires in which such permission is granted are then automatically forwarded by the CVO to the medical malpractice insurance participant. What is meant by the term "medical malpractice insurance participant" is any one, or more, of the following: insurance companies, brokers, agents, third party administrators, risk bearers, claims managers, risk managers, insurance marketers, and the like.

Using the credentialing information, at least one insurance premium quote is generated for the medical malpractice insurance policy. The medical malpractice insurance participant can provide multiple quotes from various insurance companies to the physician. The insurance participant then contacts the physician with the premium quotes and policy terms and conditions. By "quote" it is meant either a non-binding or binding quote of the cost of the insurance policy premium.

If the physician orders the medical malpractice insurance, the credentialing information is transferred from the credentialing questionnaire to a medical malpractice insurance application. An application for medical malpractice insurance is then generated by a computer for the physician.

The insurance participant then delivers the completed application to the physician for the physician's review and approval.

Once the medical malpractice insurance policy has been approved by the physician, a two year policy is generated by the insurance participant. This two year policy coincides with the required re-credentialing procedure for the physician. The physician will no longer be required to fill out a new application for medical malpractice insurance each time the medical malpractice policy comes up for renewal. Each time the re-credentialing is done, which, in the preferred embodiment, occurs every two years, the updated credentialing information can then be sent again to the insurance participant, and the medical malpractice insurance policy can be renewed with expediency and efficiency.

The two year medical malpractice insurance policy is a preferred embodiment of the invention, and is not intended to limit the invention in any way. The current inventive process also encompasses any length of policy term that coincides with the re-credentialing process. For example, if the re-credentialing occurs every three years, instead of every two years, a three year medical malpractice insurance policy can be issued.

Also, the information on the medical malpractice insurance application, since it is almost identical to the credentialing information, can be transferred back to a credentialing questionnaire for any subsequent health organizations that require credentialing of the subject physician. The medical malpractice insurance participant can transfer this information, and send copies of the credentialing questionnaires to the various health organizations, thereby saving the physician a great deal of time and effort. The physician will no longer be required to fill out multiple credentialing questionnaires for multiple health organizations. In the past, a physician had to fill out a credentialing questionnaire for each and every health organization from which they desired approval. With the inventive process, the physician need only fill out one creden-

US 7,469,214 B2

5

6

tialing questionnaire, and from that, the process transfers the information to a medical malpractice insurance application. From the insurance application, the credentialing information can be transferred to multiple questionnaires to send out to multiple health organizations. All that the physician needs to do is to contact the medical malpractice insurance participant and request that the insurance participant complete a credentialing application for whichever health organization the physician wishes. The medical malpractice insurance participant can then transfer the information from the insurance application to the credentialing questionnaire and provide the completed questionnaire to the physician. The physician then reviews the credentialing questionnaire, signs it, and submits it to the credentialing entity, or health organization. The inventive process encompasses all of the subsequent applications and questionnaires that the physician would need for any subsequent health organizations that require the credentialing information.

If a physician has already obtained medical malpractice insurance coverage, the medical malpractice insurance participant will have all, or most, of the information necessary for the credentialing process. This invention also encompasses the initial step of the process being the medical malpractice participant transferring the information from the medical malpractice insurance application to the credentialing questionnaire. In this manner, the credentialing process can be efficiently and quickly completed even after the physician has a medical malpractice insurance policy.

In either of the situations where the information is going from the insurance application to the credentialing questionnaire, or vice versa, it is possible that some of the questions will not match up. If one of the questions on either the credentialing questionnaire or the insurance application is left blank due to the questions not matching up, these questions will be highlighted, and when the physician receives the application or questionnaire, the physician will fill in the highlighted blank spaces.

In the preferred embodiment, the inventive process occurs automatically via electronic transmission and computer data manipulation. The required computer hardware, and the necessary computer code, would be obvious to one skilled in the computer art.

However, this invention is not limited to the preferred embodiment, and can be accomplished without the use of computers or electronic means. The methods of transferring information manually, or by way of a hybrid combination of manual and electronic transference, are both encompassed by this invention. In the manual, or hybrid of manual and electronic, transference embodiments, the steps taken to link the insurance application with the credentialing information are identical to the steps taken in the preferred embodiment, and those steps are incorporated herein by reference.

The present invention is also not limited to the medical malpractice field, but includes the entire range of insurance participants. The present invention can be used to link any information database, not created for insurance purposes, to any type of insurance application. The only information databases not encompassed within this invention would be databases created for the purpose of filling out an insurance application, or for the purpose of obtaining any type of insurance. An example of the type of information database not encompassed within this invention would be an Internet insurance application form. However, any other information database, not created for insurance purposes, can be linked by this inventive process to an insurance application. The means by which this information is linked with the insurance application is identical to the process described in the medical mal-

practice insurance process, and the steps of the process are incorporated herein by reference. However, when linking the information to other forms of insurance, further questions may need to be added in order to gather further, necessary information. An example of some further questions, necessary for life insurance, would be whether someone is a smoker or a nonsmoker.

The types of insurance applications that can be linked can include, but are not limited to, the following: life insurance, automobile insurance, medical malpractice insurance, legal malpractice insurance, professional liability insurance, health insurance, disability insurance, renter's insurance, homeowner's insurance, flood insurance, fire insurance, hurricane insurance, and earthquake insurance, or any other line of insurance.

It is to be noted that the invention encompasses the idea that the credentialing organization, the healthcare entity, the insurance participant, etc. can be one entity or separate entities. For example, a hospital that does its own credentialing and provides insurance for its physicians is encompassed within this invention.

In another embodiment of this invention, there is no need for a credentialing questionnaire to be provided. The CVO should have all the data necessary for filling out an insurance application, and all that would be needed would be the physician's permission for use of the information. In this embodiment, the initial step of the process would be transferring the credentialing information from the CVO directly into either an insurance application or an insurance policy.

The invention also encompasses the use of electronic transmission of the information to the physician for the physician's approval. The physician could then send approval for the insurance policy back to the insurance participant. Under this method of the invention, no signature is required by the physician, only the physician's approval of the insurance policy.

In underwriting insurance, the insurers need accurate and up to date information about all aspects of a healthcare provider's practice in order to properly underwrite the provider, and to properly evaluate the risk of exposure or loss that the provider poses to the insurer. Once the credentialing process is completed, it is generally two years before the process is repeated. In this embodiment of the invention, the credentialing process is integrated in between the credentialing and recredentialing time periods.

In this embodiment, the insurer or credentialing entity secure a release from the healthcare provider so that the credentialing information can be reviewed. If a healthcare provider changes some aspect of his practice, or desires a new insurance policy for any reason, the insurance company needs to have the most up to date information possible. If the provider has submitted credentialing information eight months ago, then any information between that time and two years later will be unavailable to the insurer. The release of information can be on the original credentialing package, an insurance application, a separate form, or any other means chosen using sound business judgment.

In order to effectuate the collaboration between the credentialing process and the issuance of insurance, the insurer will need additional information, such as the disclosure of all known medical incidents likely to become a claim for money or damages against the provider which had not been disclosed in the most recent credentialing or recredentialing process, disclosure of any or all actual claims for money or damages, or lawsuits against the provider, involving the provider subsequent to the completion of the most recent credentialing or recredentialing process, or disclosure or any changes to the provider's practice profile since the most recent credentialing

US 7,469,214 B2

7

or recredentialing process. Changes to the practice profile generally include changes that would alter risk exposure (i.e. change in practice location, addition or deletion of procedures performed by the provider, loss or addition of physicians, loss or addition of ancillary personnel, or change in the number of hours practiced by provider.)

It is to be understood that the listed additional information is not intended to limit the invention in any manner, but is only delineated to be a representative sample of the possible information. Any additional information can be used, as long as chosen using sound business judgment.

In another embodiment of this invention, the entire process can take place via a global computer network.

The invention has been described with reference to preferred embodiments. Obviously, modifications and alterations will occur to others upon a reading and understanding of this specification. It is intended to include all such modifications and alternations in so far as they come within the scope of the appended claims or the equivalents thereof.

Having thus described the invention, it is now claimed:

1. A method for ensuring current information for liability insurance underwriting when associated credentialing information has been obtained from an associated healthcare provider, the method comprising the steps of:

8

obtaining a release of the associated credentialing information, between recredentialing periods, from the associated healthcare provider, wherein the associated credentialing information is released from an associated credentialing entity to an associated insurance entity;

providing the associated insurance entity access to the associated credentialing information;

updating the associated credentialing information with updated associated credentialing information, wherein the updated associated credentialing information is updated via a computer network, the updated associated credentialing information being at least one of the group comprising: no new information, medical incident, the medical incident occurring after compiling of the associated credentialing information, likely to become a claim for damages against the healthcare provider, claim for damages arising after compiling of the associated credentialing information, lawsuit arising after compiling of the associated credentialing information, and change to healthcare provider's practice profile; and,

determining whether or not to underwrite or renew liability insurance, based at least in part on the updated associated credentialing information.

* * * * *

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. Sinclair-Allison, Inc.<br>30680 Bainbridge Road<br>Solon, Ohio 44139 | ) ) ) ) | CASE NO. CIV-12-360-M |
| Plaintiff, | ) ) | JUDGE: |
| v. | ) ) | |
| 1. Fifth Avenue Physician Services, LLC<br>108 E. 5th Street, Suite B<br>Edmond, Oklahoma 73034 | ) ) ) ) ) | **COMPLAINT**<br>**Patent Infringement** |
| 2. Fifth Avenue Agency, Inc.<br>108 E. 5th Street, Suite B<br>Edmond, Oklahoma 73034 | ) ) ) ) | **JURY DEMAND** |
| 3. Primoris Credentialing Network<br>108 E. 5th Street, Suite B<br>Edmond, Oklahoma 73034 | ) ) ) ) | |
| 4. ProFile Verification Services<br>108 E. 5th Street, Suite B<br>Edmond, Oklahoma 73034 | ) ) ) ) | |
| Defendants. | ) ) ) | |

Plaintiff Sinclair-Allison, Inc., brings this action for patent infringement against defendants Fifth Avenue Physician Services, LLC , Fifth Avenue Agency, Inc., Primoris Credentialing Network, and ProFile Verification Services (collectively, "Defendants").

## PARTIES

1.     Plaintiff Sinclair-Allison, Inc. ("Sinclair-Allison"), is a corporation organized and existing under the laws of the State of Ohio, having its principal place of business at 30680 Bainbridge Road, Solon, Ohio 44139.

2.     Upon information and belief, Defendant Fifth Avenue Physician Services, LLC, ("Fifth Services") is an Oklahoma limited liability company having its principal place of business located at 108 E. 5th Street, Suite B, Edmond, Oklahoma 73034.

3.     Upon information and belief, Defendant Fifth Avenue Agency, Inc., ("Fifth Agency") is an Oklahoma corporation also having its principal place of business located at 108 E. 5th Street, Suite B, Edmond, Oklahoma 73034.

4.     Upon information and belief, Defendant Primoris Credentialing Services ("Primoris") is an Oklahoma business also having its principal place of business located at 108 E. 5th Street, Suite B, Edmond, Oklahoma 73034.

5.     Upon information and belief, Defendant ProFile Verification Services ("ProFile") is an Oklahoma business also having its principal place of business located at 108 E. 5th Street, Suite B, Edmond, Oklahoma 73034.


## JURISDICTION AND VENUE

6.     This action arises under the patent laws of the United States, 35 U.S.C. § 1 et seq. (for example, 35 U.S.C. § 271, 281, 283, and 285), for infringement of U.S. Patent Number 6,862,571 and U.S. Patent Number 7,469,214.

7.     This Court has jurisdiction under 35 U.S.C. §§ 1331, 1332, and 1338.

8.      Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400.

9.      Upon information and belief, Defendants regularly transact and conduct business in this District, and, by itself or through one or more agents acting under its control and direction, has committed, and/or contributed to or induced acts of, infringement in this District.


## BACKGROUND OF THE CASE

A.      United States Letters Patent 6,862,571

10.     David A. Martin ("Martin") and David R. Montgomery ("Montgomery") expended considerable time, effort, and money in developing a unique method of linking physician credentialing information with a medical malpractice insurance application, as was disclosed in the application for United States Letters Patent Serial No. 09/339,479 (filed June 24, 1999)(also, "Application '479").

11.     Martin and Montgomery transferred all right title and interest in Application '479 to The Premium Group, Inc., in an assignment document recorded on July 29, 1999 (Reel/Frame No. 017746/0528).

12.     Patent Application Serial No. 09/339,479 was allowed by the United States Patent and Trademark Office, and granted United States Letters Patent No. 6,862,571 (also, "Patent '571")(Exhibit 1) on March 1, 2005.

13.     The Premium Group, Inc., subsequently transferred all right title and interest in Patent '571 to Sinclair-Allison, Inc., in an assignment recorded on June 9, 2006 (Reel/Frame No. 017746/0528).

14.     Sinclair-Allison is the owner of all right, title, and interest in United States Letters Patent No. 6,862,571.

B.      United States Letters Patent 7,469,214

15.     On February 4, 2002, Martin and Montgomery filed a continuation-in-part of Application '479, which was designated as application for United States Letters Patent Serial No. 10/067,181 ("Application '181").

16.     On February 7, 2002, Martin and Montgomery transferred all right title and interest in Application '181 to The Premium Group, Inc., in an assignment document recorded at Reel/Frame No. 012883/0984.

17.     The Premium Group, Inc., subsequently transferred all right title and interest in Application '181 to Sinclair-Allison, Inc., in an assignment recorded on June 9, 2006 (Reel/Frame No. 017746/0528).

18.     Patent Application Serial No. 10/067,181 was allowed by the United States Patent and Trademark Office, and granted United States Letters Patent No. 7,469,214 (also, "Patent '214")(Exhibit 2) on December 28, 2008.

19.     Sinclair-Allison is the owner of all right, title, and interest in United States Letters Patent No. 7,469,214.

C.      Summary of Patents At Issue

20.     United States regulatory agencies require that health professionals have their credentials verified every two years to ensure that the public is receiving care from qualified individuals.

21.     The credentialing and verification process is a time-consuming process that includes the compilation of various documents; notably, proof of a physician's completion of medical school and license to practice medicine, proof of board certification, proof of employment history, and/or proof of a valid Drug Enforcement Agency certificate.

22.     Additionally, the National Committee for Quality Assurance (NCQA) sets standards for credentialing in managed care organizations.

23.     In short, an NCQA credential review is a process by where a managed care organization authorizes, contracts, or employs practitioners who are licensed to practice independently and provide services to its members.

24.     Managed care organizations typically contract third-parties to conduct the credentialing review.

25.     A Credentials Verification Organization (CVO), which may be certified by the NCQA, will verify a practitioner's credentials for a fee.

26.     In addition to being properly credentialed, physicians must maintain medical malpractice insurance.

27.     Martin and Montgomery identified the similarities between the information provided in healthcare professional credentialing with the information included in an application for a medical malpractice insurance quote.

28.     Broadly speaking, Patent '571 includes patented processes, and apparatuses, for compiling credentialing information and transferring said information to an application for medical malpractice insurance.

29.     Broadly speaking, Patent '214 includes a patented method for ensuring current information for liability insurance underwriting, wherein associated credentialing information may be updated and analyzed to determine if a policy should be underwritten or renewed.

D.     Nature of Defendants' Business and Relationships

30.     Upon information and belief, Defendant Fifth Services is an Oklahoma based company that focuses on integrating services to improve the management of healthcare practices around the country.

31.     Upon information and belief, Defendant Primoris provides credentialing services for healthcare providers in Oklahoma, Arkansas, Kansas, Missouri, and Texas.

32.     Upon information and belief, Defendant Fifth Agency is an insurance agency offering medical malpractice insurance through its relationships with several major liability insurance carriers.

33.     Upon information and belief, Defendant ProFile is a credential verification organization (CVO) offering its services nationwide.

34.     Upon information and belief, Defendants Fifth Services, Primoris, ProFile, and Fifth Agency are in an agency relationship with each other.

35.     True and correct copies of Defendant Fifth Services' website, located at [www.fifthservices.com](www.fifthservices.com) and attached to this Complaint as Exhibit 3, show that Fifth Services advertises that its "core service offerings" are those offered by Defendants Primoris, ProFile, and Fifth Agency.

36.     As shown in Exhibit 3, Defendant Fifth Services' website advertises the services of, and contains direct links to the websites associated with, Defendants Primoris, ProFile, and Fifth Agency; while the websites associated with Primoris, Fifth Agency, and ProFile advertise and contain links to Defendant Fifth Services' website.

37.     Upon information and belief, Defendant Fifth Services owns or controls Defendants Primoris and ProFile, and is partially owned by—and controls, or is controlled by—Defendant Fifth Agency.

E.      Defendants' Willful Infringement Of Plaintiff's Patents

38.     Upon information and belief, sometime in 2007 Defendant Fifth Agency concluded that linking information obtained in the process of healthcare professional credentialing with an application for medical malpractice insurance could offer a lucrative business opportunity.

39.     Upon information and belief, Defendant Fifth Agency's investigation into the lawfulness of such services revealed Plaintiff's patents on linking credentialing information with an application for medical malpractice insurance.

▮

40.     Upon information and belief, Defendant Fifth Agency retained Oklahoma City patent attorney Mary Lee to provide an opinion of counsel on whether a proposed business arrangement and merger with Primoris would result in infringement of Plaintiff's patent(s).

41.     Upon information and belief, attorney Lee informed Fifth Agency that the proposed business arrangement would infringe upon Plaintiff's patent(s).

42.     Upon information and belief, sometime in the summer or fall of 2007, the president of Fifth Agency, James J. Feist, contacted Plaintiff Sinclair-Allison and requested that Fifth Agency be granted a license to practice the patented processes covered by Patent '571 and Patent '214.

43.     Sinclair-Allison refused Fifth Agency's request to license Patent '571 and/or Patent '214 to Fifth Agency.

44.     Upon information and belief, Fifth Agency willfully disregarded Plaintiff's refusal to offer a patent license, and subsequently arranged, and/or entered into, agency relationships with Defendants Fifth Services, Primoris, and ProFile to offer services that infringe, and/or are contributing to or inducing the infringement of, Plaintiff's Patent '571 and Patent '214.

45.     Plaintiff Sinclair-Allison's investigation into the "core services" offered by Defendant Fifth Services, and its affiliates, agents, and/or subsidiaries (Defendants Primoris, Fifth Agency, and ProFile) revealed that at least all of the claim limitations of at least one Patent '571 claim are being performed by Defendants, and as a result

Defendants are infringing, and/or are contributing to or inducing the infringement of, Plaintiff's patent rights.

46. Sinclair-Allison did not give Defendants permission to practice the invention covered by United States Letters Patent No. 6,862,571.

47. Plaintiff Sinclair-Allison's investigation into the "core services" offered by Defendant Fifth Services, and its affiliates, agents, and/or subsidiaries (Defendants Primoris, Fifth Agency, and ProFile) revealed that at least all of the claim limitations of at least one Patent '214 claim are being performed by Defendants, and as a result Defendants are infringing, and/or are contributing to or inducing the infringement of, Plaintiff's patent rights.

48. Sinclair-Allison did not give Defendants permission to practice the invention covered by United States Letters Patent No. 7,469,214.

49. Upon information and belief, as of the filing date of the above-captioned action, Defendants continue to market and sell services, within this district and elsewhere, which infringe Patent '571 and Patent '214.

50. As a result of Defendants' competitive activities and infringement, Sinclair-Allison has suffered and will continue to suffer grievous damage unless and until enjoined by this Court.


FIRST CLAIM FOR RELIEF
(Infringement of U.S. Patent 6,862,571)

51. The allegations of paragraphs 1-49 are incorporated for this Count I as though

fully set forth herein.

52.     Sinclair-Allison is the owner of all right, title, and interest in and to United States Letters Patent 6,862,571 (Patent '571)(Exhibit 1) entitled "Credentialer/Medical Malpractice Insurance Collaboration."

53.     Patent '571 was duly issued by the United States Patent and Trademark Office, and is valid and enforceable.

54.     Upon information and belief, Defendants use, sell, and/or offer for sale services that infringe claims of Patent '571.

55.     Upon information and belief, Defendants are willfully infringing, and/or are contributing to or inducing the infringement of, one or more claims of Patent '571 by using, selling and/or offering to sell infringing services in the United States.

56.     By reason of said acts by Defendants, Sinclair-Allison has been, and will continue to be, seriously damaged and irreparably injured unless Defendants are preliminarily and permanently enjoined by this Court from the actions complained of herein, and thus Sinclair-Allison is without adequate remedy at law.


SECOND CLAIM FOR RELIEF
(Infringement of U.S. Patent 7,469,214)

57.     The allegations of paragraphs 1-55 are incorporated for this Count II as though fully set forth herein.

58.     Sinclair-Allison is the owner of all right, title, and interest in and to United States Letters Patent 7,469,214 (Patent '214)(Exhibit 2) entitled "Method Of Medical

Malpractice And Insurance Collaboration."

59. Patent '214 was duly issued by the United States Patent and Trademark Office, and is valid and enforceable.

60. Upon information and belief, Defendants use, sell, and/or offer for sale services that infringe claims of Patent '214.

61. Upon information and belief, Defendants are willfully infringing, and/or are contributing to or inducing the infringement of, one or more claims of Patent '214 by using, selling and/or offering to sell infringing services in the United States.

62. By reason of said acts by Defendants, Sinclair-Allison has been, and will continue to be, seriously damaged and irreparably injured unless Defendants are preliminarily and permanently enjoined by this Court from the actions complained of herein, and thus Sinclair-Allison is without adequate remedy at law.

REQUEST FOR RELIEF

WHEREFORE, Sinclair-Allison prays for the entry of a judgment by this Court against Defendants:

A. declaring that Defendants have infringed United States Letters Patent Nos. 6,862,571 and 7,469,214;

B. ordering that Defendants, their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with Defendants, be preliminarily and permanently enjoined and restrained from further infringing Sinclair-Allison's United States Letters Patent Nos. 6,862,571 and 7,469,214 during its term;

C.      awarding damages, together with interest, to compensate Sinclair-Allison

for the past infringement by Defendants of United States Letters Patent Nos. 6,862,571

and 7,469,214;

D.      awarding Sinclair-Allison prejudgment interest according to law;

E.      finding this to be an exceptional case, and directing that Defendants pay

Sinclair-Allison treble damages, the costs of this action, and its reasonable attorneys fees

pursuant to 35 U.S.C. §284-285; and

F.      for such other relief as this Court deems just and proper.


Dated April 2, 2012.             s/Kenneth T. McConkey

                                 Kenneth T. McConkey
                                 Bar No. 20769
                                 Attorney for Plaintiff
                                 Klingenberg & Associates, P.C.
                                 330 N.W. 13th Street
                                 Oklahoma City, Ok 73103
                                 Phone: 405-236-1985
                                 Fax: 405-236-1541
                                 ken.mcconkey@kenkling.com



i:\22467\50032  lit\working\120330.patent infringement complaint.doc

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiff, Sinclair-Allison, hereby demands a trial by jury on all issues triable by a jury.

Dated:  April 2, 2012

KLINGENBERG & ASSOCIATES, P.C.

s/Kenneth T. McConkey

Exhibit 1



US006862571B2

(12) **United States Patent**　　(10) Patent No.: **US 6,862,571 B2**

Martin et al.　　(45) Date of Patent: **Mar. 1, 2005**

(54) **CREDENTIALER/MEDICAL MALPRACTICE INSURANCE COLLABORATION**

(75) Inventors: **David A. Martin**, Bentleyville, OH (US); **David R. Montgomery**, Hudson, OH (US)

(73) Assignee: **The Premium Group, Inc.**, Cleveland, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 12 days.

(21) Appl. No.: **09/339,479**

(22) Filed: **Jun. 24, 1999**

(65) **Prior Publication Data**

US 2002/0087354 A1 Jul. 4, 2002

(51) Int. Cl.$^7$ ............................................... **G06F 17/60**
(52) U.S. Cl. ...................................................... **705/4**
(58) Field of Search ................................. 705/1, 2, 3, 4; 283/54

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,831,526 A | * | 5/1989 | Luchs et al. ................... | 705/4 |
| 4,858,121 A | * | 8/1989 | Barber et al. ................. | 705/2 |
| 5,070,452 A | * | 12/1991 | Doyle, Jr. et al. ............. | 705/2 |
| 5,272,623 A | * | 12/1993 | Grubb et al. .................. | 717/1 |
| 5,640,501 A | * | 6/1997 | Turpin ....................... | 707/507 |
| 5,664,109 A | * | 9/1997 | Johnson et al. ............... | 705/2 |
| 6,035,276 A | * | 3/2000 | Newman et al. ............... | 705/2 |
| 6,189,029 B1 | * | 2/2001 | Fuerst ....................... | 709/217 |

FOREIGN PATENT DOCUMENTS

GB　　2231420 A　* 11/1990 ........... G06F/15/21

OTHER PUBLICATIONS

The Premium Group, Inc. web page. http://www.premiumgroupinc.com/services.html. Downloaded on Mar. 5, 2001.*
"Sweetwater Health Enterprises Receives NCQA Certification, Releases Network Management Software Application," PR Newswire. Sep. 26, 1996. p. 1–2.*

"CompHealth Credentialing Services Certified by the National Committee for Quality Assurance," PR Newswire. Feb. 22, 2001. p. 1–2.*

"Docsbackoffice.com, Inc. Announces CTO Relationship as Part of A Strategic Agreement with Conversion Services International to Outsource its Support, Web Site and Software Projects," Business Wire. Mar. 14, 2000. p. 1–2.*

Turner, Missy. "Bexar Medical Society Taking Credentialing Unit National," San Antonio Business Journal. Feb. 26, 1999. p. 1–2.*

Jaklevic, Starting your own PPM, Apr. 1997, Modern Healthcare, p. 42.*

The Managed care Group—Medical Management—Credentialing.

Federal Credentialing Program.

Industry's First Online Credentialing Service Saves Weeks of Processing Time.

* cited by examiner

Primary Examiner—Joseph Thomas
Assistant Examiner—Christopher L. Gilligan
(74) Attorney, Agent, or Firm—Brouse McDowell; Roger D. Emerson; Daniel A. Thomson

(57) **ABSTRACT**

An inventive process is disclosed for linking credentialing information with a medical malpractice insurance application. The credentialing information is automatically transferred from the credentialing questionnaire to an insurance application, and this credentialing information is then used to generate a medical malpractice insurance policy. The medical malpractice insurance policy is a two year policy, in order to coincide with the required re-credentialing of the healthcare provider. The inventive process also includes linking an information database, not created for insurance purposes, with an insurance application.

**17 Claims, No Drawings**

US 6,862,571 B2

1

# CREDENTIALER/MEDICAL MALPRACTICE INSURANCE COLLABORATION

## BACKGROUND OF THE INVENTION

### 1. Field of Invention

This invention pertains to the art of processes for linking an information database with an insurance application, and more particularly to the process of linking credentialing information with a medical malpractice insurance application.

### 2. Description of the Related Art

It is well known that regulatory agencies in the United States require health professionals to have their credentials verified every two years. Verification is a time consuming process that typically includes the assembly of various documents, including proof of the physician's license, a valid Drug Enforcement Agency certificate, proof of completion of medical school, proof of board certification, proof of appropriate work history, etc. Thus, the verification process often takes many days and sometimes weeks to complete. Unfortunately, this time consuming process is the only known way that the regulatory agencies can ensure the public that it is receiving care from a qualified medical professional.

It is also well known that the National Committee for Quality Assurance (NCQA) sets the standard for credentialing in managed care organizations. Defined as "the process by which a managed care organization authorizes, contracts, or employs, practitioners, who are licensed to practice independently, to provide services to its members," credentialing simply means making sure that a practitioner is qualified to render care to patients.

Although there is likely to be some variation on the specific criteria used, the basic elements required in establishing proper credentialing information for a physician are likely to include the following: a valid and current license, clinical privileges in a hospital, valid Drug Enforcement Agency (DEA) or Controlled Dangerous Substance certificate (CDS), appropriate education and training (i.e. graduation from an approved medical school and completion of an appropriate residency or specialty program), board certification, appropriate work history, malpractice insurance, and a history of any liability claims. Managed care organizations also credential nonphysician practitioners, such as dentists, chiropractors, and podiatrists. The primary differences between physician and non-physician practitioners for purposes of credentialing, lie in the requirements, and therefore, in the verification of select data. For example, chiropractors are not board certified and do not require DEA or CDS certificates.

Credentialing is a necessary and critical step in securing qualified practitioners to render and manage the care of managed care organization subscribers or members. The managed care organizations oftentimes delegate certain activities in the credentialing process. A Credentials Verification Organization (CVO), which may be certified by NCQA, will verify a practitioner's credentials for a set price. Contracting with a NCQA-certified CVO exempts the hospital, healthcare entity, or managed care organization from the due diligence oversight requirements, specified by NCQA and the Joint Commission for Accreditation of Healthcare Organizations (JCAHO), for all the verification services. By contracting out the necessary credentialing to a NCQA-certified CVO, the managed care organizations have met their due diligence requirements.

2

CompHealth, a licensed CVO in the United States, has developed a new web-based credentialing service, moving as much of the process online as possible. One of the keys to the credentialing service is an Internet application called Apply.net. Medical professionals can use the Apply.net application to submit their information to CompHealth via the Internet. However, there is currently in the art no known connection between the credentialing services, the credentialing information, and the insurance industry.

The Federal government has attempted to alleviate some of the problems of credential sharing among separate government entities. The Federal Credentialing Program was created to attempt to electronically link credentialing databases among the federal agencies and departments. However, this credentialing information sharing is limited to the federal government and does not involve the insurance industry.

The present invention provides a process for quickly and efficiently linking credentialing information with a medical malpractice insurance policy. Difficulties inherent in the related art are therefore overcome in a way that is simple and efficient while providing better and more advantageous results.

## SUMMARY OF THE INVENTION

In accordance with one aspect of the current invention, the credentialing information is automatically transferred to an insurance application.

In accordance with another aspect of the present invention, at least one medical malpractice insurance premium quote can be generated without the physician having to fill out an application.

Yet another aspect of the current invention includes generating a two year medical malpractice insurance policy in order to coincide with the required re-credentialing of the physician.

In accordance with still another aspect of the current invention, the process includes means for generating the information database for any non-insurance purpose, means for forwarding at least a portion of the information from the information database to an insurance participant, means for generating an insurance premium quote, and means for transferring the at least a portion of the information from the information database to an insurance application.

In accordance with another aspect of the current invention, the process includes a means for providing a questionnaire for gathering information for the database, means for inserting a means for obtaining a customer's permission for release of the information to the insurance participant into the questionnaire, means for inserting at least one more question into the questionnaire, the at least one more question for gathering further information related to a particular insurance product, and means for forwarding all of the questionnaires with an affirmative response to the first question to the insurance participant.

One advantage of the present invention is that the physician will not have to fill out a separate application form for medical malpractice insurance.

Another advantage of the present invention is that the medical malpractice insurance policy is of a duration that corresponds to the recredentialing process, thus eliminating the long term need for physicians to recomplete insurance applications or insurance renewal applications.

Yet another advantage of the current invention is that the entire process can be automated, thereby, creating a quick and efficient process.

US 6,862,571 B2

**3**

Still another advantage of the current invention is that the process increases competition among malpractice insurers by giving them easier access to potential insureds.

One more advantage of the current invention is that the process will drive down the healthcare provider's processing costs, thereby lowering costs of one of physicians' largest line item expenses, thereby lowering the costs of healthcare to consumers.

Still other benefits and advantages of the invention will become apparent to those skilled in the art to which it pertains upon a reading and understanding of the following detailed specification.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

The inventive process is designed to link credentialing information with a medical malpractice insurance application. The credentialing information, which the regulatory agencies require of health professionals, can be compiled for each physician by a credentials verification organization (CVO). The credentialing information, however, can be gathered by any entity licensed to do so. The CVO typically obtains and/or verifies required information about each physician, including, a valid and current license, clinical privileges at a hospital, valid DEA or CDS certificates, appropriate education and training (i.e., graduation from an approved medical school and completion of an appropriate residency or specialty program), board certification, appropriate work history, malpractice insurance, and a history of liability claims. This information is used by healthcare entities to ensure the public that it is receiving adequate care from a qualified medical professional. What is to be especially noted is that the information gathered by the CVO is virtually identical to the information required to underwrite a medical malpractice insurance policy.

The inventive process begins by having the CVO include means for obtaining the physician's permission for release of the credentialing information to the medical malpractice insurance participant. This means for obtaining the physician's permission could be in the form of a question added to the questionnaire, requesting the physician's permission. An example of what the question might be is, "May we release this information for the purpose of obtaining competitive malpractice insurance quotes for you?" The means for obtaining permission could also include a statement above the signature line stating that by signing the questionnaire the doctor is giving the CVO permission to release the information to the medical malpractice insurance participant. All of the credentialing questionnaires in which such permission is granted are then automatically forwarded by the CVO to the medical malpractice insurance participant. What is meant by the term "medical malpractice insurance participant" is any one, or more, of the following: insurance companies, brokers, agents, third party administrators, risk bearers, claims managers, risk managers, insurance marketers, and the like.

Using the credentialing information, at least one insurance premium quote is generated for the medical malpractice insurance policy. The medical malpractice insurance participant can provide multiple quotes from various insurance companies to the physician. The insurance participant then contacts the physician with the premium quotes and policy terms and conditions. By "quote" it is meant either a non-binding or binding quote of the cost of the insurance policy premium.

If the physician orders the medical malpractice insurance, the credentialing information is transferred from the creden-

**4**

tialing questionnaire to a medical malpractice insurance application. An application for medical malpractice insurance is then generated by a computer for the physician.

The insurance participant then delivers the completed application to the physician for the physician's review and approval.

Once the medical malpractice insurance policy has been approved by the physician, a two year policy is generated by the insurance participant. This two year policy coincides with the required re-credentialing procedure for the physician. The physician will no longer be required to fill out a new application for medical malpractice insurance each time the medical malpractice policy comes up for renewal. Each time the re-credentialing is done, which, in the preferred embodiment, occurs every two years, the updated credentialing information can then be sent again to the insurance participant, and the medical malpractice insurance policy can be renewed with expediency and efficiency.

The two year medical malpractice insurance policy is a preferred embodiment of the invention, and is not intended to limit the invention in any way. The current inventive process also encompasses any length of policy term that coincides with the re-credentialing process. For example, if the re-credentialing occurs every three years, instead of every two years, a three year medical malpractice insurance policy can be issued.

Also, the information on the medical malpractice insurance application, since it is almost identical to the credentialing information, can be transferred back to a credentialing questionnaire for any subsequent health organizations that require credentialing of the subject physician. The medical malpractice insurance participant can transfer this information, and send copies of the credentialing questionnaires to the various health organizations, thereby saving the physician a great deal of time and effort. The physician will no longer be required to fill out multiple credentialing questionnaires for multiple health organizations. In the past, a physician had to fill out a credentialing questionnaire for each and every health organization from which they desired approval. With the inventive process, the physician need only fill out one credentialing questionnaire, and from that, the process transfers the information to a medical malpractice insurance application. From the insurance application, the credentialing information can be transferred to multiple questionnaires to send out to multiple health organizations. All that the physician needs to do is to contact the medical malpractice insurance participant and request that the insurance participant complete a credentialing application for whichever health organization the physician wishes. The medical malpractice insurance participant can then transfer the information from the insurance application to the credentialing questionnaire and provide the completed questionnaire to the physician. The physician then reviews the credentialing questionnaire, signs it, and submits it to the credentialing entity, or health organization. The inventive process encompasses all of the subsequent applications and questionnaires that the physician would need for any subsequent health organizations that require the credentialing information.

If a physician has already obtained medical malpractice insurance coverage, the medical malpractice insurance participant will have all, or most, of the information necessary for the credentialing process. This invention also encompasses the initial step of the process being the medical malpractice participant transferring the information from the medical malpractice insurance application to the credential-

US 6,862,571 B2

5

ing questionnaire. In this manner, the credentialing process can be efficiently and quickly completed even after the physician has a medical malpractice insurance policy.

In either of the situations where the information is going from the insurance application to the credentialing questionnaire, or vice versa, it is possible that some of the questions will not match up. If one of the questions on either the credentialing questionnaire or the insurance application is left blank due to the questions not matching up, these questions will be highlighted, and when the physician receives the application or questionnaire, the physician will fill in the highlighted blank spaces.

In the preferred embodiment, the inventive process occurs automatically via electronic transmission and computer data manipulation. The required computer hardware, and the necessary computer code, would be obvious to one skilled in the computer art.

However, this invention is not limited to the preferred embodiment, and can be accomplished without the use of computers or electronic means. The methods of transferring information manually, or by way of a hybrid combination of manual and electronic transference, are both encompassed by this invention. In the manual, or hybrid of manual and electronic, transference embodiments, the steps taken to link the insurance application with the credentialing information are identical to the steps taken in the preferred embodiment, and those steps are incorporated herein by reference.

The present invention is also not limited to the medical malpractice field, but includes the entire range of insurance participants. The present invention can be used to link any information database, not created for insurance purposes, to any type of insurance application. The only information databases not encompassed within this invention would be databases created for the purpose of filling out an insurance application, or for the purpose of obtaining any type of insurance. An example of the type of information database not encompassed within this invention would be an Internet insurance application form. However, any other information database, not created for insurance purposes, can be linked by this inventive process to an insurance application. The means by which this information is linked with the insurance application is identical to the process described in the medical malpractice insurance process, and the steps of the process are incorporated herein by reference. However, when linking the information to other forms of insurance, further questions may need to be added in order to gather further, necessary information. An example of some further questions, necessary for life insurance, would be whether someone is a smoker or a nonsmoker.

The types of insurance applications that can be linked can include, but are not limited to, the following: life insurance, automobile insurance, medical malpractice insurance, legal malpractice insurance, professional liability insurance, health insurance, disability insurance, renter's insurance, homeowner's insurance, flood insurance, fire insurance, hurricane insurance, and earthquake insurance, or any other line of insurance.

It is to be noted that the invention encompasses the idea that the credentialing organization, the healthcare entity, the insurance participant, etc. can be one entity or separate entities. For example, a hospital that does its own credentialing and provides insurance for its physicians is encompassed within this invention.

In another embodiment of this invention, there is no need for a credentialing questionnaire to be provided. The CVO should have all the data necessary for filling out an insurance

6

application, and all that would be needed would be the physician's permission for use of the information. In this embodiment, the initial step of the process would be transferring the credentialing information from the CVO directly into either an insurance application or an insurance policy.

The invention also encompasses the use of electronic transmission of the information to the physician for the physician's approval. The physician could then send approval for the insurance policy back to the insurance participant. Under this method of the invention, no signature is required by the physician, only the physician's approval of the insurance policy.

The invention has been described with reference to preferred embodiments. Obviously, modifications and alterations will occur to others upon a reading and understanding of this specification. It is intended to include all such modifications and alternations in so far as they come within the scope of the appended claims or the equivalents thereof.

Having thus described the invention, it is now claimed:

1. A process of linking credentialing information with a medical malpractice insurance application, the process comprising the steps of:

providing a questionnaire for use in compiling credentialing information concerning an associated physician to create a first credentialing application, the questionnaire including means for obtaining the physician's permission for release of the credentialing information to an associated medical malpractice insurance participant;

electronically forwarding the information to an associated credentialing entity;

verifying the credentialing information;

electronically forwarding the questionnaire from the credentialing entity the medical malpractice insurance participant if the physician gave permission for release of the credentialing information;

providing the physician with at least one insurance premium quote generated by the medical malpractice insurance participant for use in generating a medical malpractice insurance policy for the physician based at least in part on the credentialing information;

preparing a medical malpractice insurance application for the physician;

electronically transferring at least a portion of the verified credentialing information from the questionnaire to the medical malpractice insurance application;

completing the formation of the medical malpractice insurance application;

delivering the medical malpractice insurance application to the physician for the physician's review and approval;

generating the medical malpractice insurance policy to coincide with subsequent credentialing applications for the physician;

electronically transferring the credentialing information from the medical malpractice insurance policy to the subsequent credentialing application;

generating a subsequent credentialing application; and,

sending the subsequent credentialing application to an associated healthcare organization to which the physician must provide the credentialing information.

2. A process of linking credentialing information with a medical malpractice insurance application, the process comprising the steps of:

US 6,862,571 B2

7

compiling credentialing information from a credentialing questionnaire regarding an associated healthcare provider;

obtaining the healthcare providers permission for release of the credentialing information to a medical malpractice insurance provider;

electronically forwarding at least a portion of the credentialing information to an associated medical malpractice insurance participant;

electronically transferring the at least a portion of the credentialing information to a medical malpractice insurance application; and,

processing the medical malpractice insurance application based on the at least a portion of the credentialing information.

3. The process of claim 2, wherein after forwarding at least a portion of the credentialing information from the credentialing entity to the medical malpractice insurance participant, the process comprises the step of:

providing the healthcare provider with at least one insurance premium quote for a medical malpractice insurance policy generated by the medical malpractice insurance participant.

4. The process of claim 2, wherein the process further comprises the step of:

delivering the medical malpractice insurance application to the healthcare provider for the healthcare provider's review and approval.

5. The process of claim 4, wherein the step of generating an insurance premium quote for a medical malpractice insurance policy comprises the steps of:

quoting the insurance premium to the healthcare provider; and,

selling the medical malpractice insurance policy to the healthcare provider.

6. The process of claim 5, wherein the process further comprises the step of:

generating the medical malpractice insurance policy, the policy being a two-year policy, in order to coincide with a required re-credentialing procedure for the healthcare provider.

7. The process of claim 6, wherein of forwarding the credentialing information to a medical malpractice insurance participant comprises the steps of:

inserting means for obtaining the healthcare providers permission for release of the credentialing information to a medical malpractice insurance provider into the questionnaire; and,

electronically forwarding all of the credentialing questionnaires with an affirmative response to the medical malpractice insurance participant.

8. The process of claim 7, wherein the process further comprises the steps of:

generating a second credentialing application;

electronically transferring the credentialing information from the medical malpractice insurance application to the second credentialing application; and,

sending the second credentialing application to another health organization to which the physician must provide the credentialing information.

9. The process of claim 8, wherein the process further comprises the step of:

repeating the preceding three steps of claim 8.

10. The process of claim 2, wherein electronically forwarding at least a portion of the credentialing information

8

from the credentialing entity to the medical malpractice insurance participant further comprises the step of:

electronically forwarding at least a portion of verified credentialing information from the credentialing entity to the medical malpractice participant.

11. An apparatus for linking credentialing information with a medical malpractice insurance application, the apparatus comprising:

means for compiling credentialing information regarding an associated healthcare provider from a credentialing questionnaire;

means for electronically forwarding the credentialing information to an associated medical malpractice insurance participant;

means for generating at least one insurance premium quote for a medical malpractice insurance policy; and,

means for electronically transferring to credentialing information from the credentialing questionnaire to the medical malpractice insurance application.

12. The apparatus of claim 11, wherein the apparatus further comprises means for generating to medical malpractice insurance policy, the policy being of a duration, in order to coincide with a required re-credentialing procedure for the healthcare provider.

13. The apparatus of claim 11, wherein the means for electronically forwarding the credentialing information to a medical malpractice participant further comprises:

means for electronically forwarding verified credentialing information to a medical malpractice insurance participant.

14. A process for linking credentialing information with a medical malpractice insurance policy, the process comprising the steps of:

providing means for obtaining an associated healthcare provider's permission to release the credentialing information to an associated medical malpractice insurance participant;

receiving permission from the healthcare provider to release the credentialing information;

electronically forwarding at least a portion of the credentialing information from an associated credentialing entity to the medical malpractice insurance participant; and,

providing the healthcare provider with at least one insurance premium quote for a medical malpractice insurance policy generated by the medical malpractice insurance participant.

15. The process of claim 14, wherein the process further comprises the steps of:

receiving the healthcare provider's approval of the at least one insurance premium quote; and,

creating a medical malpractice insurance policy.

16. The process of claim 15, wherein providing the healthcare provider with at least one insurance premium quote for a medical practice insurance policy generated by the medical practice insurance participant comprises the steps of:

providing the healthcare provider with at least one insurance premium quote for a medical malpractice insurance policy generated by the medical malpractice insurance participant; and,

US 6,862,571 B2

9

10

electronically transferring the credentialing information to a medical malpractice insurance application.

**17**. The process of claim **14**, wherein electronically forwarding at least a portion of the credentialing information from the credentialing entity to the medical malpractice insurance participant further comprises the step of:

electronically forwarding at least a portion of verified credentialing information from the credentialing entity to the medical malpractice insurance participant.

\* \* \* \* \*

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 6,862,571 B2                        Page 1 of 1
DATED        : March 1, 2005
INVENTOR(S) : David A. Martin

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 8,
Line 19, "transferring to credentialing" should be -- transferring the credentialing --.
Line 23, "generating to medical" should be -- generating the medical --.

Signed and Sealed this

Eighteenth Day of October, 2005

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

Exhibit 2

(12) **United States Patent**　　　　　　(10) **Patent No.:**　　**US 7,469,214 B2**
Martin et al.　　　　　　　　　　　　　(45) **Date of Patent:**　　　**Dec. 23, 2008**

(54) **METHOD OF MEDICAL MALPRACTICE AND INSURANCE COLLABORATION**

(75) Inventors: **David A. Martin**, Bentleyville, OH
　　　　　　　(US); **David R. Montgomery**, Hudson,
　　　　　　　OH (US)

(73) Assignee: **Sinclair Allison, Inc.**, Solon, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this
　　　　　patent is extended or adjusted under 35
　　　　　U.S.C. 154(b) by 1394 days.

(21) Appl. No.: **10/067,181**

(22) Filed: **Feb. 4, 2002**

(65) **Prior Publication Data**

　　US 2002/0082876 A1　　Jun. 27, 2002

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/339,479,
　　filed on Jun. 24, 1999, now Pat. No. 6,862,571.

(51) **Int. Cl.**
　　*G06Q 40/00*　　　　(2006.01)
(52) **U.S. Cl.** ........................ **705/4**; 705/1; 705/2; 705/3;
　　　　　　　　　　　　　　　　　　283/54
(58) **Field of Classification Search** ...................... 705/4
　　See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,831,526 A | 5/1989 | Luchs et al. | |
| 4,858,121 A | 8/1989 | Barber et al. | |
| 5,070,452 A | 12/1991 | Doyle, Jr. et al. | |
| 5,272,623 A | 12/1993 | Grubb et al. | |
| 5,325,478 A | 6/1994 | Shelton et al. | |
| 5,483,443 A | 1/1996 | Milstein et al. | |
| 5,640,501 A | 6/1997 | Turpin | |
| 5,644,778 A | 7/1997 | Burks et al. | |
| 5,664,109 A | 9/1997 | Johnson et al. | |
| 5,701,423 A | 12/1997 | Crozier | |
| 5,758,324 A | 5/1998 | Hartman et al. | |
| 5,787,434 A | 7/1998 | Nakamura et al. | |
| 6,035,276 A | 3/2000 | Newman et al. | |
| 6,104,793 A * | 8/2000 | Dyer | 379/114.25 |
| 6,189,029 B1 | 2/2001 | Fuerst | |

| | | | |
|---|---|---|---|
| 6,272,471 B1 * | 8/2001 | Segal | 705/4 |
| 6,571,214 B2 | 5/2003 | Newman et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 392 155 B1 | 7/1997 |

OTHER PUBLICATIONS

PHICO Capital Markets Debuts On-Line Insurance Quotes for Physicians Malpractice Coverage, Feb. 1999, Business Wire, p. 1867.*
*Streamlining Credentialing for the 21st Century*; Federal Credentialing Program, May 12, 1999.
*CompHealth Launches Unique Web-based Service Using VisualAge for Java*; IBM.
*CompHealth Credentialing Services Certified by the National Committee for Quality Assurance*; The Dialog Corporation; Feb. 22, 2001.
*Docsbackoffice.com, Inc. Announces CTO Relationship as Part of a Strategic Agreement with Conversion Services International to Outsource its IT Support, Web site and Software Projects*; The Dialog Corporation; Mar. 14, 2000.
*Sweetwater Health Enterprises Receives NCQA Certification, Releases Network Management Software*; The Gale Group; Sep. 26, 1996.
*Bexar Medical Society Taking Credentialing Unit National*; Bell & Howell; Feb. 26, 1999.
*Medical Management—Credentialing*; The Managed Care Group; May 13, 1999.
*Unique Service Services*, The Premium Group; Mar. 5, 2001.

* cited by examiner

*Primary Examiner*—C Luke Gilligan
*Assistant Examiner*—David Rines
(74) *Attorney, Agent, or Firm*—Roger D. Emerson; Daniel A. Thomson; Emerson, Thomson & Bennett, LLC

(57)　　　　　　**ABSTRACT**

An inventive process is disclosed for linking credentialing information with a medical malpractice insurance application. The credentialing information is automatically transferred from the credentialing questionnaire to an insurance application, and this credentialing information is then used to generate a medical malpractice insurance policy. The medical malpractice insurance policy is a two year policy, in order to coincide with the required re-credentialing of the healthcare provider. The inventive process also includes linking an information database, not created for insurance purposes, with an insurance application.

**1 Claim, No Drawings**

US 7,469,214 B2

1

# METHOD OF MEDICAL MALPRACTICE AND INSURANCE COLLABORATION

This application is a continuation-in-part application of U.S. Ser. No. 09/339,479, filed on Jun. 24, 1999, which is now U.S. Pat. No. 6,862,571.

## I. BACKGROUND OF THE INVENTION

### A. Field of Invention

This invention pertains to the art of processes for linking an information database with an insurance application, and more particularly to the process of linking credentialing information with a medical malpractice insurance application.

### B. Description of the Related Art

It is well known that regulatory agencies in the United States require health professionals to have their credentials verified every two years. Verification is a time consuming process that typically includes the assembly of various documents, including proof of the physician's license, a valid Drug Enforcement Agency certificate, proof of completion of medical school, proof of board certification, proof of appropriate work history, etc. Thus, the verification process often takes many days and sometimes weeks to complete. Unfortunately, this time consuming process is the only known way that the regulatory agencies can ensure the public that it is receiving care from a qualified medical professional.

It is also well known that the National Committee for Quality Assurance (NCQA) sets the standard for credentialing in managed care organizations. Defined as "the process by which a managed care organization authorizes, contracts, or employs, practitioners, who are licensed to practice independently, to provide services to its members," credentialing simply means making sure that a practitioner is qualified to render care to patients.

Although there is likely to be some variation on the specific criteria used, the basic elements required in establishing proper credentialing information for a physician are likely to include the following: a valid and current license, clinical privileges in a hospital, valid Drug Enforcement Agency (DEA) or Controlled Dangerous Substance certificate (CDS), appropriate education and training (i.e. graduation from an approved medical school and completion of an appropriate residency or specialty program), board certification, appropriate work history, malpractice insurance, and a history of any liability claims. Managed care organizations also credential nonphysician practitioners, such as dentists, chiropractors, and podiatrists. The primary differences between physician and nonphysician practitioners for purposes of credentialing, lie in the requirements, and therefore, in the verification of select data. For example, chiropractors are not board certified and do not require DEA or CDS certificates.

Credentialing is a necessary and critical step in securing qualified practitioners to render and manage the care of managed care organization subscribers or members. The managed care organizations oftentimes delegate certain activities in the credentialing process. A Credentials Verification Organization (CVO), which may be certified by NCQA, will verify a practitioner's credentials for a set price. Contracting with a NCQA-certified CVO exempts the hospital, healthcare entity, or managed care organization from the due diligence oversight requirements, specified by NCQA and the Joint Commission for Accreditation of Healthcare Organizations (JCAHO), for all the verification services. By contracting out the necessary credentialing to a NCQA-certified CVO, the managed care organizations have met their due diligence requirements.

2

CompHealth, a licensed CVO in the United States, has developed a new web-based credentialing service, moving as much of the process online as possible. One of the keys to the credentialing service is an Internet application called Apply-.net. Medical professionals can use the Apply.net application to submit their information to CompHealth via the Internet. However, there is currently in the art no known connection between the credentialing services, the credentialing information, and the property and casualty insurance industry.

The Federal government has attempted to alleviate some of the problems of credential sharing among separate government entities. The Federal Credentialing Program was created to attempt to electronically link credentialing databases among the federal agencies and departments. However, this credentialing information sharing is limited to the federal government and does not involve the insurance industry.

The present invention provides a process for quickly and efficiently linking credentialing information with a medical malpractice insurance policy. Difficulties inherent in the related art are therefore overcome in a way that is simple and efficient while providing better and more advantageous results.

## II. SUMMARY OF THE INVENTION

In accordance with one aspect of the present invention, a method for ensuring current information for insurance underwriting when credentialing information has been obtained from a healthcare provider includes the steps of obtaining a release of the associated credentialing information from the associated healthcare provider, updating the associated credentialing information with new information, the new information being collected by an associated insurance entity, being at least one of the group comprising: no new information, medical incident, the medical incident occurring after compiling of the associated credentialing information, likely to become a claim for damages against the healthcare provider, claim for damages arising after compiling of the associated credentialing information, lawsuit arising after compiling of the associated credentialing information, and change to healthcare provider's practice profile, and evaluating the new information.

In accordance with another aspect of the present invention a method for underwriting insurance in between recredentialing periods includes the steps of obtaining a release of associated credentialing information from an associated healthcare provider, reviewing the associated credentialing information, and updating the associated credentialing information.

In accordance with still another aspect of the present invention, the method includes the step of updating the associated credentialing information updating the associated credentialing information with new information, the new information being collected by an associated insurance entity, being at least one of the group comprising: no new information, medical incident, the medical incident occurring after compiling of the associated credentialing information, likely to become a claim for damages against the healthcare provider, claim for damages arising after compiling of the associated credentialing information, lawsuit arising after compiling of the associated credentialing information, and change to healthcare provider's practice profile.

In accordance with yet another aspect of the present invention, the method includes the steps of evaluating the new information, generating an insurance premium quote, and generating a medical malpractice insurance policy based on the new information.

US 7,469,214 B2

3

In accordance with another aspect of the present invention, the method includes the steps of obtaining a release of associated credentialing information from an associated healthcare provider, the release being obtained via a global computer network and reviewing the associated credentialing information, the information being view via the global computer network.

In accordance with still another aspect of the present invention, an apparatus for insurance underwriting between recredentialing periods includes means for obtaining a release of associated credentialing information from an associated healthcare provider, means for reviewing the associated credentialing information, and means for updating the associated credentialing information.

In accordance with yet another aspect of the present invention, the apparatus includes means for updating the associated credentialing information updating the associated credentialing information with new information, the new information being collected by an associated insurance entity, being at least one of the group comprising: no new information, medical incident, the medical incident occurring after compiling of the associated credentialing information, likely to become a claim for damages against the healthcare provider, claim for damages arising after compiling of the associated credentialing information, lawsuit arising after compiling of the associated credentialing information, and change to healthcare provider's practice profile, means for evaluating the new information, means for generating an insurance premium quote, and means for generating a medical malpractice insurance policy based on the new information.

In accordance with still another aspect of the present invention, the apparatus includes means for obtaining a release of associated credentialing information from an associated healthcare provider, the release being obtained via a global computer network and means for reviewing the associated credentialing information, the information being view via the global computer network.

Still other benefits and advantages of the invention will become apparent to those skilled in the art to which it pertains upon a reading and understanding of the following detailed specification.

## III. DESCRIPTION OF SEVERAL EMBODIMENTS

The inventive process is designed to link credentialing information with a medical malpractice insurance application. The credentialing information, which the regulatory agencies require of health professionals, can be compiled for each physician by a credentials verification organization (CVO). The CVO typically obtains and/or verifies required information about each physician, including, a valid and current license, clinical privileges at a hospital, valid DEA or CDS certificates, appropriate education and training (i.e., graduation from an approved medical school and completion of an appropriate residency or specialty program), board certification, appropriate work history, malpractice insurance, and a history of liability claims. This information is used by healthcare entities to ensure the public that it is receiving adequate care from a qualified medical professional. What is to be especially noted is that the information gathered by the CVO is virtually identical to the information required to underwrite a medical malpractice insurance policy.

The inventive process begins by having the CVO include means for obtaining the physician's permission for release of the credentialing information to the medical malpractice insurance participant. This means for obtaining the physi-

4

cian's permission could be in the form of a question added to the questionnaire, requesting the physician's permission. An example of what the question might be is, "May we release this information for the purpose of obtaining competitive malpractice insurance quotes for you?" The means for obtaining permission could also include a statement above the signature line stating that by signing the questionnaire the doctor is giving the CVO permission to release the information to the medical malpractice insurance participant. All of the credentialing questionnaires in which such permission is granted are then automatically forwarded by the CVO to the medical malpractice insurance participant. What is meant by the term "medical malpractice insurance participant" is any one, or more, of the following: insurance companies, brokers, agents, third party administrators, risk bearers, claims managers, risk managers, insurance marketers, and the like.

Using the credentialing information, at least one insurance premium quote is generated for the medical malpractice insurance policy. The medical malpractice insurance participant can provide multiple quotes from various insurance companies to the physician. The insurance participant then contacts the physician with the premium quotes and policy terms and conditions. By "quote" it is meant either a non-binding or binding quote of the cost of the insurance policy premium.

If the physician orders the medical malpractice insurance, the credentialing information is transferred from the credentialing questionnaire to a medical malpractice insurance application. An application for medical malpractice insurance is then generated by a computer for the physician.

The insurance participant then delivers the completed application to the physician for the physician's review and approval.

Once the medical malpractice insurance policy has been approved by the physician, a two year policy is generated by the insurance participant. This two year policy coincides with the required re-credentialing procedure for the physician. The physician will no longer be required to fill out a new application for medical malpractice insurance each time the medical malpractice policy comes up for renewal. Each time the re-credentialing is done, which, in the preferred embodiment, occurs every two years, the updated credentialing information can then be sent again to the insurance participant, and the medical malpractice insurance policy can be renewed with expediency and efficiency.

The two year medical malpractice insurance policy is a preferred embodiment of the invention, and is not intended to limit the invention in any way. The current inventive process also encompasses any length of policy term that coincides with the re-credentialing process. For example, if the re-credentialing occurs every three years, instead of every two years, a three year medical malpractice insurance policy can be issued.

Also, the information on the medical malpractice insurance application, since it is almost identical to the credentialing information, can be transferred back to a credentialing questionnaire for any subsequent health organizations that require credentialing of the subject physician. The medical malpractice insurance participant can transfer this information, and send copies of the credentialing questionnaires to the various health organizations, thereby saving the physician a great deal of time and effort. The physician will no longer be required to fill out multiple credentialing questionnaires for multiple health organizations. In the past, a physician had to fill out a credentialing questionnaire for each and every health organization from which they desired approval. With the inventive process, the physician need only fill out one creden-

US 7,469,214 B2

5

6

tialing questionnaire, and from that, the process transfers the information to a medical malpractice insurance application. From the insurance application, the credentialing information can be transferred to multiple questionnaires to send out to multiple health organizations. All that the physician needs to do is to contact the medical malpractice insurance participant and request that the insurance participant complete a credentialing application for whichever health organization the physician wishes. The medical malpractice insurance participant can then transfer the information from the insurance application to the credentialing questionnaire and provide the completed questionnaire to the physician. The physician then reviews the credentialing questionnaire, signs it, and submits it to the credentialing entity, or health organization. The inventive process encompasses all of the subsequent applications and questionnaires that the physician would need for any subsequent health organizations that require the credentialing information.

If a physician has already obtained medical malpractice insurance coverage, the medical malpractice insurance participant will have all, or most, of the information necessary for the credentialing process. This invention also encompasses the initial step of the process being the medical malpractice participant transferring the information from the medical malpractice insurance application to the credentialing questionnaire. In this manner, the credentialing process can be efficiently and quickly completed even after the physician has a medical malpractice insurance policy.

In either of the situations where the information is going from the insurance application to the credentialing questionnaire, or vice versa, it is possible that some of the questions will not match up. If one of the questions on either the credentialing questionnaire or the insurance application is left blank due to the questions not matching up, these questions will be highlighted, and when the physician receives the application or questionnaire, the physician will fill in the highlighted blank spaces.

In the preferred embodiment, the inventive process occurs automatically via electronic transmission and computer data manipulation. The required computer hardware, and the necessary computer code, would be obvious to one skilled in the computer art.

However, this invention is not limited to the preferred embodiment, and can be accomplished without the use of computers or electronic means. The methods of transferring information manually, or by way of a hybrid combination of manual and electronic transference, are both encompassed by this invention. In the manual, or hybrid of manual and electronic, transference embodiments, the steps taken to link the insurance application with the credentialing information are identical to the steps taken in the preferred embodiment, and those steps are incorporated herein by reference.

The present invention is also not limited to the medical malpractice field, but includes the entire range of insurance participants. The present invention can be used to link any information database, not created for insurance purposes, to any type of insurance application. The only information databases not encompassed within this invention would be databases created for the purpose of filling out an insurance application, or for the purpose of obtaining any type of insurance. An example of the type of information database not encompassed within this invention would be an Internet insurance application form. However, any other information database, not created for insurance purposes, can be linked by this inventive process to an insurance application. The means by which this information is linked with the insurance application is identical to the process described in the medical mal-

practice insurance process, and the steps of the process are incorporated herein by reference. However, when linking the information to other forms of insurance, further questions may need to be added in order to gather further, necessary information. An example of some further questions, necessary for life insurance, would be whether someone is a smoker or a nonsmoker.

The types of insurance applications that can be linked can include, but are not limited to, the following: life insurance, automobile insurance, medical malpractice insurance, legal malpractice insurance, professional liability insurance, health insurance, disability insurance, renter's insurance, homeowner's insurance, flood insurance, fire insurance, hurricane insurance, and earthquake insurance, or any other line of insurance.

It is to be noted that the invention encompasses the idea that the credentialing organization, the healthcare entity, the insurance participant, etc. can be one entity or separate entities. For example, a hospital that does its own credentialing and provides insurance for its physicians is encompassed within this invention.

In another embodiment of this invention, there is no need for a credentialing questionnaire to be provided. The CVO should have all the data necessary for filling out an insurance application, and all that would be needed would be the physician's permission for use of the information. In this embodiment, the initial step of the process would be transferring the credentialing information from the CVO directly into either an insurance application or an insurance policy.

The invention also encompasses the use of electronic transmission of the information to the physician for the physician's approval. The physician could then send approval for the insurance policy back to the insurance participant. Under this method of the invention, no signature is required by the physician, only the physician's approval of the insurance policy.

In underwriting insurance, the insurers need accurate and up to date information about all aspects of a healthcare provider's practice in order to properly underwrite the provider, and to properly evaluate the risk of exposure or loss that the provider poses to the insurer. Once the credentialing process is completed, it is generally two years before the process is repeated. In this embodiment of the invention, the credentialing process is integrated in between the credentialing and recredentialing time periods.

In this embodiment, the insurer or credentialing entity secure a release from the healthcare provider so that the credentialing information can be reviewed. If a healthcare provider changes some aspect of his practice, or desires a new insurance policy for any reason, the insurance company needs to have the most up to date information possible. If the provider has submitted credentialing information eight months ago, then any information between that time and two years later will be unavailable to the insurer. The release of information can be on the original credentialing package, an insurance application, a separate form, or any other means chosen using sound business judgment.

In order to effectuate the collaboration between the credentialing process and the issuance of insurance, the insurer will need additional information, such as the disclosure of all known medical incidents likely to become a claim for money or damages against the provider which had not been disclosed in the most recent credentialing or recredentialing process, disclosure of any or all actual claims for money or damages, or lawsuits against the provider, involving the provider subsequent to the completion of the most recent credentialing or recredentialing process, or disclosure or any changes to the provider's practice profile since the most recent credentialing

7

or recredentialing process. Changes to the practice profile generally include changes that would alter risk exposure (i.e. change in practice location, addition or deletion of procedures performed by the provider, loss or addition of physicians, loss or addition of ancillary personnel, or change in the number of hours practiced by provider.)

It is to be understood that the listed additional information is not intended to limit the invention in any manner, but is only delineated to be a representative sample of the possible information. Any additional information can be used, as long as chosen using sound business judgment.

In another embodiment of this invention, the entire process can take place via a global computer network.

The invention has been described with reference to preferred embodiments. Obviously, modifications and alterations will occur to others upon a reading and understanding of this specification. It is intended to include all such modifications and alternations in so far as they come within the scope of the appended claims or the equivalents thereof.

Having thus described the invention, it is now claimed:

**1**. A method for ensuring current information for liability insurance underwriting when associated credentialing information has been obtained from an associated healthcare provider, the method comprising the steps of:

8

obtaining a release of the associated credentialing information, between recredentialing periods, from the associated healthcare provider, wherein the associated credentialing information is released from an associated credentialing entity to an associated insurance entity;

providing the associated insurance entity access to the associated credentialing information;

updating the associated credentialing information with updated associated credentialing information, wherein the updated associated credentialing information is updated via a computer network, the updated associated credentialing information being at least one of the group comprising: no new information, medical incident, the medical incident occurring after compiling of the associated credentialing information, likely to become a claim for damages against the healthcare provider, claim for damages arising after compiling of the associated credentialing information, lawsuit arising after compiling of the associated credentialing information, and change to healthcare provider's practice profile; and,

determining whether or not to underwrite or renew liability insurance, based at least in part on the updated associated credentialing information.

*   *   *   *   *

Exhibit 3









| TWITTER | BLOG | FACEBOOK |
|---|---|---|

**@FifthAvenueSvcs** Are you all about taking the initiative? So are we. http://fifthservices.com/initiative.php
7 March 2012 | 10:31 am

**@FifthAvenueSvcs** So, what exactly is a CVO? Find out now! http://t.co/zzQNX1V0
5 March 2012 | 12:35 pm

**@FifthAvenueSvcs** Hey! We're now on Twitter. Follow us!
25 February 2011 | 12:56 pm

**fifthservices** Welcome to the Fifth Avenue Physician Services blog. We'll use this space to keep you up-to-date on industry news and let you know how Fifth Avenue is changing the way medical malpractice, credentialing and other physician services are done. For …
Continue reading →
1 December 2010 | 4:28 pm

**FIFTH SERVICES** A Juror and Lawyer walk into a bar….After the conclusion of a recent medical malpractice case in Oklahoma, one of the jurors went into a bar and started talking to a stranger who happened to be an attorney. The attorney wasn't involved in the case but was compelled to report the incident to the court after the juror made comments about his bias against the plaintiff and his insistence on trying the case by his own rules. The Supreme Court said it has no choice but to retry the case…which originally ended in a defense verdict.
Thu, 08 Mar 2012 11:31:25 -0600

**FIFTH SERVICES** Are you all about taking the initiative? So are we. http://fifthservices.com/initiative.php
Wed, 07 Mar 2012 10:31:47 -0600

**FIFTH SERVICES** I think Oklahoma cheated winter this year! Bring it on spring!
Mon, 05 Mar 2012 12:47:08 -0600

**FIFTH SERVICES** So, what exactly is a CVO? Find out now! http://t.co/zzQNX1V0
Mon, 05 Mar 2012 12:35:57 -0600





HOME   ABOUT 5TH   PRIMORIS   AGENCY   PROFILE

Copyright © 2011 Fifth Avenue Physician Services. All Rights Reserved.

4111 S. Darlington Ave. Ste 1200
Tulsa, OK 74169
Office (918)392-7880
Fax (918)355-3439

108 E. 5th Street, Suite B
Edmond, OK 73034
Office (405)285-5000
Fax (405)285-5010
Toll Free (800)460-2900





HOME   ABOUT US   CREDENTIALING   SOFTWARE   LOGIN   5TH INITIATIVE



THE
Credentialing Solution

## About Primoris Credentialing Network

The Primoris Credentialing Network is a service of Fifth Avenue Physician Services.

Primoris is a fully integrated credentialing solution that allows a provider or group practice to fully or partially outsource the credentialing task to meet their specific needs.

Primoris provides credentialing for healthcare providers in the states of Arkansas, Kansas, Missouri, Texas and Oklahoma. Clients include individual healthcare providers, physician groups, and hospital based groups. The core of our service is working with physicians, surgeons, physician assistants and nurse practitioners to complete the enrollment and credentialing requirements for healthcare payers, plans, hospitals, surgery centers, and malpractice insurance companies. We also provide notification and tracking services for state and federal licensure renewals, CMEs, and other time-sensitive issues that could affect the credentialing process.

Primoris has a unique proprietary software program that allows its clients to track the process of enrollment, access credentialing documents, and report on plan participation.

   

Fifth Avenue Physician Services.
4111 S. Darlington Ave. Ste 1200 Tulsa, OK 74169 Office (918)392-7880 Fax (918)355-3439
108 E. 5th Street, Suite B Edmond, OK 73034 Office (405)285-5000 Fax (405)285-5010 Toll Free (800)460-2900





HOME    ABOUT US    CREDENTIALING    SOFTWARE    LOGIN    5TH INITIATIVE



THE
*Credentialing Solution*

Health Plan Credentialing

We will complete health plan enrollment and credentialing requirements for all providers including, but not limited to:

• Physicians
• Surgeons
• Nurse Practitioners
• Physician Assistants

We classify health plans into two categories. Delegated – those plans who have chosen to delegate their credentialing to Primoris. And Non-Delegated – those plans who have not yet chosen to delegate their credentialing to Primoris. Delegated Plans use our file of verified information and do not require an application. This delegation affords us with very specific advantages over the traditional process.

For the Delegated payer list – Click Here

• Credentialing within 30 to 90 days
• No re-credentialing for 2 years
• Unified re-credentialing date

For health plans that have not delegated their credentialing to us, we will populate the applications with the same information we use for the delegated plans. This is the "traditional" method of credentialing. Once we populate the applications, the provider will then sign the application and send back to us to track and follow up on. Since we are using verified data to populate the app, you can still expect more efficient turn-around times. We are in the process of seeking delegation from these plans.

Found out more about Health Plan Enrollment Services in the Software Section of our website.






Fifth Avenue Physician Services.
4111 S. Darlington Ave. Ste 1200 Tulsa, OK 74169 Office (918)392-7880 Fax (918)355-3439
108 E. 5th Street, Suite B Edmond, OK 73034 Office (405)285-5000 Fax (405)285-5010 Toll Free (800)460-2900





HOME    ABOUT US    CREDENTIALING    SOFTWARE    LOGIN    5TH INITIATIVE



## Hospital and Facility Credentialing

As a part of the Primoris Network, we will populate Facility applications on behalf of the provider to sign and process.

• Hospitals
• Specialty Hospitals
• Surgery Centers
• Imaging Centers
• And More

We will interact with the facilities to keep the provider's credentials up to date on all expiring documents. It is important to note that we do not get involved in the privileging process. The hospital or facility will still want to take the provider through committee for competency.

Found out more about Hospital and Facility Application Services in the Software Section of our website.

   

Fifth Avenue Physician Services.
4111 S. Darlington Ave. Ste 1200 Tulsa, OK 74169 Office (918)392-7880 Fax (918)355-3439
108 E. 5th Street, Suite B Edmond, OK 73034 Office (405)285-5000 Fax (405)285-5010 Toll Free (800)460-2900



HOME   ABOUT US   CREDENTIALING   SOFTWARE   LOGIN   5TH INITIATIVE



....................................................................................................

## Notification and Tracking Services

For those credentialing requirements that we cannot process on your behalf, we will notify you of upcoming renewals and track through the process.

- State licensure renewals
- State narcotic license renewals
- Federal narcotic license renewals
- Malpractice insurance renewals
- Certification in advanced life support
- Many more...

Found out more about Notification and Tracking Services in the Software Section of our website.

   

Fifth Avenue Physician Services.
4111 S. Darlington Ave. Ste 1200 Tulsa, OK 74169 Office (918)392-7880 Fax (918)355-3439
108 E. 5th Street, Suite B Edmond, OK 73034 Office (405)285-5000 Fax (405)285-5010 Toll Free (800)460-2900





HOME    ABOUT US    CREDENTIALING    SOFTWARE    LOGIN    5TH INITIATIVE



## Web-Based Credentialing Software

Our proprietary web-based credentialing software provides an interactive tool to communicate with our office and give you control over your credentialing data.

Paperless document library - All credentialing documents are scanned in by our intake coordinators and are available for the provider or practice manager to view, print, save or email to other sources.

Automatic communication tools - Allows the system to keep your hospitals and health plans apprised of new credentials which reduces the amount of requests for credentials sent to the provider's office for new versions of expiring credential documents.

"Track as you go" technology - Allows the provider or practice manager to see where we are in each step of the credentialing process on each credentialing task.

Bar coded credential document tracking - All documents coming or going from our office are bar coded and logged into the system automatically.

Multiple User Interface – Setup multiple users and give them access to the information they need and restrict them from the information they don't. Set users up by location, group, tax id, or even by provider.

Notification Tools – Set certain data elements to notify users of important events like notifying the billing office of a new effective date for specific plans or changes to a provider's participation level.

Access - All information in the system can be exported to excel for reporting. There are also pre-formatted reports that can be run from within the system such as CME Reports, Provider/Plan Matrix, etc.

Timeline Tracking – Providers are tracked through the credentialing process by milestones to get a detailed picture of the number of days to process, greatly improving expectations and ability to determine problem areas.

Intake Tool – Online application and document tracking that allows multiple users and the provider to work on gathering needed information while the system does a real time audit of outstanding data.





HOME    ABOUT US    CREDENTIALING    SOFTWARE    LOGIN    5TH INITIATIVE



THE
*Credentialing Solution*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Log In

User Name

I

[GO]

   

Fifth Avenue Physician Services.
4111 S. Darlington Ave. Ste 1200 Tulsa, OK 74169 Office (918)392-7880 Fax (918)355-3439
108 E. 5th Street, Suite B Edmond, OK 73034 Office (405)285-5000 Fax (405)285-5010 Toll Free (800)460-2900

Case 1:23-cv-07360-MKV   Document 21-3   Filed 04/02/12   Page 1 of 1







## Welcome to the Fifth Avenue Initiative

Current Health Plans that have joined the Initiative:

| | | |
|---|---|---|
| Aetna | HealthSmart | Secure Horizons |
| Beech Street | Humana | USA Managed Care |
| BCBS | Iowa Tribe | Wyandotte |
| Cherokee Nation | Multiplan/PHCS | Sterling |
| Choctaw Nation | Oklahoma Health Network | Today's Options |
| Coventry | PHCS/PHCS Savility | United Healthcare |
| Evolutions Health | Preferred Community Choice (Tulsa) | United PPO |
| First Health | Humana Military | United Signature HMO |
| Galaxy | Humana Veterans | USA Managed Care |
| Generations | PremierCare | Worknet |
| Global | Prime Health | |

Find out more about how Fifth Avenue realigns the incentives related to all our services. Learn about our cost effective and innovated solution by reading up on the Fifth Avenue Initiative Program. To Find out more about the Initiative click here.





HOME  ABOUT 5TH  PRIMORIS  AGENCY  PROFILE

Copyright © 2011 Fifth Avenue Physician Services. All Rights Reserved.

4111 S. Darlington Ave. Ste 1200
Tulsa, OK 74169
Office (918)392-7880
Fax (918)355-3439

108 E. 5th Street, Suite B
Edmond, OK 73034
Office (405)285-5000
Fax (405)285-5010
Toll Free (800)460-2900





HOME    ABOUT US    INSURANCE    LINKS    5TH INITIATIVE



## WELCOME TO FIFTH AVENUE AGENCY

Fifth Avenue Agency is a leader in providing professional medical malpractice insurance brokerage to doctors, surgeons, physician groups, hospitals, and surgery centers. Through strong insurance company relationships and experienced staff, Fifth Avenue Agency is able to meet the specific coverage needs of the ever changing health care industry.






Fifth Avenue Physician Services.
4111 S. Darlington Ave. Ste 1200 Tulsa, OK 74169 Office (918)392-7880 Fax (918)355-3439
108 E. 5th Street, Suite B Edmond, OK 73034 Office (405)285-5000 Fax (405)285-5010 Toll Free (800)460-2900




HOME    ABOUT US    INSURANCE    LINKS    5TH INITIATIVE



# ABOUT FIFTH AVENUE AGENCY

Fifth Avenue Agency is an independent insurance agency representing several major liability insurance carriers. Our independence lets us focus our attention on the needs of our clients and which carrier or service is best suited to meet your malpractice needs. Fifth Avenue Agency's philosophy is that there is no one best carrier, product or service but that each has its own unique set of pros and cons. Uncovering these characteristics not only helps to identify how your malpractice risks will be covered, but where the insurance provider falls short.

Our clients range from sole practitioners to major hospitals. Whether you are in need of individual coverage or group coverage, admitted or surplus malpractice insurance, major insurance carriers or risk retention groups, nursing homes or home health care, surgery centers or hospitals, you will find a solution at Fifth Avenue Agency.

Our coverage area's extend Nationwide with primary focus on Arkansas, Kansas, Missouri, Oklahoma, and Texas.

When you buy your malpractice insurance through Fifth Avenue, you will quickly discover that it is the Fifth Avenue people behind the programs that truly make the difference. You will find our staff licensed, knowledgeable and experienced in professional liability insurance as it pertains specifically to the needs of health practitioners.

## THE FIFTH AVENUE AGENCY DIFFERENCE:

**Unbiased** – Independent advice that focuses on your medical malpractice solution and not the bottom line. No quotas, no conflicts of interest, no outside influences.

**Experienced** – Specializing and having worked directly in the procurement of thousands of standard and unique medical professional liability coverage plans, Fifth Avenue has experienced it all.

**Knowledgeable** – The healthcare industry comes with some of the most unique and complex exposures known in liability insurance. Most physicians and practitioners who have malpractice insurance have never had insurance experts dig into the many facets of professional healthcare liability insurance and had it properly explained. Understanding medical liability risks that are unique to the healthcare market is where we separate ourselves from the competition.

**Resources** – We have access to numerous insurance providers, from those designed for the individual standard solo healthcare provider, to those insurance carriers willing to think outside the box for the most unique medical liability risks. Our position in the market affords us the opportunity to be introduced to and catered by the most forward-thinking influences in medical professional liability insurance.





HOME    ABOUT US    INSURANCE    LINKS    5TH INITIATIVE



THE
*Malpractice Insurance Specialists*

# INSURANCE

Traditional Insurance
High Risk Providers and Surplus Market Insurance
Self-Insured and Captive Insurance

Our primary focus is professional malpractice liability coverage for solo physicians, physician groups, surgery centers, nursing homes and hospitals. Our Agency is a strong advocate for the coverage needs of our clients'. We want to be available to professionally maintain our clients' accounts, and communicate the guidelines to ensure that all medical services performed are properly covered.

Healthcare professional liability, or medical malpractice, coverage is a vital part of all healthcare practices. Unlike other types of liability, professional liability risk programs vary greatly in the coverage they afford, and more importantly, the coverage they exclude. We know inadequate coverage can mean professional and financial ruin for our healthcare clients.

Fifth Avenue goes beyond just costs. We thoroughly consider such issues as risk management needs, premium financing, deductible or retention options, practice structure, availability of defense counsel, risk transfer options, and coverage breakpoints.

Fifth Avenue provides insurance and risk financing options for all types of healthcare risks. Our goal is to identify and analyze all of the risks and exposures that your company may face in order to protect the company's bottom line. These services coupled with the implementation of the risk financing techniques and insurance products, separate us from our competition. We do so much more than just quote business. Our experience and expertise within the healthcare industry allows us to service the insurance and risk management needs of a wide range of healthcare classes. In addition, our strong market relationships and networking provide us the ability to offer our clients the right competitive and comprehensive insurance coverages available within the marketplace.










HOME    ABOUT US    INSURANCE    LINKS    5TH INITIATIVE



THE
*Malpractice Insurance Specialists*

# TRADITIONAL INSURANCE

Traditional Insurance
High Risk Providers and Surplus Market Insurance
Self-Insured and Captive Insurance

Traditional medical malpractice insurance policies are about taking an unknown malpractice risk and making it known. Changing the question of "how much will it cost me if I get sued?" (the unknown) to a specific premium (the known). This is sometimes referred to as "first dollar coverage" because the insurance companies pay every expense related to the claim.

*We place medical malpractice insurance policies for individuals, group practices, surgery centers, and hospitals.*

The medical malpractice market is rich with competitive insurance companies. This competitive medical malpractice marketplace helps to broaden policy provisions as well as drive prices down. However, with the competitive medical malpractice insurance market comes an enormous amount of information to wade through and decipher.

*We help define the risk, design the policy, and then deal with the insurance companies on your behalf. Insuring that you get the best policy with the best rates.*






Fifth Avenue Physician Services.
4111 S. Darlington Ave. Ste 1200 Tulsa, OK 74169 Office (918)392-7880 Fax (918)355-3439





| HOME | ABOUT US | INSURANCE | LINKS | 5TH INITIATIVE |



## HIGH RISK INSURANCE

Traditional Insurance
High Risk Providers and Surplus Market Insurance
Self-Insured and Captive Insurance

Healthcare providers that work in high risk environments or have been hit with multiple lawsuits may not fit into the traditional insurance company's pool of risk. In this event, it is about negotiations with non-traditional insurance companies to design a malpractice policy that meets those needs.

***We place medical malpractice insurance policies for high risk practitioners.***

The high risk medical malpractice market is rich with competitive insurance companies. This competitive marketplace helps to broaden professional medical malpractice insurance policy provisions as well as drive prices down. However, with this competitive insurance market comes an enormous amount of information to wade through and decipher.

***We help define the risk, design the policy, and then deal with the insurance companies on your behalf. Insuring that you get the best policy with the best rates.***






Fifth Avenue Physician Services.
4111 S. Darlington Ave. Ste 1200 Tulsa, OK 74169 Office (918)392-7880 Fax (918)355-3439
108 E. 5th Street, Suite B Edmond, OK 73034 Office (405)285-5000 Fax (405)285-5010 Toll Free (800)460-2900

108 E. 5th Street, Suite B Edmond, OK 73034 Office (405)285-5000 Fax (405)285-5010 Toll Free (800)460-2900





HOME   ABOUT US   INSURANCE   LINKS   5TH INITIATIVE



# SELF INSURED AND CAPTIVE INSURANCE

Traditional Insurance
High Risk Providers and Surplus Market Insurance
Self-Insured and Captive Insurance

Self-Insured Insurance plans are about control. It's about retaining some of the risk to reduce your insurance costs and then deciding what to do with those savings. The method to moving from a "first dollar/guaranteed cost" malpractice insurance policy to fully self-insured can be a daunting and treacherous task wrought with unnecessary costs and work. Fifth Avenue Services keeps the malpractice insurance process simple on your end.

***We help establish self-insured programs.***

Types of Self-Insurance Programs:
- Deductibles
- Risk Retention Groups
- Rent a Captive
- Pure Captive
- Group Captive
- Association Captives
- Offshore Captives

Services Include:
- Captive Management
    - Application and Licensure (Domestic, Foreign, Multi State)
    - Financial Management (Accounting, Reporting)
    - Regulatory Compliance (Tax Returns, Filings, Audits)
- Policyholder Services
    - Underwriting
    - Billing
    - Policy Issuance
    - Marketing
    - Claims Handling
    - Risk Management Programs
- Insurance and Reinsurance



HOME    ABOUT US    INSURANCE    LINKS    5TH INITIATIVE





# LINKS

**BOARDS**
American Board of Medical Specialties
National Board of Osteopathic Medical Examiners
Oklahoma Board of Nursing
Oklahoma Board of Medical Licensure and Supervision
Oklahoma Osteopathic Board

**ASSOCIATIONS**
American Medical Association
Oklahoma Osteopathic Association
Oklahoma Medical Management Association
Oklahoma State Medical Association

**OTHER**
Fifth Avenue Rx
Medical Justice
National Commission on Certification of Physician Assistants
National Practitioner Databank

   

Fifth Avenue Physician Services.
4111 S. Darlington Ave. Ste 1200 Tulsa, OK 74169 Office (918)392-7880 Fax (918)355-3439
108 E. 5th Street, Suite B Edmond, OK 73034 Office (405)285-5000 Fax (405)285-5010 Toll Free (800)460-2900







## Welcome to the Fifth Avenue Initiative

Current Health Plans that have joined the Initiative:

| | | |
|---|---|---|
| Aetna | HealthSmart | Secure Horizons |
| Beech Street | Humana | USA Managed Care |
| BCBS | Iowa Tribe | Wyandotte |
| Cherokee Nation | Multiplan/PHCS | Sterling |
| Choctaw Nation | Oklahoma Health Network | Today's Options |
| Coventry | PHCS/PHCS Savility | United Healthcare |
| Evolutions Health | Preferred Community Choice (Tulsa) | United PPO |
| First Health | Humana Military | United Signature HMO |
| Galaxy | Humana Veterans | USA Managed Care |
| Generations | PremierCare | Worknet |
| Global | Prime Health | |

Find out more about how Fifth Avenue realigns the incentives related to all our services. Learn about our cost effective and innovated solution by reading up on the Fifth Avenue Initiative Program. To Find out more about the Initiative click here.





HOME   ABOUT 5TH   PRIMORIS   AGENCY   PROFILE

Copyright © 2011 Fifth Avenue Physician Services. All Rights Reserved.

4111 S. Darlington Ave. Ste 1200
Tulsa, OK 74169
Office (918)392-7880
Fax (918)355-3439

108 E. 5th Street, Suite B
Edmond, OK 73034
Office (405)285-5000
Fax (405)285-5010
Toll Free (800)460-2900





HOME     ABOUT US     SERVICES     5TH INITIATIVE



.........................................................................................

ProFile Verification Services

ProFile is a credential verification organization (CVO) that provides outsourced verification of provider credentials for.

- Hospitals
- Surgery Centers
- Networks
- Group Medical Practices
- And More

ProFile performs Primary Source verification in a time sensitive and cost effective manner that is up to the highest industry standards.

- NCQA
- URAC
- Joint Commission
- AAAHC

Our focus is on Predictable Outcomes.

- Timely
- Complete
- Accesible

We encourage you to explore our website and learn more about why we are a leader in credential verification in the health care industry.

      

Fifth Avenue Physician Services.
108 E. 5th Street, Suite B, Edmond, Oklahoma 73034 (405) 285-5000 Office, (800) 460-2900 Toll-free

72







## About ProFile

ProFile is a credential verification organization (CVO) that provides outsourced verification of provider credentials for healthcare organizations, networks, hospitals, surgery centers, and group medical practices. Our market area extends Nation Wide.

ProFile CVO is a service of Fifth Avenue Physician Services.

We serve -

- Managed Care Organizations
- Hospitals
- Surgery Centers
- IPAs
- PHOs

- HMOs
- PPOs
- Medical Groups
- Physicians
- Home Health Organizations

- State Departments
- Federal Departments
- Credentialing Departments
- Nursing Homes
- Medical Offices






Fifth Avenue Physician Services.
108 E. 5th Street, Suite B, Edmond, Oklahoma 73034 (405) 285-5000 Office, (800) 460-2900 Toll-free
4111 S. Darlington Ave. Ste 1200 Tulsa, OK 74169 Office (918)392-7880 Fax (918)355-3439





HOME    ABOUT US    SERVICES    5TH INITIATIVE



## Services Overview

### Primary Source Verification Standards

- Joint Commission
- NCQA
- URAQ
- Others where applicable to the client.

### Initial and Re-Credentialing Files

- Primary Source Verification of all applicable data elements.

### Client Web Interface

- Track files through the verification process.
- Private label an online application for new providers.

### Timely, Accurate, and Efficient

- 30 day standard to a complete file from the date of a clean application.
- If the file cannot be completed within 30 days from acceptable sources, you will know why and what we're doing to fix it.

### File Maintenance

- Tracking and Document Gathering on all expiring credentials including:
  - o Medical License
  - o DEA
  - o State Narcotics Licenses
  - o Medical Malpractice
  - o Board Actions and Sanctions





HOME     ABOUT US     SERVICES     5TH INITIATIVE



## Services For Facilities

For hospitals, surgery centers, nursing homes, etc., ProFile will produce a complete verified file up to the applicable standards in a timely and cost effective manner. The facility maintains complete control over privilege delineation.

Facility clients can specify file formats, timeframes, and level of file maintenance.

Facility clients have the opportunity to get files at no charge if the provider participates in our Primoris Network. See programs for more details.

   

Fifth Avenue Physician Services.
108 E. 5th Street, Suite B, Edmond, Oklahoma 73034 (405) 285-5000 Office, (800) 460-2900 Toll-free
4111 S. Darlington Ave. Ste 1200 Tulsa, OK 74169 Office (918)392-7880 Fax (918)355-3439




HOME    ABOUT US    SERVICES    5TH INITIATIVE



## For Networks and MCOs

Our CVO was born out of managing networks and managed care organizations so we are uniquely familiar with the challenges you face. Meeting NCQA or URAC standards often is not enough when facing audits from various health plans. We can customize a file format to fit your specific policies and procedures.

Networks and MCO's have the ability to get free credentialing files if the provider is a member of our Primoris Network.






Fifth Avenue Physician Services.
108 E. 5th Street, Suite B, Edmond, Oklahoma 73034 (405) 285-5000 Office, (800) 460-2900 Toll-free
4111 S. Darlington Ave. Ste 1200 Tulsa, OK 74169 Office (918)392-7880 Fax (918)355-3439





**HOME    ABOUT US    SERVICES    5TH INITIATIVE**



## Services For Group Practices

For Group Practices we will verify core credentials and perform background checks prior to entering into contracts. This will verify both the provider's ability to be credentialed and their insurability for medical malpractice insurance. If the provider does not join the group, then standard rates apply.

Group Practices can specify file formats, timeframes, and level of file maintenance.

Group Practices have the opportunity to get files at no charge if the provider participates in our Primoris Network.

   

Fifth Avenue Physician Services.
108 E. 5th Street, Suite B, Edmond, Oklahoma 73034 (405) 285-5000 Office, (800) 460-2900 Toll-free
4111 S. Darlington Ave. Ste 1200 Tulsa, OK 74169 Office (918)392-7880 Fax (918)355-3439





HOME    ABOUT US    CREDENTIALING    SOFTWARE    LOGIN    5TH INITIATIVE



THE
*Credentialing Solution*

## FAQs

### DO I GET TO NEGOTIATE MY OWN RATES WITH THE PAYERS?

Yes. We do have rates available as a part of our agreements with the plans; however, during the setup process, you will have the option to decide whether you want to negotiate your own rates or keep rates that you have already negotiated.

### DO I HAVE TO BUY MY MEDICAL MALPRACTICE INSURANCE FROM FIFTH AVENUE AGENCY TO GET CREDENTIALING FROM THE PRIMORIS CREDENTIALING NETWORK?

No. You may contract with us to do the credentialing alone. If you do allow us to handle your medical malpractice insurance, we gain an added efficiency in our office, since we use the same information to underwrite an insurance policy as we do to credential. We then pass this efficiency on to you in the form of savings on your credentialing bill.

### DO I HAVE TO KEEP UPDATING THE COUNCIL FOR AFFORDABLE QUALITY HEALTHCARE (CAQH)?

No. Because we have delegated credentialing agreements with the health plans, we are able to satisfy the payers need for this information in a format that better suits the healthcare providers' needs. In the event that a health plan will not delegate to Primoris and insists on using CAQH as its only data source, we will update your CAQH for you.

### DO I STILL "OWN" MY CREDENTIALING INFORMATION?

Yes. Not only do you own it, but you have access to it 24/7. Our proprietary credentialing software gives you the ability to download all the information into an excel spreadsheet. All documents such as copies of licenses, insurance certificates, etc. are available to print as well.

### CAN YOU REALLY GET ME ON THE HEALTH PLANS IN 60 DAYS?

Yes. We can get you on the health plans in 60 days. This is not a guarantee that this will be the case in every circumstance. There are three caveats to this time frame. One is getting the information from the healthcare provider. The more information we have, the more true this statement is. We often use the phrase "within 60 days of a complete application." If the provider doesn't know where they worked during certain time periods or who their insurance carriers were, this can hold up the process. The second caveat is the complexity of the provider. If the provider has been working for 30 years and it includes overseas work and education, it could slow the process down. Finally, though we are delegated, the health plan does still have the ultimate say and in some cases may take additional time to "load" the provider, etc. We will do our best to apprise you of the situation on a plan-by-plan basis.

### WHAT'S THE FASTEST YOU'VE GOTTEN SOMEONE ON THE HEALTH PLANS?

One week. Two days to credential and notify the plans, 5 days for the plans to complete their process. This is highly unusual though. A healthcare provider fresh out of residency with little to no "moonlighting" will take us about 3 to 4 weeks. Still pretty fast.

DOES THIS AFFECT MY CONTRACTS WITH THE PAYERS?

No. You are still responsible for your agreements and dealing with the payers on contract issues. We are just here for the credentialing process. You simply let us know what plans you want to participate in, and we fulfill the credentialing requirements.

## Glossary of Credentialing Terms

COUNCIL FOR AFFORDABLE QUALITY HEALTHCARE (CAQH) - National free online universal application for provider and healthcare organizations.

CREDENTIALING - Examination of a physician's or other health care provider's credentials to determine whether he or she should be entitled  to clinical privileges at a hospital or to a contract with an MCO (Managed Care Organization) Our IPA is a MCO.

GOVERNMENT AGENCIES - Medicare, Medicaid, State Licensure Boards, Dept. of Corrections, Health Department, VA, Dept of Defense (TRICARE), Dept of Veterans Affairs (Project Hero)

INDEPENDENT PHYSICIANS ASSOCIATION (IPA) - A health care model that contracts with physicians and/or other health care providers in order to provide services in return for a negotiated fee.  Physicians that are members of an IPA continue in their existing individual or group practices but are able to take advantage of the efficiencies offered by the IPA.

INTAKE - The process to obtain comprehensive information from a physician or other health care provider to be utilized in the Credentialing and Verification process.

NON-DELEGATED (TRADITIONAL) - MCOs or health plans that do not commit (powers, functions, decisions etc.) to another MCO and typically requires a physician or other health care provider to complete that MCO's specific application and be processed through the MCO's credentialing process.

PAYER - Health Insurance Companies, Others (Blue Cross, Blue Shield, Aetna, Medicare, Medicaid, etc.) An employer, insurer, third party administrator, or other organization which has agreed to be responsible for funding benefit payments for individuals or entities enrolled in a MCO entity.

PLANS - Typically refers to a Health Plan, usually a Managed Care Plan (i.e. BlueCross BlueShield, Cigna, Aetna etc.)

PROFESSIONAL ORGANIZATIONS - Associations, AMA, State Medical Societies, American Boards of Medical Specialties and sub-specialties.

PROVIDER - Physicians (MD,DO, DPM etc), Physician Assistants, Advanced Registered Nurse Practitioners, Certified Registered Nurse Anesthetists, Physical Therapist, Occupational Therapists, Speech Therapists… individuals duly trained and licensed in the specific specialty.

   

Fifth Avenue Physician Services.
4111 S. Darlington Ave. Ste 1200 Tulsa, OK 74169 Office (918)392-7880 Fax (918)355-3439
108 E. 5th Street, Suite B Edmond, OK 73034 Office (405)285-5000 Fax (405)285-5010 Toll Free (800)460-2900

79







**Fifth Avenue Physician Services is an Oklahoma based company that focuses on integrating services to improve the management of healthcare practices around the country.**
Our core service offerings are:

**Primoris**

Credentialing Solution that uses the traditional IPA model to contract with health plans and medical facilities to streamline the credentialing process

**Agency**

Malpractice Insurance Agency that uses the independent broker model to provide competitive policies from multiple insurance companies

**ProFile**

Credential Verification Organization that performs traditional medical provider verification and background checks for medical facilities

## Mission
To build a team approach with our clients and deliver product and service solutions in an innovative and cost effective manner. We will set the highest standards in service, operations, and cost containment in our industry.

## Values
You will find that it's the people at Fifth Avenue that make the difference. Our experienced staff knows health care. You will quickly feel like they are an integral part of your team.

### Integrity
Clear commitments to ethical conduct and solutions that are in the best interest of others.

### Innovation
Committed to the belief that there is a better way that benefits everyone and we are capable of finding it

### Resolve
The relentless pursuit of objectives through purposeful activity and a solutions-oriented mindset.

### Team
We value loyalty, where each employee, client, or business partner has a strong sense of belonging and a willingness to work together to improve.

### Fifth Avenue Physician Services
Creating profitable efficiency in the healthcare industry.

## FIFTH AVENUE INITIATIVE PROGRAM

**Find out more about how Fifth Avenue realigns the incentives related to these services to provide a cost effective and innovated solution by reading up on the Fifth Avenue Initiative Program.**







HOME     ABOUT US     CREDENTIALING     SOFTWARE     LOGIN     5TH INITIATIVE



THE
Credentialing Solution

## Primoris Credentialing Network

Primoris is an outsource solution to the credentialing problem. We specialize in the credentialing of physicians, surgeons, nurse practitioners, and physician assistants for the entire medical industry.

  • Health Plan Enrollment with all plans
  • Medicare and Medicaid Enrollment
  • Medical Facility Applications

The word "Primoris" is Latin for premier, distinguished, at the top. Our experienced staff will help put you in control of the monotonous task of enrollment and application processing for individual providers or large groups.

  • Fast Enrollment
  • Uninterrupted Practice

Our competitive pricing model allows the practice to use all or part of our service to help meet the specific needs of the organization.

  • Flexible
  • Cost Containment

We invite you to explore the website and learn more about why we say Primoris is "The Solution" for outsourced credentialing.






Fifth Avenue Physician Services.
4111 S. Darlington Ave. Ste 1200 Tulsa, OK 74169 Office (918)392-7880 Fax (918)355-3439
108 E. 5th Street, Suite B Edmond, OK 73034 Office (405)285-5000 Fax (405)285-5010 Toll Free (800)460-2900

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Sinclair-Allison, Inc.

**DEFENDANTS**
1.) Fifth Avenue Physician Services, LLC, 2.) Fifth Avenue Agency, Inc., 3.) Primoris Credentialing Network, 4.) ProFile ☐

**(b)** County of Residence of First Listed Plaintiff   Cuyahoga
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Oklahoma, OK
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Klingenberg & Associates, P.C.
330 N.W. 13th Street Oklahoma City, OK 73103   405-236-1541 ☐

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)     and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☒ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
35 U.S.C. 271; 28 U.S.C. 1331, 1332 and 1338
Brief description of cause:
Patent Infringement

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE

DOCKET NUMBER

DATE
04/02/2012

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

82

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. Sinclair-Allison, Inc. | ) | |
| 30680 Bainbridge Road | ) | |
| Solon, Ohio 44139 | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| 1. Fifth Avenue Physician Services, LLC | ) | |
| 108 E. 5th Street, Suite B | ) | |
| Edmond, Oklahoma 73034 | ) | CASE No. CIV-12-360-M |
| | ) | |
| 2. Fifth Avenue Agency, Inc. | ) | |
| 108 E. 5th Street, Suite B | ) | |
| Edmond, Oklahoma 73034 | ) | |
| | ) | |
| 3. Primoris Credentialing Network | ) | |
| 108 E. 5th Street, Suite B | ) | |
| Edmond, Oklahoma 73034 | ) | |
| | ) | |
| 4. ProFile Verification Services | ) | |
| 108 E. 5th Street, Suite B | ) | |
| Edmond, Oklahoma 73034 | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION TO DISMISS AND BRIEF IN SUPPORT OF DEFENDANTS FIFTH AVENUE PHYSICIAN SERVICES, LCC, FIFTH AVENUE AGENCY, INC., PRIMORIS CREDENTIALING NETWORK, AND PROFILE VERIFICATION SERVICES

John A. Kenney, OBA #4976
Amy D. White, OBA #19255
Jeremiah L. Buettner, OBA #21615
McAfee & Taft A Professional Corporation
10th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102
Telephone: 405-235-9621
Facsimile: 405-235-0439
john.kenney@mcafeetaft.com
amy.white@mcafeetaft.com
jeremiah.buettner@mcafeetaft.com

**ATTORNEYS FOR DEFENDANTS**

# TABLE OF CONTENTS

**Page No.**

THE PATENTS AT ISSUE ...................................................................................2

ARGUMENT AND AUTHORITY .........................................................................4

Standard for Rule 12(b)(6) Motion to Dismiss ......................................................4

PROPOSITION 1:  PLAINTIFF'S CLAIM FOR PATENT INFRINGEMENT
                 FAILS BECAUSE THE PATENTS AT ISSUE ARE
                 INVALID AS UNPATENTABLE ABSTRACT IDEAS.........................4

  A.  Patentability of Business Methods ...............................................................4

     1.  The Patents Fail to Satisfy the Machine-or-Transformation Test.................5

        (a)  Machine ......................................................................................6

        (b)  Transformation ...........................................................................9

     2.  The Patents are not otherwise patentable, and constitute
         efforts to patent the abstract idea of acting as a
         clearinghouse of information ...........................................................9

CONCLUSION ....................................................................................................11

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page No.**

Accenture Global Servs. GmbH v. Guidewire Software, Inc.
    691 F.Supp.2d 577, 597 (D. Del. 2010) ............................................................8

Bilski v. Kappos (Bilski II)
    130 S.Ct. 3218 (2010) ...........................................................................5, 6, 9, 10

CLS Bank International v. Alice Corporation Pty. Ltd.
    768 F.Supp.2d 221 (D.C.D.C. March 3, 2011) .........................................6, 8, 10

CyberSource Corp. v. Retail Decisions, Inc.
    654 F.3d 1366, 1369 (Fed. Cir. 2011) .......................................................6, 9, 10

DealerTrack, Inc. v. Huber
    674 F.3d 1315 (Fed. Cir. 2012) .............................................3, 4, 5, 7, 8, 10, 11

Digitech Information Systems, Inc. v. BMW Financial Services NA, LLC
    2012 WL 1081084 (M.D. Fla. March 30, 2012) ............................................6, 8

Fuazzysharp Techs., Inc. v. 3D Labs Inc., Ltd.
    WL 4899215 at *4 (N.D. Cal. Dec. 11, 2009) ..................................................8

Neitzke v. Williams
    490 U.S. 319, 326-27 (1989) ...........................................................................4

SiRF Tech., Inc. v. Int'l Trade Comm'n
    601 F.3d 1319, 1332 (Fed. Cir. 2010) ................................................................6

In re Bilski (Bilski I)
    545 F.3d 943, 961-62 (Fed. Cir. 2008).........................................................5, 9

In re Comiskey
    554 F.3d 967, 977 (Fed. Cir. 2009) ................................................................6, 7

In re Schrader
    22 F.3d 290, 291(Fed. Cir. 1994) ...................................................................10

Rules and Regulations

Fed. R. Civ. P. 12(b)(6) ............................................................................................1, 4

Statutes

35 U.S.C. § 101 ................................................................................................4, 6, 7, 8

130 St.Ct. at 3227 ...................................................................................................6

674 F.3d at 1315, 1333-34.......................................................................................7, 8

## MOTION TO DISMISS OF DEFENDANTS FIFTH AVENUE PHYSICIAN SERVICES, LCC, FIFTH AVENUE AGENCY, INC., PRIMORIS CREDENTIALING NETWORK, AND PROFILE VERIFICATION SERVICES

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants, Fifth Avenue Physician Services, LLC ("Fifth Services"), Fifth Avenue Agency, Inc. ("Fifth Agency"), Primoris Credentialing Network ("Primoris"), and Profile Verification Services ("Profile") (collectively "Defendants"), respectfully move the Court for an Order dismissing the Complaint of Plaintiff, Sinclair-Allison, Inc. ("Plaintiff"), for failure to state a claim upon which relief can be granted. In its Complaint, Plaintiff alleges that Defendants infringed two patents: (1) United States Letters Patent 6,862,571 (the "'571 Patent"), entitled "Credentialer/Medical Malpractice Insurance Collaboration," attached and incorporated by reference in Plaintiff's Complaint as Exhibit 1; and (2) United States Letters Patent 7,469,214 (the "'214 Patent"), entitled "Method of Medical Malpractice and Insurance Collaboration," attached and incorporated by reference in Plaintiff's Complaint as Exhibit 2.

The '571 Patent was filed in 1999 and issued in 2005, which was before the courts further developed and clarified the rules for business method patents. A very recent case addressing the issue is *Dealertrack, Inc. v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012), which examined a business method patent remarkably similar to the '571 and '214 Patents, ultimately holding that the method was an unpatentable abstract idea. Like the business method at issue in *Dealertrack*, the business method sought to be patented in the '571 and '214 Patents is an unpatentable abstract idea, and therefore the patents are unenforceable and invalid as a matter of law. Consequently, Plaintiff's Complaint for infringement thereof fails.

## THE PATENTS AT ISSUE

The '571 and '214 Patents claim processes and apparatus directed to sharing information between files. Specifically, the claims of the '571 Patent define a process and apparatus for collecting and sharing medical provider information between medical

malpractice insurance databases and physician credentialing databases. The '214 Patent, a continuation-in-part of the '571 Patent, claims a method for ensuring that the databases are current. As noted at column 5, lines 18-50 of the '571 patent, the "invention" is not limited to the preferred embodiment, i.e. use on computer system, or to the medical malpractice field. Essentially, the preferred embodiment utilizes a computer system as a clearinghouse, transferring the information to a credentialing institution and generating an application for medical malpractice. (Complaint, ¶¶ 28-29; *see also* '517 Patent, '214 Patent.)

## ARGUMENT AND AUTHORITY

### Standard for Rule 12(b)(6) Motion to Dismiss

Fed. R. Civ. P. 12(b)(6) authorizes a defendant to move, before filing a responsive pleading, for dismissal of the complaint. A motion made under rule 12(b)(6) challenges the legal sufficiency of the complaint, not the sufficiency of any evidence that might be adduced. The purpose of the rule is to allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail, and thus to spare litigants the burdens of unnecessary pretrial and trial activity. *Neitzke v. Williams,* 490 U.S. 319, 326-27 (1989).

Whether asserted claims in a patent are invalid for failure to claim statutory subject matter under 35 U.S.C. § 101 is a question of law. *Dealertrack*, 674 F.3d at 1333. In this case, Plaintiff's Complaint as pleaded initially rests entirely on the legal determination that the '571 Patent and the '214 Patent are valid and enforceable. Because the issue of patentable subject matter is a legal determination that can be made on the face of the pleadings and the incorporated exhibits (i.e., the two patents), it is an appropriate and necessary determination at this stage of the litigation.

# PROPOSITION 1: PLAINTIFF'S CLAIM FOR PATENT INFRINGEMENT FAILS BECAUSE THE PATENTS AT ISSUE ARE INVALID AS UNPATENTABLE ABSTRACT IDEAS.

## A. Patentability of Business Methods

The patents in suit do not claim patentable subject matter because the are directed to the abstract idea of functioning as an information clearinghouse. The United States Patent Act, 35 U.S.C. § 101 *et seq.*, states that:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

In defining the scope of § 101 patentable subject matter, the Supreme Court has set forth three broad categories of subject matter ineligible for patent protection: "laws of nature, physical phenomena, and abstract ideas." *Dealertrack*, 764 F.3d at 1331 (*citing Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010) ("*Bilski II*")).

Although business methods *may* be patentable as a "process," they must do more than claim an abstract idea. In evaluating whether a method claim constitutes patentable subject matter or a mere "abstract idea," courts utilize a two-pronged analysis: (1) whether the method is tied to a particular machine or apparatus or transforms a particular article into a different state or thing (the "machine-or-transformation test"); and (2) whether the claims, despite not satisfying the machine-or-transformation test, are otherwise patent-eligible. *See generally Bilski v. Kappos*, 130 S.Ct. 3218 (2010); *Dealertrack*, 674 F.3d 1315. Because the methods described in the patents at issue do not satisfy the machine-or-transformation test, and furthermore are an attempt to patent the abstract idea of acting as an information clearinghouse for credentialing information, the methods are not patentable.

## (1) The Patents Fail to Satisfy the Machine-or-Transformation Test.

Pursuant to the machine-or-transformation test, an invention is a process if "(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *In re Bilski*, 545 F.3d 943, 961-62 (Fed. Cir. 2008) (*"Bilski I"*).

Further, "the use of a specific machine or transformation of an article must impose meaningful limits on the claim's scope to impart patent-eligibility … [and] the involvement of the machine or transformation in the claimed process must not merely be insignificant extra-solution activity." *Id.* While the *Bilski II* decision did hold that the machine-or-transformation is not the **exclusive** test for patentability of "process" claims; the *Bilski II* Court noted that the test was "a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101." 130 S.Ct. at 3227. Consequently, in evaluating process patents subsequent to *Bilski II*, courts continue to utilize the machine-or-transformation test as an initial inquiry.[1]

(a) *Machine*

Neither the '571 Patent or the '214 Patent are tied to a particular machine for purposes of the "machine-or-transformation" test. Although the claims of the patents at issue are framed in terms of computer equipment, the specification clearly indicates that the invention "**can be accomplished without the use of computers or electronic means**. The methods of transferring information manually, or by way of hybrid combination of manual and electronic transference, are both encompassed by this invention." ('571 Patent, Col. 5, Ln. 19-23; '214 Patent, Col. 5, Ln. 43-48.)

For purposes of the machine-or-transformation test, the Federal Circuit has "defined a 'machine' as 'a concrete thing, consisting of parts, or of certain devices and combination of devices. This includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result." *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1332 (Fed. Cir. 2010).

---

[1]  *See, e.g. CyberSource Corp. v. Retail Decisions Inc.*, 654 F.3d 1366 (Fed. Cir. 2011); *CLS Bank International v. Alice Corporation Pty. Ltd.*, 768 F.Supp.2d 221 (D.C.D.C. March 3, 2011) ("the machine-or-transformation test helps guide a court in the decision as to whether a process is subject matter eligible under the Patent Act"); *Digitech Information Systems, Inc. v. BMW Financial Services NA, LLC*, Case No. 6:10-CV-1373, 2012 WL 1081084 (M.D. Fla. March 30, 2012) ("Although not conclusive, the machine-or-transformation test is an 'important and useful' tool to help determine whether a patent claims an abstract idea or a patentable process.").

To impart patent-eligibility to an otherwise unpatentable process under the theory that the process is linked to a machine, the use of the machine "must impose meaningful limits on the claim's scope." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011). However, merely using a computer to implement an abstract idea in a specific fashion will not satisfy the requirements of 35 U.S.C. § 101. *See In re Comiskey*, 554 F.3d 967, 977 (Fed. Cir. 2009).

The method and apparatus[2] claims of the '571 and '214 Patents are directly analogous to the patents at issue in the *Dealertrack* and *Comiskey* decisions. In *Comiskey*, the claims defined an arbitration resolution method and system for mandatory arbitration. The *Comiskey* Court noted that "mental processes – or processes of human thinking – standing alone, are not patentable, even if they have practical application." *Id.* at 979. In concluding that the *Comiskey* claims did not satisfy the requirements of 35 U.S.C. § 101, the court held:

> [T]he present statute does not allow patents to be issued on particular business systems-such as a particular type of arbitration-that depend entirely on the use of mental processes. In other words, the patent statute does not allow patents on particular systems that depend for their operation on human intelligence alone, a field of endeavor that both the framers and Congress intended to be beyond the reach of patentable subject matter. Thus, it is established that the application of human intelligence to the solution of practical problems is not in and of itself patentable.

*Id.* at 980.

Similarly, the *Dealertrack* Court reviewed the claims of a patent directed to a computer-aided method of managing a credit application.[3] The patentee's primary argument in favor of patentable subject matter was that the "computer-aided" limitation

---

[2]  Claim 11 of the '571 Patent ostensibly describes an apparatus for practicing the unpatentable abstract idea. The apparatus is acknowledged by the patent to be obvious. ('571 Patent, Col. 5, Ln. 18 ("[t]he required computer hardware, and the necessary computer code, would be obvious to one skilled in the computer art."). Therefore, Claim 11 does not define patentable subject matter.

[3]  The claimed method involved receiving credit application data from dealers, processing the data to conform to the individual application forms of different banks, forwarding the completed applications to banks selected by the dealer, receiving answers from the banks, and forwarding those answers back to the dealer. 674 F.3d at 1333.

sufficiently limited the claims to an application of an idea. The court disagreed, stating that "[t]he undefined phrase 'computer aided' is no less abstract than the idea of a clearinghouse itself… [s]imply adding a 'computer aided' limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible." 674 F.3d at 1333.

As discussed above, method claims of the '571 Patent and the '214 Patent do not require a specific application nor are they tied to a particular machine. *Cf.* 674 F.3d at 1333-34. Consequently, as in the *Dealertrack* decision, the Plaintiff's description of the claims to as generally involving computer processes, such as forwarding previously compiled information to recipients, does not convert the abstract idea to patentable subject matter under 35 U.S.C. § 101.

Although both patents at issue expressly state that the invention is not limited to the use of computers or electronic means, even if a computer were held to be necessary for the claimed process, "[t]he salient question is not whether the claims are tied to a computer. Rather, as *Bilski* [*I*] makes clear, the question is whether the claims are tied to *a particular machine*."[4]  *CLS Bank Intern.*, 768 F.Supp.2d at 237, *quoting Fuazzysharp Techs., Inc. v. 3D Labs Inc., Ltd*., No. 07-5948, 2009 WL 4899215, at *4 (N.D. Cal.

---

[4]  *See also DealerTrack, Inc. v. Huber*, 657 F.Supp.2d 1152 (C.D. Cal. 2009), *aff'd* 674 F.3d 1315 (Fed. Cir. 2012) (finding that claims directed to a "computer aided method" of managing a credit application to be invalid under § 101). The *DealerTrack* Court noted that in order for a patent to elevate a general purpose computer to a particular machine, the patent must specify how the hardware and database is "specially programmed" to implement the method, and the claimed central process cannot be "nothing more than a general purpose computer that has been programmed in some unspecified manner." *DealerTrack*, 657 F.Supp.2d at 1156; *see also Accenture Global Servs. GmbH v. Guidewire Software, Inc.*, 691 F.Supp.2d 577, 597 (D. Del. 2010) (suggesting that a method conducted by a "data processing system," which also claimed a "claim folder," "display device," and "screen," was not tied to a particular computer per the machine-or-transformation test because the terms failed to "imply a specific computer having any particular programming – they are descriptive of a general computer system at best."); *Digitech Information Systems, supra,* (holding that simply referencing claimed method as a "computer-implemented process" or incorporating terms such as "computer aided" or "software implemented" does not suffice to make the process "tied to" a particular machine.

Dec. 11, 2009) (emphasis in original). The '571 Patent and '214 Patent make clear that the process would only, at most, require a "general purpose computer," which "does not tie the claim to a particular machine or apparatus." *Id.* The '571 Patent clearly does not contemplate the reliance on a specific computer, noting that "[t]he required computer hardware, and the necessary computer code, would be obvious to one skilled in the computer art." (*See* '571 Patent, Col. 5, Ln. 15-17 and '214 Patent, Col. 5, Ln. 40-42.)

Because the claimed process clearly – and *expressly* – is not tied to a particular machine or apparatus, the patents at issue cannot be held to satisfy the "machine" prong of the "machine-or-transformation" test.

(b)  *Transformation*

The '571 Patent and '214 Patent also do not satisfy the "transformation" prong of the test. Under the transformation prong of the machine-or-transformation test, "[a] claimed process is patent-eligible if it transforms an article into a different state or thing" and the transformation is "central to the purpose of the claimed process." *Bilski I*, 545 F.3d at 962. The "transformation" prong of the test contemplates a physical change. For example, processes for chemical or physical transformation of physical objects or substances are patentable. *Id.* at 962-63. In contrast, acts such as **gathering data**, **manipulations of data are not considered transformation,** and making transactions do not constitute transformations. *See Bilski I*, 545 F.3d at 963; *see also CyberSource*, 654 F.3d at 1370 ("The mere manipulation or reorganization of data, however, does not satisfy the transformation prong.") At most, the '571 Patent and '214 Patent involve compiling data and transmitting it to other parties – neither describe a physical transformation sufficient to satisfy the "transformation" prong of the "machine-or-transformation" test.

**(2)    The Patents are not otherwise patentable, and constitute efforts to patent the abstract idea of acting as a clearinghouse of information.**

Because the *Bilski* Court held that the machine-or-transformation test was not dispositive, courts must follow the initial machine-or-transformation inquiry with a determination if, despite not satisfying the test, the claims are otherwise patent-eligible or are an "attempt to patent abstract ideas." *Bilski*, 130 S. Ct. at 2339-30. Although "[t]here is no clear definition of what constitutes an abstract idea,"[5] the *Dealertrack* decision is directly analogous and provides a clear rule that methods directed to the abstract idea of a clearinghouse for information is an abstract idea:

> Dealertrack's claimed process in its simplest form includes three steps: receiving data from one source (step A), selectively forwarding the data (step B, performed according to step D), and forwarding reply data to the first source (step C). **The claim "explain[s] the basic concept" of processing information through a clearinghouse**, just as claim 1 in *Bilski II* "explain[ed] the basic concept of hedging." *See Bilski II*, 130 S.Ct. at 3231. … **Neither Dealertrack nor any other entity is entitled to wholly preempt the clearinghouse concept.**

674 F.3d at 1333.

Like the Dealertrack process, the '571 Patent and '214 Patents are abstract ideas limited only by application in a certain area (i.e., the medical credentialing and malpractice insurance area). The *Dealertrack* Court clearly held that this was not enough to render the process patent-eligible, citing *Bilski II* and *Diehr* (claims not patent eligible though they "limit[ed] an abstract idea to one field of use…").

> The restriction here is precisely the kind of limitation held to be insufficient to confer patent eligibility in *Bilski II*. The notion of using a clearinghouse generally and using a clearinghouse specifically to apply for car loans, like the relationship between hedging and hedging in the energy market in *Bilski II*, is of no consequence without more.

674 F.3d 1315, 1334.

Additionally, pre- and post-*Bilski II* cases offer further guidance as to the nature of abstract ideas. For example, if the steps can be performed by a human using a pen and

---

[5]    *CLS Bank*, 768 F.Supp.2d at 232.

paper, it is an unpatentable mental process. *Cybersource*, 654 F.3d at 1371. An idea may also be abstract although it requires a series of steps to take place in the real world. *Bilski II*, 130 S.Ct. at 3231; *Bilski II*, *supra* (abstract idea connected to real world through tangible means: commodities and money, but insufficient to render abstract concept of hedging patentable); *In re Schrader*, 22 F.3d 290, 291 (Fed. Cir. 1994) (method of bidding at auction requiring "physical effect or result" of "entering of bids in a 'record,'" not sufficient to constitute patentable subject matter).

The *Dealertrack* decision and the other foregoing cases confirm what common sense suggests, that the compilation of data and forwarding it on to other parties is simply not a patentable "business method," but merely an abstract idea. Conceivably, the patents at issue could foreclose any attempt to use previously collected credentialing information as a shortcut to obtaining a medical malpractice insurance quote, even if the information is recopied by pencil and paper and submitted by mail. *See* fn. 2, *supra.* This type of method is simply not patentable under 35 U.S.C. § 101 *et seq.*

## <u>CONCLUSION</u>

While a business method may be patentable, it will not be patentable if it seeks to claim an abstract idea. Because the '571 Patent and '214 Patent are neither tied to a particular machine nor transform an article, they do not satisfy the initial inquiry of the "machine-or-transformation" test. Additionally, the idea of using a clearinghouse of information is an abstract idea, as was confirmed by the *Dealertrack* Court. Accordingly, under the applicable analysis, the claims in the subject patents are not patent eligible under 35 U.S.C. § 101, and the patents are invalid as a result. Consequently, Plaintiff's claims for patent infringement fail as a matter of law, and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

Respectfully submitted,


*s/ John A. Kenney*
John A. Kenney, OBA #4976
Amy D. White, OBA #19255
Jeremiah L. Buettner, OBA #21615
McAfee & Taft A Professional Corporation
10th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK  73102
Telephone:    405-235-9621
Facsimile:      405-235-0439
john.kenney@mcafeetaft.com
amy.white@mcafeetaft.com
jeremiah.buettner@mcafeetaft.com
ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

     I hereby certify that on this 4th day of June, 2012, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

          Kenneth T McConkey
          Klingenberg & Associates PC
          330 NW 13th St
          Oklahoma City, OK 73103

          Nathan B Webb
          Emerson Thomson Bennett
          1914 Akron-Peninsula Rd
          Akron, OH 44313

          */s/ John A. Kenney*

(N.D. Ohio 2010)(Unpublished; Exhibit A). Furthermore, when analyzing a patent to determine whether it is directed to an abstract idea, as Defendants allege, "this disqualifying characteristic should exhibit itself so manifestly as to override the broad statutory categories of eligible subject matters." *Research Corp. Technologies, Inc. v. Microsoft Corp.*, 627 F.3d 859, 868 (Fed. Cir. 2010).

B. **It Would Be Inappropriate for the Court to Address Disputed Claim Construction Issues in a 12(b)(6) Motion**

Claim construction "is an important first step in a § 101 analysis." *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008) *aff'd on other grounds*, 130 S.Ct. 3218 (2010). In construing patent claims, courts should consider the intrinsic evidence, including the patent's claims, the specification, and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303,1312-17 (Fed. Cir. 2005). The prosecution history provides evidence of how the USPTO and the inventor understood the patent. *Id.* at 1317. Courts may also consider extrinsic evidence, such as dictionaries, treatises, and expert testimony, to understand the field of the invention and to help determine what a person of ordinary skill in the art would understand the claim terms to mean. *Id.* at 1317-19. In the end analysis, the Court must heed the "basic tenant of patent law that patent claims should be interpreted, if possible, in a manner that will preserve the validity of the claims."*1 Annotated Patent Digest § 7:23*; *citing Generation II Orthotics Inc. v. Medical Technology Inc.*, 263 F.3d 1356, 1365 (Fed. Cir. 2001).

In a rule 12(b)(6) motion, however, the inquiry is limited to "reviewing the sufficiency of the complaint alone." *Gilchrist v. Citty*, 71 Fed. Appx. 1, 3 (10th Cir. 2003).

Thus, unless they were included with the complaint, neither the patent's prosecution history nor extrinsic evidence are available for the Court to consider in making any claim constructions necessary to decide the motion to dismiss.

Furthermore, although claim construction is a matter of law, disputed issues of claim construction are not suitable for resolution on a motion to dismiss, and a motion to dismiss that would require claim terms to be construed should be denied. *Deston Therapeutics, LLC v. Trigen Labs, Inc.*, 723 F.Supp.2d 665, 670 (D. Del. 2010) *citing, e.g., In re Bill of Lading Transmission and Processing System Patent Litigation*, 695 F.Supp.2d 680, 684 (S.D. Ohio 2010)(declining to address claim construction issues in a Rule 12 context); *Tech. Patents, LLC v. Deutsche Telekom AG*, 573 F.Supp.2d 903, 920 (D. Md. 2008)(refusing to resolve disputed claim construction issues without the parties having been afforded a proper opportunity to assert claim interpretations in a coherent and complete fashion). Indeed, this Court cannot even fully determine the appropriate burden of proof without review of the Patent '571 and '214 prosecution histories; a "patent challenger's burden to prove invalidity by clear and convincing evidence is *especially heavy* when the patent examiner considered the asserted basis for invalidity during patent prosecution." *Progressive*, 2010 WL 4698676 at 5 (Emphasis added), *citing Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990).

## III.  **ARGUMENT**

A proper patentability analysis confirms that the claims contained in Patents '571 and '214 satisfy 35 U.S.C. § 101, and that Defendants' motion to dismiss should be

"The machine-or-transformation test is a two-branched inquiry; an applicant may show that a process claim satisfies § 101 either by showing that his claim is tied to a particular machine, or by showing that his claim transforms an article." *In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008). In this case, the central purpose of both patents is to transform information derived from a credentialing application, or updated credentialing application, into a medical malpractice insurance application. Additionally, Defendants have failed to provide clear and convincing evidence that the patents failed to sufficiently disclose and claim mechanical devices that perform the patented process. Thus, the machine-or-transformation test is satisfied and Defendants' motion to dismiss must be denied.

1. The Machine Test

Defendants' invalidity arguments are fundamentally flawed in repeatedly asserting that—because the patent specification broadly discloses that the process can be accomplished without the use of computers—the patent's claims are not sufficiently tied to a particular machine and, therefore, fail the machine-or-transformation test.[2] (*See* Defs.' Br. at 2, 4, 6, 7). These arguments demonstrate a basic misunderstanding of even rudimentary patent law principles: namely, the important differences between a patent's specification (aka, the "written description") and its claims (the numbered paragraphs

---

[2] Defendants' analysis of the machine test fails to even acknowledge the specific patent claim terms at issue ("electronically forwarding"; "electronically transferring"; and "computer network"), nor does it provide any construction of what these claim terms are to be interpreted to mean; instead, Defendants' arguments merely posit that the claims fail to disclose a sufficiently specific machine; how Defendants arrived at this conclusion without construing what the claim language means is difficult to determine.

located at the end of the patent).

A patent's specification "shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112. Under well-settled law, however, "**it is the claims, not the written description, which define the scope of the patent right**." *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998)(Emphasis added). It is a fundamental principle of patent law that the specification may not be used to alter the scope of a claim to make it broader by deleting claim limitations expressed in the words of the claim. *Continental Paper Bag Co. v. Eastern paper Bag Co.*, 28 S. Ct. 748, 751 (1908); *accord, Cimiotti Unhairing Co. v. American Fur Refining Co.*, 25 S. Ct. 697, 702 (1905). It is entirely proper to use the specification to interpret what a patentee means by a word or phrase found in the claims, but this is not to be confused with adding everything about the invention described in the specification into the claims. *See U.S. v. Adams*, 86 S. Ct. 708, 713; *Laitram*, 163 F.3d at 1347. Thus, Defendants' focus on statements contained only in the specification is improper, and effectively attempts to delete claim limitations directed to the mechanical aspects of the claimed processes in arguing that the patent claims do not satisfy the machine-or-transformation test.

When the focus of the § 101 analysis is properly directed at the claim elements, it is clear that both patent '571 and '214 recite components sufficient to meet the machine test. Each of the independent claims contained in patent '571, and thus each of its

dependent claims, contain specific limitations requiring "electronically forwarding" and/or "electronically transferring" information from a credentialing application to a medical malpractice insurance participant or application. (Patent '571, 6: 31, 34, 46, 58; 7: 7, 10; 8: 13, 19, 44). Furthermore, in interpreting the meaning of "electronically forwarding" and "electronically transferring" it is proper to look to the specification, which explains that among the credentialing information to be transferred is data contained in specific web-based credentialing databases, that the entire process can be automated, that in one embodiment "the inventive process occurs automatically via electronic transmission and computer data manipulation," and that computers create the medical malpractice applications generated a result of the process. (Patent '571, 2: 1-9, 65-66; 4: 2-3; 5: 13-15). Patent '214 is a continuation-in-part of Patent '571, and as a consequence contains all of the written description contained in Patent '571 plus additional disclosure specifying that the "entire process can take place via a global computer network"; the limitation of a "computer network" is also found in Claim 1. (Patent '214, 7: 12-13; Claim 1).

Thus, the claimed processes include limitations that meaningfully limit the claim scope to only those credentialing and medical malpractice collaborations that utilize electronic forwarding and transferring (Patent '571) and a computer network (Patent '214). Contrary to the Defendants' contention that "the patents at issue could conceivably foreclose any attempts to use previously collected credentialing information as a shortcut to obtaining a medical malpractice insurance quote, *even if the information is recopied by a pencil and paper and submitted by mail*," it is plainly obvious that all of the relevant

patent claims require an *electronic* forwarding or transfer of information (Patent '571) and a global computer network (Patent '214). (Defs.' Br. at 9)(Emphasis added).

"Inventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act." *Research Corp.*, 627 F.3d at 869. Patents '571 and '214 explicitly teach that internet based credentialing technologies exist, that credentialing information is linked via the Federal Credentialing Program, but that the present invention provides processes, and apparatuses (Claim 11), that overcome difficulties inherent in known technologies by efficiently linking credentialing information with a medical malpractice insurance application. (Patent '571 and '214, 2: 1-23).

The patent's written description need not detail the particular instrumentalities— whether mechanical or software based—necessary for each step of the process:

> That a process may be patentable, irrespective of the particular form of the instrumentalities used, cannot be disputed. If one of the steps of a process be that a certain substance is reduced to a powder, it may not be at all material what instrument or machinery is used to effect that object, whether a hammer, a pestle and mortar, or a mill.

*Gottschalk v. Benson*, 93 S. Ct. 253, 256 (1972). Similarly, the software programming necessary to effectuate the various process steps—in particular the electronic transferring of credentialing information to a medical malpractice insurance application—essentially "creates a new machine, because a general purpose computer in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software." *In re Alapat*, 33 F.3d 1526, 1545 (Fed. Cir. 1994).

Therefore, Defendants' misconstrue the language contained in the specification

which states "the required computer hardware, and necessary computer code, would be obvious to one of skill in the art" (Patent '571, 5: 15-17); the intricate and complex programming code necessary to effectuate the "transferring" of information from one format (credentialing application) to another (a medical malpractice insurance application) does not need to be listed with each corresponding bit of source code; and computers capable of running the programming code, which were admittedly in existence, need not be named by manufacturer and model number.

But even if this Court concludes that the process claims fall short of meeting the machine test, there can be no doubt that Claim 11 of Patent '571 meets the machine test, as it discloses a machine; specifically, "an *apparatus* for linking credentialing information with a medical malpractice insurance application." Defendants assert that this claim is not directed to statutory subject matter since the sum of necessary hardware was admitted to be obvious to one of skill in the art (Defs.' Br. at Fn. 2). Once again, however, Defendants argument misses the mark: "[m]odern inventions very often consist merely of a new combination of old elements or devices, where nothing is or can be claimed except the new combination." *Parks v. Booth*, 102 U.S. 96, 102 (1880); *accord, Clearstream Wastewater Systems, Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1445 (Fed. Cir. 2000)("Combination claims can consist of new combinations of old elements or combinations of new and old elements… it is well established in patent law that a claim may consist of all old elements, … for it may be that the combinations of the old elements is novel and patentable."). Thus, while the individual hardware may have been obvious to persons of skill in the art, the novel combination of these parts was a

patentable apparatus that satisfies the machine test and § 101.

As a result, Plaintiff contends that all of the claims contained in Patents '571 and '214 are valid; or, *at least*, the apparatus Claim 11 of Patent '571 meets the machine test. In short, Defendants' arguments are premised on a patently improper deletion of claim terms reciting electronic machinery, and have failed to provide the requisite clear and convincing evidence that the machine test has not been met.

2. The Transformation Test

A claimed patent process "is patent-eligible if it transforms an article into a different state or thing…[t]his transformation must be central to the purpose of the claimed process." *Bilski*, 545 F.3d at 962. In this instance, the patent abstract—which defines the invention in its most basic terms—states that "[a]n inventive process is disclosed for linking credentialing information with a medical malpractice insurance application…[t]he credentialing information is automatically transferred from the credentialing questionnaire to an insurance application, and this credentialing information is then used to generate a medical malpractice insurance policy." (Patent '571, Abstract). Patent '214 is directed at a similar process. Because the central purpose of the patents is to transform a medical healthcare professional's credentialing application into an application for medical malpractice insurance, the transformation test is also met.

Contrary to Defendants' incorrect contention, without citation to authority, that transformation "contemplates a physical change," this legal analysis is much more nuanced than suggested. (Defs.' Br. at 7). As the Federal Circuit recognized in *Bilski*:

"the main aspect of the transformation test that requires clarification here is

what sorts of things constitute 'articles' such that their transformation is sufficient to impart eligibility under § 101?... [i]t is virtually self-evident that a process for a chemical or physical transformation of physical objects is patent–eligible subject matter…[t]he raw materials of many information-age processes, however, are electronic signals and electronically manipulated data….which, if any, of these processes qualify as transformation or reduction of an article into a different state or thing constituting patent-eligible subject matter?"

*Bilski*, 545 F.3d at 962. In answering this question, the *Bilski* court favorably cited to *In re Abele*, 684 F.2d 902 (CCPA 1982) in observing that the transformation of some raw data can meet the transformation test. *Id.* In *Abele*, the Court concluded that a broad claim reciting a process of graphically displaying variances of data from average values was not patentable because the claim did not specify any particular type or nature of data, nor did it specify how or from where the data was obtained or what the data represented; in contrast, a more narrow claim, specifying the details of the data, was deemed a patentable transformation of raw data into a visual depiction of an object on a display. *Id.* In finding the claim patent-eligible, the Court noted that the electronic transformation of the data itself was sufficient "without any transformation of the underlying physical object that the data represented." *Id.* [3]

Patents '571 and '214 both have a transformative central purpose: to take a credentialing application and transform the data in a fashion that eventually produces a

---

[3] The *Bilski* transformation test framework has subsequently been applied in concluding that a patented process and system for "taking raw information and putting it into a format which enables people who are knowledgeable or skilled in a particular area to interact" met the transformation test because it created the ability for computer users to interact in real-time communications. *VS Technologies, LLC v. Twitter, Inc.*, 2011 WL 4744911, at 6. (E.D. Va. 2011)(Unpublished; Exhibit B).

■

medical malpractice insurance application. And a review of the USPTO's July 27, 2010

*Interim Guidelines for Determining Subject Matter Eligibility for Process Claims in View*

*of Bilski v. Kappos*, Federal Register, Vol. 75, No. 143, at 43925 ("Interim

Guidance")(Ex. C) further supports the conclusion that Patents '571 and '214 meet the

transformation test. According to the Interim Guidelines, where an Examiner is reviewing

a patent application where a transformation may occur, the following factors are relevant:

> 1) the particularity or generality of the transformation. A more particular transformation weighs in favor of transformation; 2) the degree to which the recited article is particular; *i.e.* can be specifically identified (not any and all articles). A transformation applied to a generically recited article would weigh against eligibility; [and] 3) the nature of the transformation in terms of the type or extent of change in a state or thing, for instance **by having a different function or use, which would weigh towards eligibility**, compared to merely having a different location.

(Interim Guidelines, at 43925(Emphasis added)).

Applying the Interim Guidelines to the patents at issue, it's clear that—as in

*Abele*—the claims do indicate the specific type of data (credentialing information), where

the data was obtained from (credentialing questionnaire), and the specific nature of the

transformation—a transformation which crucially transforms the credentialing

information for a different function or use.[4] Because the central purpose of the claims is

to transform data from one intended use to another intended use, and because the claims

and specification clearly describe with particularity the source of such data, the relevant

claims meet the transformation test.

---

[4] Similarly, Patent '214 transforms the intended use of specific information related to credentialing incidents into information relevant for medical malpractice insurance underwriting.

**B. The Patent '571 and '214 Claims Are Not Directed to Laws of Nature, Natural Phenomena, or Abstract Ideas**

The '571 patent claims novel processes, and apparatuses, for linking a healthcare professional's credentialing information with a medical malpractice insurance application. The '214 patent claims a novel method for ensuring that the most currently available information is used in liability insurance underwriting by using updated credentialing information. These claimed methods and apparatuses are not abstract ideas, and Defendants have not alleged that these claims improperly recite laws of nature of natural phenomena. In fact, these claimed methods *assume* the presence of electronics; otherwise, the claim elements requiring "electronically forwarding" and "electronically transferring" (Patent '571, all claims), and "computer network" (Patent '214, Claim 1), are rendered meaningless.

Defendants rely heavily on *Dealertrack v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012), contending that the case addresses patents "remarkably similar" to the ones at issue in the present case, but the following analysis suggests otherwise. (Defs.' Br. at 1). *Dealertrack* summarized the relevant patent claims as including three steps--receiving data from one source (step A), selectively forwarding the data (step B), and forwarding reply data to the first source (step C)—which it described as "processing information through a clearinghouse[5]," a basic concept which no party is entitled to preempt. *Dealertrack*, 674

---

[5] The term "clearinghouse" does not appear in either of the patents at issue in this case. Plaintiff's vigorously deny that the relevant patent claims amount to a clearinghouse, and that such a claim construction can only be arrived at upon a more formal claim construction process than afforded by the present opposition memorandum (see Issue C).

F.3d at 1333. Importantly, unlike in the present case, the *Dealertrack* attorneys did not

argue that the claims effected a transformation, and as a result only the machine test was

applied. *Id.* at 1332. The *Dealertrack* case, therefore, is much different from Patents '571

and '214, which actually effectuate a transformation of information for a different

intended function or purpose; the *Dealertrack* patents did not change the fundamental

nature of the information, which remained, at both the inception and conclusion of the

process, only a credit application. Moreover, in applying the machine test, the Court

concluded that language in the patent claims preamble (which, in patent law, are

generally not considered a part of the actual patent claim)—which recited that the process

was "computer aided"—did not meet the machine test because the specification did not

detail how the process was aided by the computer. *Id.*, at 1333. Once all language reciting

machines was removed, and in the absence of a transformation argument, the Court

concluded the claims were unpatentable abstract ideas. *Id.*, at 1334.

Defendants also cite to *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d

1366, 1371 (Fed. Cir. 2011) for the proposition that a process is unpatentable when it can

be performed by a human using only a pen and paper. However, courts have admonished

that the eligibility exclusion for purely mental steps is particularly narrow, and that

claims must be considered as a whole; the mere presence of mental steps in a claim does

not detract from the patentability of other steps. *Island Intellectual Property LLC v.

Deutsche Bank AG*, 2012 WL 386282, at 8 (S.D.N.Y Feb. 6, 2012). Ignoring process

steps requiring the use of computers is improper:

> While it is theoretically possible that the claimed calculations could be

completed in a hypothetical person's head—albeit very inefficiently…there is a distinction between 'more quickly' and 'only way practical'…in the instant action, the time involved in performing the claimed invention by hand would mean in reality that such an invention would "never see the light of day;" it would be useless. It cannot be—and, in fact, would be explicitly contrary to *cybersource* [sic]—that a machine which plays a significant part in permitting a method actually to be performed can be disregarded for the purposes of patent eligibility.

*Id.*

In short, Defendants' positions on the allegedly abstract nature of the relevant patent claims once again ignore the plain language of the claims—which require electronic forwarding and transferring of information, and the use of a computer network, so that credentialing information can be transformed into a medical malpractice insurance application. And even assuming the basic premise of the relevant patents is an abstract idea, which Plaintiff disputes, "the application of an abstract idea to a 'new and useful end' is the type of invention that the Supreme Court has described as deserving of patent protection." *Gottschalk v. Benson*, 93 S. Ct. 253, 255 (1972). Under the very narrow exception to eligible patent matter carved out for abstract ideas, and the requirement that to invalidate a patent claim under § 101 the disqualifying characteristic must be manifestly apparent, the Defendants' have failed to provide clear and convincing evidence requiring invalidation of the '571 and '214 patents.

## C. It Would Be Premature to Grant Defendants' Motion to Dismiss

Unlike the claims in *Bilski*, which were on appeal from an original rejection at the USPTO, the issued claims of patents '571 and '214 are presumed to be valid. In granting the '571 and '214 patents, the USPTO is presumed to have concluded correctly that the

credentialing process required by such entities requiring such verification, such as the entities that pay for medical services (i.e., health insurance plans).  (*See generally,* Compl., Dkt. 1; *see also* Ex. 1, Decl. of A. Feist, at P. 3.)  Plaintiff and Defendants also engage in providing services to clients relating to the acquisition of medical malpractice insurance.  (*Id.* at P. 10.)

(2)     On April 2, 2012, Plaintiff filed the instant lawsuit against Defendants, alleging infringement of two business method patents: (a) United States Letters Patent 6,862,571 (the "'571 Patent"), entitled "Credentialier/Medical Malpractice Insurance Collaboration," and (b) United States Letters Patent 7,469,214 (the "'214 Patent"), entitled Method of Medical Malpractice and Insurance Collaboration (collectively, the "Patents").  (*See* Compl., Dkt. No. 1.)  The Patents define a process for collecting and sharing medical provider information between medical malpractice insurance databases and physician credentialing databases.  The '214 Patent, a continuation-in-part of the '571 Patent, claims a method for ensuring that the databases are current.  Essentially, the preferred embodiment utilizes a computer system as a clearinghouse, transferring the information to a credentialing institution and generating an application for medical malpractice.  (Compl., ¶¶ 28-29.)

(3)     On June 4, 2012, Defendants filed a Motion to Dismiss, arguing that the business methods described in the Patents comprised unpatentable subject matter, as illustrated by case law issued after the Patents were issued.  (Motion to Dismiss, Dkt. No. 18.)  In addition, on October 4, 2012, Defendants provided voluntarily and without a discovery request two declarations from Defendants' employees that perform the

credentialing and medical malpractice insurance services, averring that Defendants do not use the business method outlined in the Patents, but rather manually select and include client information for a solicitation of a medical malpractice bid (the "Declarations"). (*See* Ex. 1; Ex. 2, Declaration of Jim Mays.)

(4)     Other than the submission of the two Declarations by Defendants, no discovery has been conducted by either side in the nearly eight months since filing this case.

(5)     On November 28, 2012, Defendants' counsel received a Notice of Subpoena from Plaintiff's counsel.   (Ex. 3, Notice of Subpoena.)   The Notice of Subpoena lists twenty (20) entities that Defendants either have served or are planning on serving (upon request, Plaintiff's counsel refused to advise Defendants' counsel as to the status of service; however, Defendants believe at least some of the subpoenas have been served).   The Notice also does not contain information such as the date ordered for response to the Subpoenas, and Plaintiff's counsel has likewise refused to provide Defendants' counsel with copies of the Subpoenas.   (Ex. 4, 11/28/12 E-mail from N. Webb.)

(6)     Of the twenty (20) recipients of the Subpoenas, twelve (12) are Defendants' clients, and two (2) comprise other entities with current or potential professional relationships with Defendant.[1]   The subpoenas come directly before December, which is an exceptionally busy time for Defendants' clients, who are typically on a calendar year

---

[1]     The other six recipients comprise competitors, former employees, the Oklahoma Insurance Department, and two entities seemingly unrelated to this case.

18.     In completing a medical malpractice insurance application, I rarely utilize or refer to the information contained in the Primoris Database, for the same reasons set forth above. Occasionally, I will refer to the Primoris Database for basic demographic information. In retrieving this information, I recopy this information to the application manually.

19.     While Fifth Avenue does have the capability for using information from the Primoris Database to partially prepopulate a portion of certain carriers' applications (typically demographic information such as name, date of birth, social security number, and addresses), we do not do so. The reason for this is that the questions are often formatted slightly differently, and the software can bring the information in incorrectly. At a minimum, it would require a close review to ensure the information is correctly transposed. As a result, I forego this process in favor of manual data entry.

20.     Even if functional, the automatic population of certain fields on a medical malpractice insurance application would provide only a small portion of the information necessary for the whole application. The application has numerous fields that simply cannot be completed using the Primoris Database information.

21.     Once I complete an application, I will submit it to the insurance carrier. For some carriers, such as Medical Protective, complete an online application and submit the information directly via their website. For other carriers, such as ProAssurance or PLICO, I will scan and e-mail the application to a contact within the carrier. If additional documents are required, I will scan and e-mail those documents as well.

22.     Once the medical malpractice insurance carrier receives and reviews the completed application, it will notify me directly and provide me with a bindable quote. If it is acceptable to the client, I will bind the coverage.

23.     In accordance with the above paragraphs, the following is a list of items that neither Primoris nor Fifth Avenue perform. Primoris and Fifth Avenue **do not:**

    a.  Provide a questionnaire to a medical provider for use in compiling credentialing information, including a release from the medical provider to give the credentialing information to a medical malpractice insurance participant;

    b.  Electronically forward information contained on a credentialing questionnaire to an associated credentialing agency (Primoris will either review, verify and approve credentialing information itself (i.e., for Delegated Plans) or forward to the health insurance plan (i.e., for Nondelegated Plans));

    c.  Electronically forward a credentialing questionnaire from credentialing entity to a medical malpractice insurance participant;

8.     It may take up to thirty (30) to sixty (60) days to receive the insurance quote from the medical malpractice insurer. I will receive the quote via e-mail from the insurer based on classifications, retro dates, and other rate-generating specifics data. I will take this information and create a document for the client, which I will either send by e-mail or hand deliver to the client in a face to face meeting.

9.     Fifth Avenue follows a similar procedure for clients that are not in the Primoris Database. The impact of not having the Primoris Database as a resource for information is minimal.

## Completing a Medical Malpractice Insurance Application

10.     After receiving the medical malpractice insurance quote from Fifth Avenue, a client will either elect to either proceed with a full application or not. If the client elects to proceed, I will take the information that I have available, and I will pre-populate an application to the extent I can with the information I have available. There is no standardized application used for all medical malpractice insurance carriers; each is formatted differently and many require different information. The pre-populated application will then be forwarded for completion and signature by the insured.

11.     Pre-populating a medical malpractice insurance application is not an automated process, and involves physical pre-populating the form either by hand, or on a computer, depending on the insurance carrier. I may contact the client to obtain any additional information required or forward the pre-populated application to the client for completion and signature.

12.     While Fifth Avenue does have the capability for using information from the Primoris Database to pre-populate a portion of certain carriers' applications (typically demographic information such as name, date of birth, social security number, and addresses), we do not do so. The reason is that the questions are often formatted slightly different, and the software can map the information incorrectly. At a minimum, it would require a close review to ensure the information is correctly transferred to the application. As a result, I forego this process in favor of a more manual process.

13.     Even if functional, the automatic pre-population of certain fields on a medical malpractice insurance application would provide only a small portion of the information necessary for the complete application. The application has numerous fields that simply cannot be completed using the Primoris Database information.

14.     Once I have a complete application signed by the applicant, I will submit it to the insurance carrier. For some carriers, such as Medical Protective, I would complete an online application and submit the information directly via their website. For other carriers, such as ProAssurance or PLICO, I will scan and e-mail the application to a contact with the carrier. If additional documents are required, I will scan and e-mail those documents as well.

## CERTIFICATE OF SERVICE

I hereby certify that on **May 31, 2013,** a copy of the foregoing Joint Appendix was filed electronically using the Court's CM/ECF system. Notice of this filing will be sent by operation of the Court's CM/ECF to all parties indicated on the electronic filing receipt, including John A. Kenney and Amy D. White at the following addresses:

john.kenney@mcafeetaft.com

amy.white@mcafeetaft.com

/s/ Nathan B. Webb
Nathan B. Webb (#0084506)
*Attorney for Appellant, Sinclair-Allison, Inc.*